UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Unsealed 4/24/09 

CASE NO. 08-20385-CV-GRAHAM/TORRES

~~Sealed~~

WILLIAM APPEL, ROY WIIK and
ANNE WIIK, his wife, LESLIE ALLOCCO,
FLORENCE KRUSE, and LINDA DAWSON,

     Plaintiffs,

v.

LIBERTY AMERICAN INSURANCE
COMPANY, a Florida corporation;

LIBERTY AMERICAN INSURANCE
GROUP, INC., a Delaware corporation,

MOBILE HOMEOWNERS' INSURANCE
AGENCIES, INC., a Florida corporation,
*now known as* LIBERTY AMERICAN
INSURANCE SERVICES, INC.,

MOBILE USA INSURANCE
COMPANY, a Florida corporation,
*now known as* LIBERTYAMERICAN
SELECT INSURANCE COMPANY, and,

PHILADELPHIA CONSOLIDATED
HOLDING CORPORATION, a
foreign corporation,

     Defendants.

_____/

FILED by ___ D.C.

DEC 23 2008

STEVEN M. LARIMORE
CLERK U S DIST CT
S. D. of FLA. – MIAMI

## **FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR TRIAL BY JURY**

Plaintiffs, WILLIAM APPEL, ROY WIIK and ANNE WIIK, his wife, LESLIE

ALLOCCO, FLORENCE KRUSE, and LINDA DAWSON ("Plaintiffs" collectively) by and

through their undersigned counsel, bring this action in their individual capacities and on behalf

of the class of persons similarly situated as defined below, and for their First Amended



Complaint allege, pursuant to their own knowledge, or where there is no personal knowledge, upon the investigation of counsel and/or upon information and belief, to wit:

## **INTRODUCTION**

1.     This action seeks declaratory relief, equitable relief, and money damages as the result of a common course of conduct of unconscionable business practices, deception, misrepresentation, and exploitation by Defendants LIBERTY AMERICAN INSURANCE COMPANY ("LAIC"), LIBERTY AMERICAN INSURANCE GROUP, INC. ("LAIG"), MOBILE HOMEOWNERS' INSURANCE AGENCIES, INC., *now known as* LIBERTY AMERICAN INSURANCE SERVICES, INC., ("LAIS"), MOBILE USA INSURANCE COMPANY, *now known as* LIBERTY AMERICAN SELECT INSURANCE COMPANY ("LASIC") (the "LIBERTY AMERICAN  Defendants" collectively) and PHILADELPHIA CONSOLIDATED  HOLDING  CORPORATION ("PCHC") that   victimized thousands of Florida's most vulnerable, venerable, and most cherished citizens, its elderly.

2.     The LIBERTY AMERICAN Defendants and PCHC (collectively "Defendants"), constitute a highly sophisticated, integrated and interrelated insurance enterprise. Commencing at least as early as September 1, 2003 through and including December 31, 2006, Defendants implemented routine business policies and procedures targeting Florida senior citizen mobile homeowners. Defendants intentionally sold Florida elderly mobile homeowners insurance policies when Defendants (1) failed to evaluate the actual and replacement value of the insured mobile homes; (2) failed to maintain adequate underwriting procedures; (3) imposed arbitrary policy limits on their mobile homeowners' policies; and (4) failed to adequately disclose the policy limits they imposed.  Defendants knowingly and routinely undervalued and underinsured

the mobile homes of their elderly policyholders, including Plaintiffs and Class Members, which left them at great risk in the case of catastrophic losses.

3.      Indeed, during the course of their business, Defendants sold Plaintiffs and Class Members mobile homeowners insurance coverage when Defendants' senior officers and managers knew that there were intended ambiguities between the typewritten language contained on the Declaration Page of the insurance policy and the language contained in the body of the printed insurance policy.

4.      In a separate printed Section of the standard "Declarations Page" entitled "Additional Coverages" Defendants provided to Plaintiffs and Class Members, "Replacement Cost Mobile Home" coverage that was typed in as additional coverage. Defendants uniformly represented that additional insurance coverage that Defendants sold to Plaintiffs and Class Members would provide additional "replacement cost" coverage for mobile home damage.  The ordinary meaning of "replacement cost" coverage is the amount needed to replace or repair damaged property with materials of similar kind and quality, without deducting for depreciation. In direct contradiction to this meaning, buried in the policy under a pre-printed "Loss Settlement" provision is language purporting to restrict coverage to stated policy limits. As a matter of course, Defendants knew that the policy limits were far less than replacement costs.

5.      After Plaintiffs and Class Members made insurance claims because their mobile homes had suffered catastrophic windstorm damage due to hurricanes, Defendants took advantage of the ambiguity between Defendants' typewritten Declaration Page and the printed Loss Settlement provision and did nothing to correct it, because paying out claims on a replacement cost basis would have cut into Defendants' profit margins.  Instead of complying with the coverages provided on the Declarations Page and paying for replacement cost coverage,

3

Defendants paid on a "policy limits' basis resulting in the payment of Plaintiffs' and Class Members' claims at only a fraction of what Plaintiffs and Class Members needed in order to repair or replace their significantly damaged mobile homes. Defendants routinely caused Plaintiffs and Class Members monetary injury because of Defendants' failure to provide the replacement cost coverage purchased by the Plaintiffs and Class.

      6.     Accordingly, on behalf of themselves and similarly situated Class Members, Plaintiffs seek a declaration that they and other Class Members are entitled to "additional coverages" including "replacement cost mobile home" as the term is commonly understood and as provided by the Declarations Page of the insurance policy. Further, Plaintiffs seek damages and restitution as a result of Defendants' breach of the Plaintiffs' and Class Members' insurance policies and/or Defendants' unjust enrichment, and seek a Court order to prohibit Defendants from conducting the unlawful business practices set out below.

## NATURE OF CASE

      7.     Plaintiffs' claims arise out of Defendants' common course of conduct which caused similar injury to Plaintiffs and Class Members to whom Defendants sold "Manufactured Homeowners Insurance" policies.

      8.     All of Defendants' policyholders have the same rights and Defendants have the same obligations under the terms of the standard form policy which is attached as Exhibit "A."

      9.     Defendants have written and are writing personal lines insurance in Florida for mobile homeowners. The submissions made by Defendants to the Florida Office of Insurance Regulation, Department of Financial Services, state that Defendants provide mobile home insurance coverage for senior citizens who live in mobile homes in Florida. The majority of the mobile homes they insure are located in adult mobile home communities.

4

10.     The wrongful business practices, as more fully described below, involve, *inter alia,* the knowing, willful practice of Defendants' senior management in selling mobile homeowners insurance coverage to unsuspecting Florida senior citizens that the Defendants did not intend to pay at the time of their insureds' losses.

*Defendants' Standard Insurance Policy*

11.     The standard Florida Manufactured Homeowners Insurance Policies that are the subject of this case are generic standard forms identified on each page by the code "HO-3 Ed. 4-84." Defendants submitted this standard form policy to the Florida Office of Insurance Regulation for approval on or about September 2003. Upon information and belief, however, Defendants used the submitted insurance policy form before this time and are still using it.

12.     Defendants' insurance policies have regularly contained a two (2) page "Declarations Page" in addition to the multi-page Florida Mobile Homeowners Policy identified as HO-3 Ed. 4-84. (See Exhibit "B"). The "Declarations Page" *and* the HO-3 Ed. 4-84 form comprise the policy sold to Plaintiffs and Class Members. Unlike the HO-3 Ed. 4-84 insurance policy form Defendants submitted for approval to the State of Florida, the Declarations Page Defendants submitted for approval was a blank template Defendants designed and which Defendants had <u>not</u> filled in with the typewritten replacement cost provision.

13.     The standard Declarations Page Defendants provided to Plaintiffs and Class Members on its face, in bold typewritten language, under the separate section heading "Additional Coverages" includes the following:

**Additional Coverages**      **REPLACEMENT COST MOBILE HOME**      **INCL**
                              **REPLACEMENT PERSONAL EFFECTS**       **INCL**
                              **$500 NON HURR DEDUCTIBLE**           **INCL**

(Please Note: On Exhibit "B" attached hereto, emphasis has been added to said language for identification purposes involving this case.)

5

14. The body of the HO-3 Ed. 4-84 of the insurance policy describes 1) Policy Coverages; 2) Liability; 3) Exclusions; and 4) General Policy Conditions. (See Exhibit "A")

15. The policy by its very terms also states to insureds that mobile homeowners' policies are designed to provide coverage for the insured's mobile home, other structures on the premises, personal belongings, loss of use of the mobile home, personal liability and medical payments to others. Page 1 of said policy under the heading "Policy Coverages" provides in pertinent part:

> **POLICY COVERAGES**
>
> "Please refer to your policy Declarations for the coverage limit applicable to each policy coverage...
>
> *The Declarations will indicate if you have any optional coverage, which may not be included in this outline......*

(See Exhibit "A") (emphasis added)

16. Throughout the HO-3 Ed. 4-84 policy, the "definitions" sections are woefully inadequate, fail to define essential coverage terms, and fail to define "replacement costs." Upon information and belief, Defendants never provided Plaintiffs and Class Members any endorsement which explained the "Replacement Costs" coverage stated on the Declarations Page.

### *Defendants' Wrongful Business Practices*

17. During the course of their business, Defendants have utilized the services of their employees, an in-house insurance agency which was or is their largest single agent, and independent insurance agents to sell their mobile home insurance products in a uniform manner to Florida mobile homeowners.

18.     Commencing at least as early as September 1, 2003 through December 21, 2006, Defendants instructed their employees and independent insurance agents to sell said insurance policies as "replacement cost" policies without any limits on replacement cost due to windstorm loss. As a result, Defendants sold to consumers and wrote insurance policies whose Declarations Pages advised that the insurance coverage afforded included "replacement cost" as the method of payment for a mobile home property damage claim due to windstorm loss.

19.     In truth and in fact, Defendants employed wrongful business practices in Florida by, *inter alia*, knowingly selling to unsuspecting senior citizens insurance products representing that the insurance coverage afforded was for "replacement costs" in the event that the insured suffered a property damage windstorm loss when Defendants knew that the claims would not be adjusted on that basis.

20.     At all times material hereto, Defendants insured more than One Hundred Thousand (100,000) Florida mobile homeowners per year, which provided mobile homeowners insurance coverage described above.

21.     In 2004, Florida was hit with at least four hurricanes: Charley, Frances, Ivan and Jeanne. In 2005, Florida was hit again by several hurricanes and at least one tropical storm: Hurricanes Wilma, Katrina, Rita and Dennis, and tropical storm Tammy. The result of these storms on many Florida mobile home owners, including Plaintiffs and Class Members, was devastating. These storms caused them losses for which they desperately needed to replace their mobile homes entirely or replace a significant portion of their homes.

22.     At least as early as September 1, 2003 and through and including December 31, 2006, Plaintiffs and Class Members sustained property damages due to windstorm and timely submitted insurance claims to Defendants as a result of hurricane windstorm damage that they

7

sustained.    Defendants, however, routinely denied or paid only a portion of Plaintiffs' and Class Members' claims due to hurricane windstorm damage as well as other bona fide claims made during the applicable period of time. Post hurricane, Plaintiffs suffered significant frustration and economic loss of being underpaid by Defendants for bona fide damage claims.    This litigation ensued.

**JURISDICTION AND VENUE**

23.    This Court has subject matter jurisdiction of the claims asserted herein pursuant to 28 U.S.C. § 2201, and 28 U.S.C. § 1332(d)(2)(A) as the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which members of the class of plaintiffs are citizens of states different from at least one Defendant.

24.    This Court has jurisdiction over Defendant PHILADELPHIA CONSOLIDATED HOLDING CORPORATION ("PCHC") because, *inter alia*:

    a.   PCHC has established, maintained and operated its Personal Lines Division in Florida and at least one of its Commercial Lines offices in Florida;

    b.   PCHC has leased real property in Altamonte Springs, Florida;

    c.   PCHC has held itself out as having regional offices in Florida and as a company which designs, markets and underwrites specialty commercial and personal property and casualty insurance products;

    d.   PCHC's managers, officers and/or directors have resided in Florida and conducted its business in Florida;

    e.   PCHC has solicited insurance agents and producers to do its insurance business in Florida;

8

f.  PCHC has regularly marketed and sold insurance policies to persons in Florida and actively sought and maintained sales agents in Florida;

g.  PCHC's managers, officers, and/or directors executed the insurance policies at issue which were breached in Florida;

h.  PCHC is part of an insurance holding company system which filed yearly reports  in Florida; these holding company system filings indicate, among other things:

  i.  In a 2005 Consent Order issued by the State of Florida, the Florida Office of Insurance Regulation named PCHC and described PCHC as the *controlling company* of LAIC; said Consent Order was signed by PCHC officer James McGuire, Jr., on behalf of PCHC, and LAIG officer, P. Daniel Eldridge on behalf of LAIG;

  ii.  PCHC maintained a "Regional Vice President" for Florida;

  iii.  PCHC officers and managers were officers, managers and board members of the LIBERTY AMERICAN Defendants and *vice versa*; and,

  iv.  LIBERTY AMERICAN Defendants' managers and officers had ownership interests in PCHC.

i.  PCHC purchased 100% of the stock of the LIBERTY AMERICAN Defendants' predecessors whose operations were based in Florida;

9

      j.   PCHC owns the LIBERTY AMERCIAN Defendants, which are wholly owned subsidiaries whose principal offices are located in Florida;

      k.   A hyperlink from the LIBERTY AMERICAN Defendants' website relating to employment opportunities linked back to PCHS's website; and,

      l.   PCHC monitors and controls the daily activities of the LIBERTY AMERICAN Defendants which are domiciled or do substantial business in Florida and maintain headquarters in Florida.

25.    This Court has jurisdiction over the LIBERTY AMERICAN Defendants because, *inter alia*, they:

      a.   Are domiciled in Florida;

      b.   Maintain principal offices in Florida;

      c.   Do substantial business for all Defendants in Florida;

      d.   Are licensed to conduct insurance business in Florida; and/or,

      e.   Are registered with the Florida Department of State, Division of Corporations to do business in Florida.

26.    Defendant LIBERTY AMERICAN INSURANCE GROUP, INC., is part of the same integrated insurance holding company system including all Defendants which is registered in Florida. Said company is directed and contolled by Defendant PHILADELPHIA CONSOLIDATED HOLDING CORPORATION, and operates in Florida under the fictitious name "PHILADELPHIA INSURANCE COMPANIES" which is registered in Florida. Venue is proper under 28 U.S.C. § 1391, as acts and/or omissions giving rise to Plaintiffs' claims

occurred in this District and Defendants maintain and oversee agents or representatives in this District. Additionally, Defendants conducted business activities on an on-going basis in this District at all times material hereto.  At all times material hereto, Defendants employed on a regular basis insurance agents to sell all of its insurance products to Class Members residing in this District, including Miami-Dade County, Florida.  At all times material, Defendants have had continuous and systematic contacts in this District by actively doing business, employing insurance agents, adjusting claims and perpetuating the business practice scheme that is the subject of this cause in Miami-Dade, Broward, and Palm Beach Counties, Florida.

## PARTIES

27.    Defendants' activities are standard and implemented uniformly by all Defendants. Each Defendant is part of a highly integrated insurance holding company system which shares functions, locations, records and personnel in and affecting Florida and mobile home insureds in this District.

### *Plaintiffs*

28.    Plaintiff WILLIAM APPEL is a Florida resident, a senior citizen, mobile home owner and one of Defendants' insureds. Mr. APPEL purchased Defendants' standard Florida Mobile Homeowners Policy (Exhibit "A"). Defendants sold Mr. APPEL mobile homeowners insurance on a replacement cost basis and Defendants (1) failed to evaluate the actual cash value and replacement cost value of his mobile home prior to selling him Defendants' standard policy; (2) failed to maintain adequate underwriting procedures; (3) imposed arbitrary policy limits on his homeowners policy; and (4) failed to adequately disclose the policy limits they imposed through application of the "Loss Settlement" provision which directly contradicted his Declarations Page.  Like other Class Members, the standard Declarations Page of Mr. APPEL's

11

policy clearly states that its coverage includes "additional coverage" for "Replacement Cost Mobile Home." During the Class Period, Mr. APPEL made a timely claim to Defendants for replacement costs due to catastrophic windstorm damage to his mobile home as a result of a hurricane or other severe windstorm. However, Defendants failed to pay Mr. APPEL the replacement costs covered under the insurance policy Defendants sold to him.

29.     Plaintiff LESLIE ALLOCCO is a Florida resident, a senior citizen, mobile home owner and one of Defendants' insureds. Mrs. ALLOCCO purchased Defendants' standard Florida Mobile Homeowners Policy (Exhibit "A"). Defendants sold Ms. ALLOCCO mobile homeowners insurance on a replacement cost basis and Defendants (1) failed to evaluate the actual cash value and replacement cost value of her mobile home prior to selling her Defendants' standard policy; (2) failed to maintain adequate underwriting procedures; (3) imposed arbitrary policy limits on her homeowners policy; and (4) failed to adequately disclose the policy limits they imposed through application of the "Loss Settlement" provision which directly contradicted his Declarations Page. Like other Class Members, the standard Declarations Page of Mrs. ALLOCCO's policy clearly states that its coverage includes "additional coverage" for "Replacement Cost Mobile Home." During the Class Period, Mrs. ALLOCCO made a timely claim to Defendants for replacement costs due to catastrophic windstorm damage to his mobile home as a result of a hurricane or other severe windstorm. However, Defendants failed to pay Mrs. ALLOCCO the replacement costs covered under the insurance policy Defendants sold to her.

30.     Plaintiffs ROY and ANNE WIIK are husband and wife, Florida residents, senior citizens, mobile home owners and are insureds of Defendants. Mr. and Mrs. WIIK purchased Defendants' standard Florida Mobile Homeowners Policy (Exhibit "A"). Defendants sold the

WIIKS mobile homeowners insurance on a replacement cost basis and Defendants (1) failed to evaluate the actual cash value and replacement cost value of their mobile home prior to selling them Defendants' standard policy; (2) failed to maintain adequate underwriting procedures; (3) imposed arbitrary policy limits on the WIIKS' homeowners policy; and (4) failed to adequately disclose the policy limits they imposed through application of the "Loss Settlement" provision which directly contradicted their Declarations Page. Like other Class Members, the standard Declarations Page of the WIIKs' policy clearly states that its coverage includes "additional coverage" for "Replacement Cost Mobile Home". During the Class Period, Mr. and Mrs. WIIK made a timely claim to Defendants due to catastrophic windstorm damage to their mobile home as a result of a hurricane or other severe windstorm. However, Defendants failed to pay them the replacement costs covered under the insurance policy Defendants sold to them.

31.     Plaintiff FLORENCE KRUSE, a Florida resident, and her daughter, LINDA DAWSON, are mobile home owners and two of Defendants' insureds. Mrs. DAWSON and Ms. DAWSON purchased Defendants' standard Florida Mobile Homeowners Policy (Exhibit "A"). Defendants sold Mrs. KRUSE and Ms. DAWSON mobile homeowners insurance and Defendants (1) failed to evaluate the actual cash value and replacement cost value of their mobile home prior to selling them Defendants' standard policy; (2) failed to maintain adequate underwriting procedures; (3) imposed arbitrary policy limits on their homeowners policy; and (4) failed to adequately disclose the policy limits they imposed  through the "Loss Settlement" provision which directly contradicted their Declaration Page. Like other Class Members, the standard Declarations Page of their policy states that its coverage includes replacement costs. During the Class Period,  Mrs. KRUSE and Ms. DAWSON made a timely claim to Defendants for replacement costs due to catastrophic windstorm damage to their mobile home as a result of a

hurricane or other severe storm. However, Defendants failed to pay Plaintiffs the replacement costs covered under the insurance policy Defendants sold them.

<em>Defendants</em>

32.     Notwithstanding corporate formalities, Defendants present a public image of a single enterprise. Defendants personnel and processes are inextricably intertwined.

33.     Defendants operate and hold themselves out to the public in Florida, individually and in concert, under the singular trade name "PHILADELPHIA INSURANCE COMPANIES" which is a registered fictitious name in Florida.

34.     The "Liberty Bell" logo is a trademark of the "PHILADELPHIA INSURANCE COMPANIES" and is conspicuously depicted on the websites of all Defendants. Signage on Defendants' principal place of business in Florida located at 7785 66th Street North,, Pinellas Park, Florida, where Defendants employ approximately 100 employees advertises to the general public "Philadelphia Insurance Companies" and displays the "Liberty Bell" logo.

35.     The insurance policies of Plaintiffs and Class Members at issue specifically refer to "PHILADELPHIA INSURANCE COMPANIES," contain Defendants' logo, and were executed by officers of the "PHILADELPHIA INSURANCE COMPANIES" which is identified in PCHC's Securities and Exchange Commission ("SEC") filings as including all Defendants.

36.     PHILADELPHIA CONSOLIDATED HOLDING CORPORATION ("PCHC") is a publicly traded company based in Philadelphia, Pennsylvania. On information and belief, PCHC, and its officers and employees, at all time material to this litigation, actively directed and controlled the daily activities of the LIBERTY AMERICAN Defendants, and totally dominated the LIBERTY AMERICAN Defendants in Florida, to the extent that the LIBERTY AMERICAN

14

Defendants manifested no separate corporate interests of their own and functioned solely to achieve the purposes of PCHC, in that, among other things:

    a.  "PHILADELPHIA INSURANCE COMPANIES GET MORE" is a nationally registered tradename owned by PCHC;

    b.  The tradename "PHILADELPHIA INSURANCE COMPANIES" is a fictious name registered in Florida at the identical address for PCHC's location in Pennsylvania, which PCHC likewise lists for the "Philadelphia Insurance Companies," One Bala Plaza, Suite 100, Bala Cynwyd, PA 19004-0950;

    c.  PCHC's principal assets consist of 100% of the capital stock of its subsidiaries, including the LIBERTY AMERICAN Defendants;

    d.  PCHC has referred routinely and publicly to the Florida offices of the LIBERTY AMERICAN Defendants as PCHC's "Pesonal Lines Division" a/k/a PCHC's "Personal Lines Underwriting Group," which produces and underwrites specialized manufactured housing and homeowners' property and casualty business principally in Florida;

    e.  A hyperlink on the LIBERTY AMERICAN Defendants' website relating to employment opportunies, www.PHLYjobs, linked back to PCHS's website; "PHLY" is a national tradename registered and owned by PCHC;

    f.  PCHC routinely stated on its website that it maintained a regional office in Florida;

    g.  A PCHC VP served as PCHC regional manager for Florida;

    h.  LIBERTY AMERICAN Defendants' employees reported directly and routinely to PCHC officers or managers;

15

i. Email of employees of the LIBERTY AMERICAN Defendants and PCHC employees resided and were stored on a computer server which PCHC monitored, controlled, accessed and backed up on the premises of the LIBERTY AMERICAN Defendants in Florida;

j. PCHC implemented business process management software to keep its departments like the LIBERTY AMERICAN Defendants from acting independently;

k. PCHC conducted customer satisfaction surveys of claims processing in Florida in the wake of the 2004 hurricane season;

l. PCHC's Executive VP, President, CEO, and/or Chairman entered into employment contracts regularly and directly with the LIBERTY AMERICAN Defendants' employees whereby PCHC was defined as an employer for competitive and proprietary purposes; was a beneficiary of the contract; and was the entity to which official notices were to be sent;

m. PCHC has managed and operated the human resource department functions of the LIBERTY AMERICAN Defendants, including taking information from potential hires for the Pinellas Park, Florida location of PCHC's Personal Lines Division (the LIBERTY AMERICAN Defendants);

n. LIBERTY AMERICAN Defendants' employees referred to "Philadelphia" as the home office;

o. PCHC routinely and publicly advertised and referenced on its website its "Management Team," all of whom were officers, supervisors, managers and/or directors of the LIBERTY AMERICAN Defendants;

16

p.  PCHC Executive VP, President, CEO and/or Chairman, James McGuire, Jr., directly participated in and directed hurricane-related claims practices and procedures and directed business practices implemented by the LIBERTY AMERICAN Defendants after the catastrophic hurricanes that struck Florida in 2004 and 2005, which are relevant to Plaintiffs' suit;

q.  PCHC solicitsFlorida insureds to report Florida claims on *its* website;

r.  PCHC required LIBERTY AMERICAN  Defendants' employees to execute written codes of conduct, which defined the "Company" as PCHC *and* the LIBERTY AMERICAN Defendants;

s.  PCHC required LIBERTY AMERICAN Defendants' employees to adhere to its underwriting guidelines;

t.  PCHC maintained, controlled and operated an corporate intranet through which Defendants' communicated, including, a function allowing LIBERTY AMERICAN Defendants' employees to review their payroll histories and departmental operational procedures and also view the employee manual for their jobs at "Philadelphia;"

u.  In SEC filings, PCHC describes itself as maintaining a local presence in markets throughout the country through which it actively controls Defendants' operations;

v.  PCHC states that it "has field offices strategically located nationwide to provide local       service       to       our       agents       and       policyholders." http://www.phly.com/products/Brochure PHLY%20Private%20Company.pdf;

17

w. A link for "Personal Lines" information (which includes the mobile home policies it sells) on PCHC's website leads to the website for the LIBERTY AMERICAN Defendants, which are based in Florida;

x. PCHC touts that it maintains a local presence in Florida and elsewhere:

> [T]o *more effectively serve its [insurance] producer and customer base*, operating through 13 regional offices and 25 field offices throughout the country, which report to the regional offices. These offices are staffed with marketers, field underwriters, and, in some cases, accounts receivable and claims personnel, *who interact closely with home office management in making key decisions*. (Emphasis added)

PCHC SEC Form 10 K at 3 (February 28, 2007); and,

y. PCHC maintains detailed systems, records and databases that enable the regular and daily monitoring and oversight of the LIBERTY AMERICAN Defendants' operations in Florida.

37. LIBERTY AMERICAN INSURANCE GROUP, INC., LIBERTY AMERICAN INSURANCE COMPANY, and MOBILE USA INSURANCE COMPANY, *now known as* LIBERTY AMERICAN SELECT INSURANCE COMPANY and MOBILE HOMEOWNERS INSURANCE AGENCIES, INC., *now known as* LIBERTY AMERICAN INSURANCE SERVICES, INC., comprise the "LIBERTY AMERICAN" Defendants referred to in this First Amended Complaint.

38. In 1999, LASIC, LAIC and other PCHC subsidiaries entered into a pooling agreement whereby the entire net insurance business of said companies was treated as a single unit and distributed on *pro rata* basis among them. PCHC President and CEO, James J. Maguire, Jr., was the sole signatory on said agreement.

18

39.     Defendant LIBERTY AMERICAN INSURANCE GROUP, INC., ("LAIG") is a corporation and wholly owned subsidiary of PCHC, which, at all times material hereto, has had the authority or apparent authority to market, transact., and settle Plaintiffs and Class Members' mobile home insurance coverage in Florida on behalf of PCHC and the other Defendants.

40.     LAIG has routinely stated on its website that it marketed insurance on behalf of its wholly owned subsidiaries, Defendants LIBERTY AMERICAN INSURANCE COMPANY and MOBILE USA INSURANCE COMPANY, *now known as* LIBERTY AMERICAN SELECT INSURANCE COMPANY.

41.     LAIG maintains offices and operates at the same business address in Florida as the other LIBERTY AMERICAN Defendants, which comprise PCHC's "Personal Lines Division."

42.     LAIG submitted Defendants' holding company system filings mentioned above which were made under LAIG's letterhead, and LAIG routinely filed insurance-licensing-related and corporate information and documentation required by the State of Florida on behalf of all Defendants.

43.     LAIG is the custodian of the insurance policies at issue in this case. The Declaration Pages of Plaintiffs were emblazoned with LAIG's corporate name, and were on a form carrying the acronym "LAIG." Defendants' employees corresponded with Plaintiffs about the insurance claims at issue in this suit under LAIG's letterhead. LAIS employees' business cards expressly referred to LAIG's corporate name, not the names of other Defendants. Some settlement checks to satisfy insureds' claims appear to have been drawn on an account under LAIG's name.

44.    At least as early January 2001, the LIBERTY AMERICAN Defendants and PCHC have shared the same personnel, managers, officers, functions and principal location in Florida.

45.    Along with PCHC the LIBERTY AMERICAN Defendants have uniformly and routinely held themselves out to the public in Florida under the "PHILADELPHIA INSURANCE COMPANIES" trade name and have displayed their "Liberty Bell" logo.

46.    At all times material hereto, sales brochures for mobile owner insurance coverage prominently displayed LAIG's name, Defendants' "Liberty Bell" logo and the trade name "PHILADELPHIA INSURANCE COMPANIES."  The copyright for such brochure has been owned by LAIG.

47.    In soliciting policies and adjusting claims for Plaintiffs and Class Members, the LIBERTY AMERICAN Defendants and PCHC, individually or in concert, have routinely acted as an agent or agents for each other in marketing, providing insurance coverage and settling insurance claims under the trade name, "PHILADELPHIA INSURANCE COMPANIES." Defendants regularly settled insurance claims at issue in this case under the LAIG letter head which expressly referred to "PHILADELPHIA INSURANCE COMPANIES."  PCHC has registered the trademark, "PHILADELPHIA INSURANCE COMPANIES GET MORE," with the United States Patent and Trademark Office.

48.    On its website, PCHC lists as regional offices two locations in Florida, one of which is PCHC's "Personal Lines Division" a/k/a the "Personal Lines Underwriting Group" consisting of the LIBERTY AMERICAN Defendants, "which ha[ve] underwriting responsibility for [PCHC's] personal property insurance products for the homeowners and manufactured housing market in Florida." PCHC SEC Form 10 K at 3 (February 28, 2007).

49.     LAIG promotes itself on its signage, website, and stationery as being a "member of PHILADELPHIA INSURANCE COMPANIES." Additionally, LAIG displays on its stationery, website, and signage the Liberty "Bell" logo which is a registered trademark of the PHILADELPHIA INSURANCE COMPANIES.  Also, a link on the LAIG website for employment information connects back to the PCHC website whose pages are repeatedly emboldened with the fictitious name, "PHILADELPHIA INSURANCE COMPANIES" and Defendants' logo.

50.     At all times material hereto, Defendant MOBILE USA INSURANCE COMPANY, *now known as* Defendant LIBERTY AMERICAN SELECT INSURANCE COMPANY (LASIC) has been authorized and had the apparent authority to market and transact and did transact mobile home insurance coverage in the State of Florida on behalf of PCHC and all Defendants.  LASIC is a registered corporation in Florida and has held a license to transact insurance in Florida.  At all times material hereto, active daily direction and control of LASIC was conducted by PCHC and LASIC's parent, LAIG, which owns 100% of LASIC's stock. LASIC's officers and managers have year after year been the same officers and managers as the other LIBERTY AMERICAN Defendants.

51.     At all times material hereto, Defendant LIBERTY AMERICAN INSURANCE COMPANY ("LAIC") has been authorized and has had the apparent authority to market and provide and did provide mobile home insurance coverage in the State of Florida on behalf of PCHC and all Defendants.  LAIC is a registered corporation in Florida and has held a license to transact insurance in Florida.  At all times material hereto, active daily direction and control of this Defendant was conducted by PCHC and LAIC's parent, LAIG, which owned 100% of its

stock. LAIC's officers and managers have year after year been the same officers and managers as the other LIBERTY AMERICAN Defendants.

52.    At all times material hereto, Defendant MOBILE HOMEOWNERS INSURANCE AGENCIES, INC., *now known as* LIBERTY AMERICAN INSURANCE SERVICES, INC., ("LAIS") has been authorized and has had the apparent authority to market and provide and did provide mobile home insurance coverage and claims administration as a managing general agent for Defendants in the State of Florida on behalf of PCHC and all Defendants. LAIS is a registered corporation in Florida. At all times material hereto, active daily direction and control of this Defendant was conducted by PCHC and LAIS's parent, LAIG, which owned 100% of its stock. LAIS's officers and managers have year after year been the same officers and managers as the other LIBERTY AMERICAN Defendants.

53.    LAIG and LAIS have jointly filed suit in the United States District Court for the Middle District of Florida. In that litigation, LAIG and LAIS jointly referred to themselves as "Liberty American" and stated that they engaged in the business of providing homeowners insurance and mobile home insurance at the same Florida address. The crux of that dispute revolved around Liberty American's copyright-protected and proprietary software used to calculate rates for its customers and prospective customers and to operate its website.

54.    At all times material hereto, PCHC has routinely listed on its website as its "Management Team" individuals who were officers and managers of the LIBERTY AMERICAN Defendantsl. Indeed, Defendants have in fact maintained an integrated and overlapping management structure closely held and controlled by a few individuals:

        a. One family, the McGuire family has presided over and dominated every aspect of Defendants' insurance enterprise:

   i.  At all times material hereto, James Joseph Maguire, Jr., has been President, CEO, Executive VP and/or Chairman of PCHC, COO of Defendant LAIS, and Chairman and CEO or COO of LAIG and Defendants LASIC and LAIC; The LIBERTY AMERICAN Defendants' management reported regularly and directly to James Joselph Maguire, Jr.; PCHC's James McGuire, Jr., directly participated in and directed hurricane-related claims practices and procedures and directed business practices implemented by the LIBERTY AMERICAN Defendants after the catastrophic hurricanes that struck Florida in 2004 and 2005, which are relevant to Plaintiffs' suit; PCHC identified James J. Maguire, Jr., a member of its "Management Team;" James J. Maguire, Jr., was the sole signatory on the pooling agreements among LASIC, LAIC and other PCHC subsidiaries whereby their entire net insurance business was treated as a single unit and distributed on *pro rata* basis among them;

  ii.  James Joseph Maguire's Jr.'s brother Christopher J. Maguire has severd as Executive Vice President & Chief Operating Officer of PCHC and as Chief Underwriting Officer for Defendants, to whom LIBERTY AMERICAN Defendant

managers reported directly; PCHC identified Christopher J. Maguire, Jr., as a member of its "Management Team;"

iii. Timothy J. Maguire and Susan M. Maguire, the children of PCHC founder, James J. Maguire, Sr., and the siblings of James J. Maguire, Jr. and Christopher J. Maguire, are also employees and managers of PCHC;

iv. On or about December 31, 2004, Frances M. Maguire, wife of PCHC Chairman and founder, James J. Maguire Sr., was reported by the Florida Office of Insurance Regulation, Department of Financial Services, as owning more than 15 % of the stock of PCHC and she reportedly purchased LASIC and LAIC in 2005; This ownership led to a 2005 Consent Order issued by the state of Florida, in which the Florida Office of Insurance Regulation named PCHC and described PCHC as the controlling company of LAIC; said Consent Order was signed by PCHC manager and officer James McGuire, Jr., on behalf of PCHC, and LAIG officer, P. Daniel Eldridge on behalf of LAIG

b. Until at least January 31, 2005, P. Daniel Eldridge was a Florida resident, served as president of LAIG and also served on the board of directors of its parent company, PCHC, and as a President and Director of Defendants, LAIS, LASIC and LAIC. P. Daniel Eldridge was a signatory on the insurance policies of Plaintiffs at issue and had an employment contract

signed by PCHC CEO James J. Maguire, Jr.,;  During his tenure with Defendants, P. Daniel Eldridge reported directly and regularly to his PCHC superior, James J. Maguire, Jr.;

c.  At all times material hereto, Thomas Bruce Meyer a/k/a "T. Bruce Meyer" has been a Florida resident, served as a manager and on the board of directors of PCHC, and was an Senior Vice President, President or Chief Financial Officer of LAIG, and served as an officer of Defendants LAIS, LASIC and LAIC; PCHC identified T. Bruce Meyer as a member of its "Management Team;" and,

d.  At all times material hereto, Craig Phillip Keller served as either Executive Vice President, Secretary, Treasurer, and/or Chief Financial Officer of PCHC, has been signatory to the insurance policies of Plaintiffs at issue, and served as an officer of Defendants LAIS, LAIC and LASIC; PCHC identified Craig Phillip Keller as a member of its "Management Team;"

55.    At all times material hereto, Plaintiffs are informed and believe and allege that each Defendant is responsible in some manner for the occurrences and damages alleged herein, and that Plaintiffs' and Class Members' damages were proximately caused by said Defendants.

56.    At all times material hereto, Plaintiffs are informed and believe and allege that each of the Defendants acted in concert with each and every other Defendant, intended to and did participate in the events, acts, practices and courses of conduct alleged herein, and were a proximate cause of damage and injury thereby to Plaintiffs and Class Members.

57.    At all times material hereto, Plaintiffs are informed and believe and allege that the acts complained of, and otherwise attributable to each Defendant were executed and

performed by its agents or personnel which were at the same time acting within the scope and actual or apparent authority of PCHC and the LIBERTY AMERICAN Defendants.

58.    As stated *supra*, at all times material hereto, Plaintiffs are informed and believe and allege that each Defendant's operations were seamlessly integrated and each actively participated in the business practices about which Plaintiffs complain. Accordingly, PCHC, LAIG, LAIC, LAIS and LASIC are included in and referred to throughout this First Amended Complaint collectively as "Defendants."

59.    Whenever in this First Amended Complaint reference is made to any act or omission of a corporate defendant, partnership, or other entity, such allegations shall be deemed to mean that the directors, officers, agents, employees, distributors, partners, contractors, third-party sales agencies or representatives of said corporate defendant, partnership or other entity, did, authorize or command such act or omission while actively engaged in the management, operation, control or representation of the affairs of said corporate defendant, partnership or entity, and while acting within the course and scope of their agency, distributorship, contract, employment, representation and capacity.

## PLAINTIFFS AND CLASS MEMBERS INSURANCE POLICIES

60.    At all times material hereto, Defendants through their employees and agents sold Plaintiffs and other Class Members Defendants' standard Manufactured Homeowners Insurance Policy identified as form HO-3 Ed. 4-84 designed to provide coverage for their mobile homes, other structures on their premises, and other policy coverages. (See Exhibit "A" attached hereto.)

61.    In a separate, purportedly independent "Additional Coverages" section of the Declarations Page of each policy issued to Plaintiffs and Class Members, uniformly typewritten text without qualification or condition provides:

| **Additional Coverages** | REPLACEMENT COST MOBILE HOME | INCL |
| | REPLACEMENT PERSONAL EFFECTS | INCL |
| | $500 NON HURR DEDUCTIBLE | INCL |

62.    The body of said insurance policy on page 1 also uniformly provides:

**POLICY COVERAGES**

"*Please refer to your policy Declarations for the coverage limit applicable to each policy coverage*, the deductible that applies to property losses and the policy premium. *The Declarations will indicate if you have any optional coverage which may not be included in this outline …*

(emphasis added)

**SECTION I – PROPERTY COVERAGE**

| **COVERAGE A** | Covers your dwelling including any attached structures. |
| **COVERAGE B** | Covers other structures on the premises of your insured dwelling, which are unattached to the primary residence, such as a detached garage, swimming pool, fence, or utility shed. **THIS COVERAGE IS INCLUDED ONLY IF THERE IS A LIMIT SHOWN IN THE DECLARATIONS AND YOU PAY AN ADDITIONAL PREMIUM.** |
| **COVERAGE C** | Covers your personal property such as clothes and furniture. Special limits apply to many classes of property such as jewelry. Other classes of personal property such as motorized vehicles are excluded. You should review the limits and exclusions and contact your agent to see if coverage is available in this policy or under some other type of insurance. |
| **COVERAGE D** | Additional Living Expense provides for payments to you if you temporarily cannot live in your mobile home because of a covered loss to your dwelling. |

63.    The standard form policy provided to Plaintiffs and Class Members does not define or otherwise explain many key terms including "Additional Coverages" and "REPLACEMENT COST MOBILE HOME---INCLU." " "Replacement cost" is historically and commonly understood to be the amount needed to replace or repair damaged property with

materials of similar kind and quality, without deducting for depreciation. Upon information and belief, Defendants <u>never</u> provided Plaintiffs and Class Members with any endorsement which explained or limited their "Replacement Cost" coverage represented in their mobile homeowner policies.

64.     On page 8 of Plaintiffs' and Class Members'  policies, Defendants include a "Loss Settlement" provision which contradicts the "Additional Coverages" section of their Declarations Page which includes "Replacement Cost Mobile Home." The "Loss Settlement" provision contained in ¶ 3 b. (1) provides in pertinent part:

> If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay . . .not more than the least of the following amounts:
>
> (a)     *The limit of liability under this policy that applies to the building*

(emphasis added)

65.     On page 9 of Plaintiffs and Class Members'  policies, Defendants' "Loss Settlement" provision continues in ¶ 3 b. (2) and likewise contradicts the "Additional Coverages" section of the Declarations Page and provides in pertinent part:

> If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the full replacement cost of the building immediately before the loss, we will pay . . .*not more than the limit of liability under this policy that applies to the building. . .*

 (emphasis added)

## FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS

66.     Plaintiffs are senior citizens who reside in a well designed mobile home retirement community located in Port Charlotte, Florida. Because of their ages, Plaintiffs have been and were likely to be trusting of Defendants.

*Defendants Promoted Trustworthiness and Expertise*

67.    At all times material hereto, Defendants have had superior knowledge of their policies and claims practices and have held a position of expertise, trust and confidence with their policyholders, like Plaintiffs. .

68.    Defendants have touted that "Philadelphia Insurance Companies is committed to writing quality policies that offer quality coverage you [the customer] can count on." http://www.phly.com/products/products.aspx?alias=40604.

69.    Defendants' brochures and "mission statement" have provided "that integrity and mutual respect are the foundation of long-term and fulfilling relationships with [Defendants'] employees, customers, and business partners." PCHC 2005 Annual Report at 1.

70.    Purportedly, Defendants'  "insurance products and coverage enhancements address the specific needs of [Defendants'] customers. [Defendants] talk with end users to find out what's important to them." PCHC 2006 Annual Report at 4.

71. Defendants advertise that their "staff is proud to be associated with a company who takes pride in maintaining an atmosphere of honesty and integrity." http://www.phly.com/aboutphly/Culture/Default.aspx.

72.    Defendants likewise advertise that they engage in "performance with integrity." According to Defendants, "Trust" in them by insureds is developed:

> [O]ver time, but is managed by clearly defined processes, written standard operating procedures, automated systems and a staff operating under a code of business conduct that promotes performance around these standards. Our ability to weather storms — whether literally, in the case of hurricanes, or figuratively — comes from the resilience and integrity of our people. Their character, and [Defendants'] disciplined approach to the business, gives [Defendants] a firm foundation to withstand all kinds of calamities. and that the trust they engender with insureds develops over time.

29

PCHC 2004 Annual Report at 5.

*Defendants' Common Course of Conduct*

73.    Between September 1, 2003 through and including December 31, 2006, Plaintiffs were sold Defendants' Manufactured Homeowners Insurance Policies by Defendants' employees and independent insurance agents authorized by Defendants to sell their mobile home insurance products in Florida.

74.    Each Plaintiff placed trust and confidence in Defendants and had reason to believe that the insurance contracts issued by Defendants provided for mobile homeowners insurance coverage for replacement costs when windstorm damage occurred due to hurricanes in Florida.

75.    The Declarations Page of each policy issued to all Plaintiffs and Class Members expressly and routinely included replacement cost insurance coverage in a separate section set forth under "Additional Coverages." In truth and in fact:

  a. Defendants knew and promoted to their agents that their insurance policies be uniformly and routinely offered and sold to elderly consumers, including Plaintiffs and Class Members, as "replacement cost" policies and that their Declarations Pages stated that coverage included "replacement costs;

  b. Defendants knew that their standard Declarations Page expressly stated replacement cost coverage was included when the underlying insurance policy was silent or failed to define such coverage;

  c. Defendants failed to correct the language in each insurance policy to clearly state that claims would be adjusted and paid on a "policy limits" basis;

30

       d. Defendants failed to correct or disclose their insurance policy language by making timely public filings with the Florida Office of Insurance Regulation; and,

       e. Defendants failed to issue any endorsement explaining and clarifying replacement cost coverage in their insurance policy;

76.    The foregoing conduct contributed to the ambiguity of replacement cost coverage in Plaintiffs' and Class Members' mobile home policies.

77.    Defendants' senior managers, in fact, failed to correct any ambiguity concerning replacement cost coverage included in Plaintiffs' and Class Members' coverage because they knew that to do so would reduce their profits when claims were made or when policies were renewed. Defendants made a business decision that to clarify the subject of "replacement cost" would require a filing with the Insurance Commissioner to notify the State that there was a reduction in coverage. If this had been done each insured would have been required to be notified in writing and a new insurance policy issued. The loss of insureds inherent in this process would have potentially caused a significant loss in insurance business for Defendants which they wanted to avoid.

78.    Furthermore, between September 1, 2003 through and including December 31, 2006, Defendants, through their highly integrated company and tightly controlled operations in Florida, intentionally sold Florida elderly mobile homeowners insurance policies when Defendants:

       a. Failed to adequately and reasonably evaluate the actual and replacement value of the insured mobile homes;

31

b. Failed to maintain adequate and reasonable underwriting procedures;

c. Imposed policy limits on their homeowners policies which were arbitrary because they were not relate to an assessment of property values;

d. Undervalued and underinsured the mobile homes of their elderly policyholders, including Plaintiffs and Class Members, which left them at greater risk in the case of catastrophic losses;

e. Failed to adequately disclose the policy limits they imposed; and

f. Failed to pay the claims of Plaintiffs and Class Members as "replacement costs" policies; rather, claims were intentionally paid as "policy limits" claims resulting in massive financial savings for Defendants to the detriment of Plaintiffs and Class Members.

79.    Each Plaintiff suffered devastating hurricane windstorm damage to their insureds dwelling exceeding Fifty Thousand Dollars ($50,000) during the applicable time period. Each Plaintiff timely submitted insurance claims to Defendants due to damages to their mobile homes. Upon information and belief, Defendants have maintained detailed records relating to the policies sold to Plaintiffs and the Class, their premium payment and claims histories, and the methods and means by which Defendants paid their claims.

80.    Defendants proximately caused damages to each Plaintiff and Class Member because he/she was _not_ paid for his/her covered hurricane windstorm damage claims based upon a "replacement cost" basis. Instead, his or her claim was paid based upon an insurance "policy limits" or other non-replacement cost method. Each Plaintiff and Class Member paid insurance

premiums to Defendants for a policy which expressly stated that replacement cost coverage was included when, as a result of Defendants' conduct set forth above, that was routinely and uniformly not the case.

## CLASS ACTION ALLEGATIONS

81.    Plaintiffs allege that Defendants' conduct as outlined above was systematic and continuous and has affected thousands of elderly Floridians.  This action is brought pursuant to *Fed.R.Civ. P.* 23(b)(1)(A) and (B), (b)(2), and/or (b)(3).  Plaintiffs seek class action certification of a Florida class of consumers on behalf of Plaintiffs individually and as a class action on behalf of all persons within the State of Florida as follows:

> All Florida insureds of Defendants who from September 1, 2003 through and including December 31, 2006 (the "Class Period"): (1) purchased or maintained in-force Manufactured Homeowners Insurance Polices marketed by Defendants whose Declaration Pages stated that coverage included replacement costs; (2) thereafter suffered  losses to their insured dwellings which were covered under their insurance policies; (3) made  claims for insurance benefits to Defendants for damage to property covered under their insurance policies;  and (4) were paid by Defendants on a "policy limits" or other non-replacement cost basis.

Excluded from the Class are Defendants, their parents, subsidiaries and affiliates, their directors and officers and members of their immediate families, and members of the federal judiciary.

82.    The Class is so numerous as to make it impracticable to bring all members of the Class before the Court.  The exact number of Class Members is unknown, but can be determined from the records of Defendant corporations.  Plaintiffs believe that there are thousands of persons in the Class and their identities and addresses can be readily ascertained from the records maintained by Defendants.

83.     There are numerous and substantial questions of law and fact common to all of the members of the Class which will control this litigation and which will predominate over any individual issues.  Included within the common questions of law or fact are:

a.  Whether Defendants' engaged in a common course of  conduct to sell mobile homeowners insurance coverage as replacement cost coverage;

b.  Whether the Declarations Pages of Plaintiffs' and Class Members' policies stated replacement cost coverage without limits was included;

c.  Whether replacement costs is commonly understood to be the amount needed to replace or repair damaged property with materials of similar kind and quality, without deducting for depreciation;

d.  Whether the Court can declare the rights and interests of the parties based upon a review of the Declarations Page and applicable insurance contracts, and related documentation;

e.  Whether Defendants implemented a business practice to adjust insurance claims to Plaintiffs and Class Members utilizing a non-replacement cost method of payment;

f.  Whether Defendants breached the Manufactured Homeowners Insurance Policies sold to Plaintiffs and Class Members, by not settling claims on a replacement cost basis;

g.  Whether Defendants were unjustly enriched by the misconduct alleged herein;

34

      h.  Whether Plaintiffs and Class Members are entitled to injunctive relief or other equitable relief against Defendants; and,

      i.  Whether Plaintiffs and Class Members have sustained money damages or are due restitution and the proper measure thereof.

84.    All Class Members have been monetarily injured by the wrongful conduct of the Defendants. Plaintiffs' claims are typical of the claims of the Class and Plaintiffs have no interest that is adverse to the interests of other Class Members. The named Plaintiffs are members of the Class of victims described herein. As Class Members were, Plaintiffs were subjected to the same common course of conduct by Defendants and their agents. Plaintiffs were solicited and induced by Defendants to contract for manufactured homeowners insurance coverage stating that claims would be paid on a "replacement cost" basis, and when Plaintiffs' claims were actually made, they were paid by Defendants on a "policy limits" or other non-replacement cost basis.

85.    Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced and competent in the prosecution of class actions and complex civil litigation to represent them in this cause.

86.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, the Class Members will continue to suffer money damages and the Defendants' violations of law will proceed without remedy while said Defendants continue to retain the proceeds of their ill-gotten gains.

87.    Most individual Class Members have little ability to prosecute an individual action due to the complexity of the issues involved in this litigation, the enormity of Defendants'

uniform sales scheme, the significant costs attendant to litigation on this scale, and the amount of money damages suffered by or restitution owed Class Members.

88.     This action will cause an orderly and expeditious administration of class claims, econmies of time, effort and expense will be fostered, and uniformity of decisions will be insured.

89.     This action presents no difficulty that would impede its management by the Court as a class action and a class action is superior to other available methods for the fair and efficient adjudication of these claims.

90.     Plaintiffs seek preliminary and permanent injunctive and equitable relief on behalf of the entire Class on grounds generally applicable to the entire Class in order to enjoin and prevent Defendants from selling Manufactured Homeowners Insurance Policies as replacement cost policies when such is not the case and to correct their business practices and insurance policies.

91.     Because Plaintiffs seek injunctive relief and corresponding declaratory relief for the entire class, the prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members which would establish incompatible standards of conduct for the Defendant corporations. Further, adjudications with respect to individual Class Members would, as a practical matter, be dispositive of the interests of other Class Members who are not parties to the adjudication and may impair and impede their ability to protect their interests.

## COUNT I
### (Breach of Contract)

92.     Plaintiffs readopt and reallege the allegations set forth in Paragraphs 1-91 as if fully set forth herein.

36

93.     Plaintiffs and Class Members entered into valid standard contracts of insurance with Defendants--Defendants' Manufactured Homeowners Insurance Policies, which provided insurance coverage for specified risks and perils, including windstorm losses due to hurricanes or other severe storms. (See Exhibit "A")

94.     Defendants contracted to provide insurance coverage for Plaintiffs' and Class Members' mobile homes, other structures on their premises, their personal belongings, loss of use of their mobile homes, personal liability, and medical payments to others, and agreed to pay hurricane windstorm damage claims based upon a "replacement cost" basis.

95.     The insurance policies offered by Defendants refer their clients including Plaintiffs and Class Members to the Declarations Page which provides that "the Declarations will indicate if you have any optional coverage, which may not be included in this outline." Page 1 of the Declarations Page under the separate section heading "Additional Coverages" expressly specifies "REPLACEMENT COST MOBILE HOME – INCL." (See Exhibit "B")

96.     Plaintiffs and Class Members paid in a timely manner all insurance premiums in order to bind the Defendants' Manufactured Homeowners Insurance Policies. Plaintiffs and the Class have performed all conditions precedent under their contracts. Plaintiffs timely submitted claims to Defendants for replacement costs due to hurricane windstorm damage which was a covered peril under their policies.

97.     Defendants materially breached the terms of the insurance contact, *inter alia*, by soliciting Plaintiffs and Class Members as clients to offer insurance products,  and by offering and entering into said insurance contracts as "replacement cost" insurance policies but failing to adjust claims on a "replacement cost" basis to the detriment of Plaintiffs and all Class Members.

98.    As a result of Defendants' breach of contract, Plaintiffs and the Class have suffered money damages.    Accordingly, Defendants are liable to Plaintiffs and the Class for breach of contract damages incurred in an amount to be established at the time of trial.

## COUNT II
### (Unjust Enrichment)

99.    Plaintiffs readopt and reallege the allegations set forth in paragraphs 1-91 as if fully stated herein, and further state:

100.    Count II is pled in the alternative to Count I.

101.    As a result of the their payment of premiums to Defendants and/or Defendants' failure to settle their claims on a replacement cost basis, Plaintiffs and Class Members have conferred benefits on Defendants of which Defendants were aware, and which Defendants have voluntarily and unjustifiably accepted and retained.

102.    As a result of the relationship between Defendants on the one hand, and Plaintiffs and Class Members on the other, and the facts as stated above, it would be inequitable for Defendants to retain said benefits.

103.    Plaintiffs and Class Members have no adequate remedy at law by virtue of Defendants' course of conduct.

104.    Accordingly, Defendants are liable to Plaintiffs and Class Members for restitution measured by the benefits they conferred on Defendants, and as set forth in the Prayer for Relief below.

## COUNT III
### (Money Had and Received)

105.    Plaintiffs readopt and reallege the allegations set forth in Paragraphs 1-91 as if fully stated herein, and further state:

106.    Count III is pled in the alternative to Count I.

107.    Plaintiffs are elderly mobile homeowners who reside in a retirement community.

108.    Defendants constitute a highly sophisticated, integrated and interrelated insurance enterprise, which is highly knowledgeable about the mobile home insurance products it sells.

109.    Defendants or their agents are licensed to sell insurance in Florida. Defendants are obligated to follow applicable state laws and guidelines relating to insurance practices and filings with state government.

110.    Defendants possess superior knowledge about their Manufactured Homeowners Insurance Policies, their underwriting practices, their claims practices and the meaning of key insurance terms such as "replacement cost."

111.    Defendants have targeted elderly mobile homeowners for their mobile home insurance products and Defendants have taken undue advantage of their superior position *vis-à-vis* individual mobile homeowners whom Defendants have insured, including Plaintiffs and Class Members, by underinsuring their homes, and failing to pay Plaintiffs and Class Members' claims on a replacement cost basis.

112.    As a result, Defendants have retained or obtained moneys from Plaintiffs and Class Members that in equity and good conscience Defendants should return.

113.    Plaintiffs and Class Members have no adequate remedy at law by virtue of Defendants' course of conduct.

114.    The exaction by Defendants of premiums and/or retention of claims monies is an imposition on Plaintiffs and Class Members, giving rise to a claim for assumpsit for money had and received.

115.    By reason of the foregoing, Plaintiffs and Members of the Class have been damaged in an amount to be determined at trial.

## COUNT IV
### (Injunctive Relief)

116.    Plaintiffs readopt and reallege the allegations set forth in Paragraphs 1-115 as if fully stated herein, and further state:

117.    Defendants have not paid replacement cost claims of Plaintiffs and Class Members.

118.    As set forth in Counts I, II, or III, Defendants have violated one or more cognizable legal rights of Plaintiffs and Class Members.

119.    Defendants continue to retain monies due and owning Plaintiffs and Class Members for the replacement costs associated with hurricane windstorm damages Plaintiffs and Class Members' insured dwellings suffered.

120.    Plaintiffs and Class Members have no adequate remedy at law by virtue of Defendants' course of conduct.

121.    Irreparable injury will be suffered unless a permanent injunction issues to prevent Defendants from continuing to settle mobile homeowner insurance claims on a policy limits instead of a replacement costs basis.

122.    Any potential injury to Defendants attributable to an injunction providing that it must settle claims on a replacement cost basis is outweighed by the injury that Plaintiffs and Class Members and the public will suffer if such injunction is not issued, and such injunction would not be adverse to the public interest.

40

## COUNT V
### (Declaratory Relief)

123.    Plaintiffs readopt and reallege the allegations set forth in Paragraphs 1-91 as if fully stated herein, and further state:

124.    Pursuant to the provision of 28 U.S.C. § 2201, this case involves an actual controversy within the jurisdiction of this Court and Plaintiffs and Class Members ask the Court to declare the rights of Plaintiffs and Class Members.

125.    Defendants entered into valid insurance contracts with Plaintiffs and Class Members that were authored and drafted by Defendants and submitted to the Florida Office of Insurance Regulation, Department of Financial Services as a public filing. (See Exhibit "A" attached hereto)

126.    Each Manufactured Homeowners Insurance Policy was sold by Defendants to Plaintiffs and Class Members as an insurance policy offering "replacement cost" as the basis for adjusting claims due to hurricane windstorm damage.

127.    Page 1 of the Declarations Page provides as follows:

| **Additional Coverages:** | REPLACEMENT COST MOBILE HOME | INCL |
| | REPLACEMENT PERSONAL EFFECTS | INCL |
| | $500 NON HURR DEDUCTIBLE | INCL |

(See Exhibit B).

128.    Page 1 of 2 of the Florida Mobile Homeowners Policy – Outline (part of the insurance contract – Exhibit "A") provides:

**Policy Coverages**

Please refer to your policy Declarations for the coverage limit applicable to each policy coverage, the deductible that applies to property losses and the policy premium. The Declarations will indicate if you have any optional coverage, which may not be included in this outline ...

129.    The body of the insurance contract (Exhibit "A") under the heading "Definitions" fails to define "replacement cost".

130.    As set forth above, pages 8-9 appear to limit Defendants' liability for payment of claims to policy limits, which contradicts the "Additional Coverages" section of their standard Declarations Page.

131.    As stated herein, Plaintiffs and all Class Members, based on the Declarations Page of Defendants' Manufactured Homeowners Insurance Policy, have reason to believe they were covered on a replacement cost basis in the case of a hurricane or other similar catastrophic event.

132.    During the class period, Plaintiffs and Class Members made insurance claims after suffering windstorm damages caused by hurricanes in Florida and their claims were processed and adjusted by Defendants on a "policy limits" basis and not upon a "replacement cost" basis of payment of claims.

133.    Plaintiffs and all Class Members are in doubt as to the language of the insurance contract and its applicability by virtue of the failure on the part of Defendants to adjust and pay insurance claims as provided in the Declarations Page and insurance contract.

134.    Plaintiffs and all Class Members state to the Court that the unambiguous statement on the face of the Declarations Page that the separate section entitled "Additional Coverages" includes "replacement cost mobile home" dictates that hurricane windstorm damage claims of Plaintiffs and Class Members should be adjusted and paid upon a replacement costs basis..

135.    Plaintiffs and all Class Members state to the Court that the language of the Florida Manufactured Homeowners Insurance Policy refers each policyholder to the Declarations Page

in order to learn the "coverage limit applicable to each policy coverage" and further provides that "Declarations will indicate if you have any optional coverage…"

136.    Again, the language of the Declarations Page and the body of the insurance policy clearly provide for the method of payment of hurricane windstorm damage insurance claims to be on a "replacement cost" basis.

137.    Plaintiffs and Class Members have no adequate remedy at law by virtue of Defendants' course of conduct.

138.    Plaintiffs and all Class Members seek the entry of an appropriate Order declaring and interpreting the terms and provisions of said Manufactured Homeowners Insurance Policy.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

(A)    Certification of the Class pursuant to Rue 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as representatives of the Class and designating their counsel as counsel for the Class;

(B)    A declaration that Defendants have committed the violations alleged herein, and that the Florida Mobile Homeowners Insurance Policy offered and sold to Plaintiffs and Class Members provides for replacement cost coverage;

(C)    An Order requiring Defendants to pay restitution to Plaintiffs and all Class Members as a direct result of Defendants' unlawful and unfair business practices, violations of law, statutes and/or regulations;

(D)    Preliminary and permanent injunctive relief and equitable relief on behalf of the Class in order to enjoin and prevent Defendants from committing the ongoing unfair business practices described herein;

(E)    Compensatory damages in an amount to be proven at trial;

(F)    Pre-judgment and post-judgment interest; and

(G)    Reasonable attorney's fees and costs and; and,

(H)    Such other and further relief as the Court may deem necessary or appropriate.

## JURY DEMAND

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand trial by jury of all issues triable in this cause.

By: _Tod Aronovitz_

Tod Aronovitz (FBN 186430)
ta@aronovitzlaw.com
**ARONOVITZ LAW**
777 Brickell Avenue
Suite 850
Miami, Florida 33131
305-372-2772 Telephone
305-397-1886 Facsimile

Steven R. Jaffe (FBN 390770)
sjaffe@rra-law.com
**ROTHSTEIN ROSENFELDT ADLER**
Las Olas City Centre
401 East Las Olas Boulevard, Suite 1650
Fort Lauderdale, FL 33301
954-522-3456 Telephone
954-527-8663 Facsimile

Mark S. Fistos (FBN 0909191)
mfistos@rra-law.com
**ROTHSTEIN ROSENFELDT ADLER**
200 West College Avenue, Suite 226
Tallahassee, FL 32301
850-727-0020 Telephone
954-527-8663 Facsimile

Michael H. Lax (FBN 182067)
mhlax@laxpa.com
**MICHAEL H. LAX, P.A.**
18001 Old Cutler Road, Suite 409
Miami, Florida 33157
305-256-5529 Telephone
305-256-5597 Facsimile

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the **First Amended Complaint** was *mailed* this 22nd day of December, 2008 to counsel for Defendants as follows:

Marcy Levine Aldrich
marcy.aldrich@akerman.com
Christopher S. Carver
christopher.carver@akerman.com
**AKERMAN SENTERFITT**
One Southeast Third Avenue
25th Floor
Miami, FL 33131-1714
305-374-5600 Telephone
305-374-5095 Facsimile

*Tod Aronovitz*

*First Amended Class Action Complaint and Demand for Trial By Jury*
CASE NO. 08-20385-CV-GRAHAM/TORRES

# Exhibit "A"

# Mobile USA Insurance Company

MUSA261198    0

7785 66th Street North, Pinellas Park, Florida 33781    (800) 299-8911    fax (727) 541-1608    www.libertyamerican.com

## A.M. BEST RATED "A+, SUPERIOR"



# MANUFACTURED HOMEOWNERS INSURANCE POLICY

*FLORIDA*

LIBERTY AMERICAN INSURANCE GROUP
A MEMBER OF PHILADELPHIA INSURANCE COMPANIES

MHO J2 (Ed. 01/02)

EXHIBIT
"A"

NOTICE TO ALL INSUREDS:

IN THE PROCESS OF THE ISSUANCE OF THIS POLICY OR ANY RENEWAL THEREOF, IT MAY BE NECESSARY FOR THE COMPANY TO MAKE AN INVESTIGATION AS TO YOUR INSURABILITY INCLUDING, IF APPLICABLE, INFORMATION AS TO YOUR CHARACTER, GENERAL REPUTATION, PERSONAL CHARACTERISTICS AND MODE OF LIVING. UNDER THE PROVISIONS OF PUBLIC LAW 91-508 YOU ARE ENTITLED TO BE NOTIFIED IN WRITING OF THE COMPLETE NATURE AND SCOPE OF THIS INVESTIGATION, PROVIDED YOU REQUEST IT FROM THE COMPANY IN WRITING WITHIN A REASONABLE TIME AFTER THE EFFECTIVE DATE OF YOUR POLICY.

## TABLE OF CONTENTS

| | PAGE |
|---|---|
| **DEFINITIONS** | 1 |
| **SECTION I COVERAGES** | |
| COVERAGE A – DWELLING | 2 |
| COVERAGE B – OTHER STRUCTURES | 2 |
| COVERAGE C – PERSONAL PROPERTY | 2 |
| COVERAGE D – LOSS OF USE | 3 |
| ADDITIONAL COVERAGES | 3 |
| PERILS INSURED AGAINST | 5 |
| EXCLUSIONS | 7 |
| CONDITIONS | 8 |
| **SECTION II LIABILITY** | |
| COVERAGE E – PERSONAL LIABILITY | 10 |
| COVERAGE F – MEDICAL PAYMENTS TO OTHERS | 10 |
| EXCLUSIONS | 11 |
| ADDITIONAL COVERAGES | 13 |
| **GENERAL POLICY CONDITIONS** | 14 |

IN WITNESS WHEREOF, We have caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declaration Page by our duly authorized agent.

P. Daniel Eldridge
President

Craig P. Keller
Secretary

For inquiries concerning your policy please contact your agent or 800-299-8911.

MHO J2 (ED. 01/02)

MUSA261198    0

## FLORIDA MOBILE HOMEOWNERS POLICY - OUTLINE

The following outline of coverage is for informational purposes only. Florida law prohibits this outline from changing any of the provisions of the insurance contract which is the subject of this outline. Any endorsement regarding changes in types of coverage, exclusions, limitations, reductions, deductibles, coinsurance, renewal provisions, cancellation provisions, surcharges, or credits will be sent separately. READ YOUR MOBILE HOMEOWNERS INSURANCE POLICY CAREFULLY.

Mobile Homeowners policies are designed to provide coverage for your mobile home, other structures on your premises, your personal belongings, loss of use of your mobile home, personal liability and medical payments to others.

### POLICY COVERAGES

Please refer to your policy Declarations for the coverage limit applicable to each policy coverage, the deductible that applies to property losses and the policy premium. The Declarations will indicate if you have any optional coverage, which may not be included in this outline. Below is a brief description of the principal coverage features.

### SECTION I – PROPERTY COVERAGE

COVERAGE A    Covers your dwelling including any attached structures.

COVERAGE B    Covers other structures on the premises of your insured dwelling, which are unattached to the primary residence, such as a detached garage, swimming pool, fence or utility shed. *This coverage is included only if there is a limit shown in the Declarations and you pay an additional premium.*

COVERAGE C    Covers your personal property such as clothes and furniture. Special limits apply to many classes of property such as jewelry. Other classes of personal property such as motorized vehicles are excluded. You should review the limits and exclusions and contact your agent to see if coverage is available in this policy or under some other type of insurance.

COVERAGE D    Additional Living Expense provides for payments to you if you temporarily cannot live in your mobile home because of a covered loss to your dwelling.

### ADDITIONAL COVERAGES INCLUDED

**Personal Property Replacement Cost Coverage** – replaces your contents, in event of a covered loss, with new items of like quality

**Mobile Home Removal** – We will pay up to a $500 when your mobile home must be removed because it is threatened by a loss covered by this policy.

### OPTIONAL COVERAGES AVAILABLE

- Lienholder Single Interest – We will pay the lienholder for direct, sudden, or accidental loss to the mobile home caused by collision while the home is being moved from one place to another. Collision, which damages only wheels, tires, axles, and running gear, is not covered. We will pay the lienholder if they are unsuccessful in their efforts to recover possession of the home or its missing parts due to the Named Insured's transfer of ownership without permission of the lienholder.

- Trip Collision – We will cover your mobile home for 30 days while it is being moved for the perils of collision, upset or stranding or sinking. See the policy for definitions of these perils.

- Golf Cart Coverage – provides property damage as well as liability coverage for your owned golf cart. Read the endorsement that is attached to your policy when this coverage is added.

- Scheduled Personal Property – Allows you to schedule personal property items covering them for additional risks and removing any deductible that may apply to the rest of your policy.

MUSA IOTL 09 03

## SECTION II – LIABILITY COVERAGES

**COVERAGE E**    Covers you for what you become legally liable to pay for bodily injury or property damage to others, as a result of your personal activities or the premises insured by this policy. We will also pay for legal costs to defend you if suit is brought against you. Read the policy for any exclusion that may apply to this coverage.

**COVERAGE F**    Covers medical expense of others injured at your mobile home or as a result of your personal activities.

## PERILS INSURED AGAINST

Your dwelling and other structures are covered against risk of physical loss unless specifically excluded in the policy. Your contents are also covered for named perils unless additional risk perils are purchased. Please read your policy for a description of each.

## EXCLUSIONS

Your policy contains some basic exclusions that apply to all mobile homeowners policies. Other exclusions may apply if there are unacceptable exposures. Basic property exclusions are loss from earth movement (other than sinkhole collapse, water damage from flood and other surface or wind-driven waters, power failure, neglect, war and nuclear hazards. You may purchase flood insurance through the National Flood Insurance Program (NFIP). Your mobile home may be excluded from coverage against windstorm or hail. This would occur if your mobile home were eligible for coverage in the Citizens Property Insurance Company (CPIC) high-risk program. We require that you purchase your wind coverage through the CPIC. Please contact your agent to determine if your mobile home must be insured through the NFIP for flood or the CPIC for windstorm or hail coverage. We also exclude rain, snow, sleet, sand, or dust to the interior of a building unless the direct force of the wind or hail damages the exterior of the building causing an opening in a roof or wall and the rain, snow, sleet, sand, or dust enters through this opening. Certain attachments to your mobile home that may be easily damaged by windstorm are excluded. Please refer to your policy.

Your policy also contains basic exclusions that apply to Section II - Liability coverages. Basic liability exclusions are intentional acts, liability caused by most watercraft, aircraft and business pursuits. There may be other exclusions such as liability caused by certain dogs or other animals. Refer to the declarations and read your policy to determine if there are exclusions added to your policy.

## PREMIUM DISCOUNTS & SURCHARGES

Our policy may contain certain discounts and/or surcharges that apply based upon possible reduced exposure to loss or increased exposure to loss. The following list, while not necessarily complete, portrays some types of exposure that may change your original premium. Your agent is trained in determining if you qualify for any discounts. If you think you may qualify for one, call your agent.

- Mobile Home meets ANSI/ASCE 7-88 standards
- Age 50 and older
- Fire Sprinkler System, Fire Extinguisher and smoke alarm
- Security Guards or Security Gated Community.

## RENEWAL AND CANCELLATION PROVSIONS

You may cancel this policy at any time for any reason. Our right to cancel your policy is limited to the conditions described in your policy. If we intend to cancel or refuse to renew your policy, we will send you an advanced written notice telling you the reasons for our action, and the date the cancellation or non-renewal becomes effective.

**NOTICE:  THIS OUTLINE IS FOR INFORMATIONAL PURPOSES ONLY AND IS <u>NOT</u> INTENDED TO CHANGE THE POLICY CONTRACT IN ANY WAY. READ YOUR POLICY CAREFULLY. YOUR AGENT WILL ASSIST YOU WITH ANY QUESTIONS ABOUT YOUR POLICY.**

MUSA261198    0

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY
## SPECIAL PROVSIONS – FLORIDA
## OWNER OCCUPIED IN PARK MOBILE HOMEOWNERS ENDORSEMENT

**DEFINITIONS**

8. **"residence premises"** is deleted and replaced by the following:

8. **"residence premises"** means the mobile home and other structures located on land owned by or leased to you where you reside and which is shown as the **"residence premises"** in the Declarations.

**SECTION I – PROPERTY COVERAGES**

**COVERAGE B – Other Structures** – applies only if a limit for Coverage B is shown in the Declarations.

**COVERAGE D – Loss of Use** is deleted and replaced with the following:

The limit of liability for Coverage D is the total limit for all the coverages that follow.

1. If a loss covered under this Section makes that part of the **residence premises** where you reside not fit to live in, we cover, at your choice, either of the following. However, if the **residence premises** are not your principal place of residence, we will not provide the option under paragraph b. below.

   a. **Additional Living Expense,** meaning any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living; or
   b. **Fair Rental Value,** meaning the fair rental value of that part of the **residence premises** where you reside less any expenses that do not continue while the premises is not fit to live in.

   Payment under a. or b. will be for the shortest time required to repair or replace

the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere. However, if at the time of the covered loss you are located at a residence owned by or rented to you, other than the **residence premises,** we cover the Additional Living Expense loss as provided under a. for no more than two weeks should you return to Florida to assess the damages to the **residence premises.**

2. If a loss covered under this Section makes that part of the **residence premises** rented to others or held for rental by you not fit to live in, we cover the:

   **Fair Rental Value,** meaning the fair rental value of that part of the **residence premises,** rented to others or held for rental by you less any expenses that do not continue while the premises is not fit to live in.

   **Payment** will be for the shortest time required to repair or replace that part of the premises rented or held for rental.

3. If a civil authority prohibits you from use of the **residence premises** as a result of direct damage to neighboring premises by a Peril Insured Against in this policy, we cover the Additional Living Expense or Fair Rental Value loss as provided under 1 and 2 above for no more than two weeks.

The periods of time under 1, 2, and 3 above are not limited by the expiration of this policy.

We do not cover loss or expense due to cancellation of a lease or agreement.

**ADDITIONAL COVERAGES** –The following Additional Coverage is added:

FL 1A.96 (Ed. 05/03)

**9. Mobile Home Removal** – We will pay up to a $500 when your mobile home must be removed because it is threatened by a loss covered by this policy.

## SECTION I –PERILS INSURED AGAINST

### COVERAGE A-DWELLING and COVERAGE B- OTHER STRUCTURES
The following are added to paragraph 2

g. rain, snow, sleet, sand, or dust to the interior of a building unless the direct force of the wind or hail damages the exterior of the building causing an opening in a roof or wall and the rain, snow, sleet, sand, or dust enters through this opening.

h. windstorm or hail to:
(1) Any structure, including supports and screens, with a roof-like covering not made of strong, durable material; awnings or attachments made of cloth or canvas; or any structure not completely built or fully installed.
(2) Screens, including supports around a pool, patio or other areas.
(3) Fences, property line and similar walls, including seawalls.
(4) Greenhouse, hothouse, slathouse, trellis, pergola, cabana, and other outdoor equipment used to service the **residence premises.**
(5) Structure, including the property in or on the structure, located in whole or in part over water.
Coverage is provided for metal, fiberglass or rigid plastic (not cloth), porches, carports, cabana rooms, awnings, and utility rooms, but only when attached to the mobile home.

## SECTION 1 – EXCLUSIONS
The following is added to 1. b. Earth Movement

This exclusion does not apply sinkhole loss. Sinkhole loss means actual physical damage to the property covered arising out of or caused by sudden settlement or collapse of the earth supporting such property only when such settlement or collapse results from subterranean voids created by the action of water on limestone or similar rock formation. Loss in conjunction with sinkhole loss means structural damage to the building. Contents coverage shall apply only if there is structural

damage to the building. This coverage does not apply to land, including the land on which the dwelling is located.

## SECTION I – CONDITIONS

### 3. Loss Settlement
The following is added to 3. Loss Settlement

c. For loss caused by the peril of hail, we will pay the least of:
(1) the cost to repair; or
(2) the replacement cost of the damaged portion of the dwelling. However, we will pay 50% of the replacement cost damaged portion of the dwelling prior to the actual replacement. Upon receipt of the proof that replacement has been completed, we will pay the balance of the replacement cost of the damaged portion of the dwelling; or
(3) the Amount of Insurance shown on your Declaration Page.

6. Appraisal is deleted and replaced by the following:

6. **Mediation or Appraisal.** If you and we fail to agree on the amount of the loss, either may:
a. Demand a mediation of the loss in accordance with the rules established by the Florida Insurance Department. The results of the mediation are binding only when both parties agree, in writing, on a settlement and, within 3 business days after reaching settlement, you have cashed or deposited any check or draft we provided to you as a result of the mediation conference.

We will pay the cost of conducting any mediation conference except when you fail to appear at a conference. That conference will then be rescheduled upon your payment of the costs of that rescheduled conference. However, if we fail to appear at a mediation conference, we will pay your actual cash expenses incurred while attending the conference and also pay the mediator's fee for the rescheduled conference.

b. Demand an appraisal of the loss. In this event, each party will choose a competent appraiser within 20 days after receiving a

written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that a judge of a court of record in the state where the **residence premises** is located make the choice. The appraisers will separately set the amount of the loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of the loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two would set the amount of the loss.

Each party will:

(1) Pay its own appraiser; and

(2) Bear the other expenses of the appraisal and umpire equally.

If, however, we demanded the mediation and either party rejects the mediation results, you are not required to submit to, or participate in, any appraisal of the loss as a precondition to action against us for failure to pay the loss.

8. Suit Against Us is deleted and replaced with the following:

**8. Suit Against Us.** No action can be brought unless the policy provisions have been complied with and the action is started within five (5) years after the date of loss.

9. Our Option is deleted and replaced with the following:

**9. Our Option.** We may, at our option, repair or replace any covered part or item of damaged property. If an identical replacement is not available, substitute replacement of equal or greater features and functions will be substituted.

10. Loss Payment is deleted and replaced with the following:

**10. Loss Payment.** We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Losses will be payable:
a. 20 days after we receive your proof of loss and reach written agreement with you; or

b. 60 days after we receive your proof of loss and:

(1) There is an entry of a final judgment; or
(2) There is a filing of an appraisal award of a mediation settlement with us.


## SECTION II - EXCLUSIONS

1. **Coverage E – Personal Liability and Coverage F- Medical Payments to Others**, items a. and e. are deleted and replaced by the following:

a. which is expected or intended by one or more **insureds** even if the **bodily injury or property damage:**
(1) is of a different kind, quality or degree than initially expected or intended; or
(2) is sustained by a different person, entity, real or personal property than initially intended.

e. arising out of:
(1) the ownership, maintenance, use, loading or unloading of motor vehicles or all other motorized land conveyances, including trailers, owned or operated by the **insured**. Motorized land conveyances include motor vehicles designed for or used for recreational use off public roads, not subject to motor vehicle registration..
(2) the entrustment by an **insured** of a motor vehicle or any other motorized land conveyance to any person; or
(3) statutorily imposed vicarious parental liability for the actions of a child or minor using a conveyance excluded in paragraph (1) or (2) above.

This exclusion does not apply to:
(1) a trailer not towed by or carried on a motorized land conveyance.
(2) a motorized golf cart when used to play golf on a golf course.
(3) a vehicle or conveyance not subject to motor vehicle registration which is:
   a. used and designed to service an insured's residence;
   b. used and designed for assisting the handicapped;
   c. in dead storage in the **insured location.**

1. Coverage E – Personal Liability and Coverage F – Medical Payments to Others item i. is added:

i. arising out of the use, sale, manufacture, delivery, transfer or possession by any person of a Controlled substance(s) as defined under Federal Law. Controlled Substances include but are not limited to cocaine, LSD, marijuana, and all narcotic drugs. However, this exclusion does not apply to the legitimate use of prescription drugs by a person following the orders of a licensed physician.

## SECTION II CONDITIONS

1. Limit Of Liability is deleted and replaced by the following:

1. **Limit of Liability**
   a. Our total limit of liability under Coverage E for all damages resulting from any one **occurrence** will not be more than the limit of liability for Coverage E as shown in the Declarations. All **bodily injury** and **property damage** resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one **occurrence**.
   b. Sub-Limit of Liability – Subject to Paragraph 1. above, our total liability under Coverage E for damages for which an insured is legally liable because of statutorily imposed vicarious parental liability not other wise excluded is $10,000. This sublimit is within, but does not increase the Coverage E limit of liability.
   c. The limit of liability in a. above and sublimit in b. above apply regardless of the number of **insureds**, claims made or persons injured.
   d. Our total liability under Coverage F for all medical expense payable for **bodily injury** to one person as the result of one accident will not be more than the limit of liability for Coverage F as shown on the Declarations.

## SECTIONS I AND II – CONDITIONS

5. Cancellation is deleted and replaced by the following:

5. **Cancellation**

a. You may cancel this policy at any time by returning to us or advising us in writing of the date that the cancellation is to take effect.
b. When this policy has been in effect for 90 days or less, we may cancel immediately if there has been a material misstatement or misrepresentation or failure to comply with our underwriting requirements.
c. We may also cancel this policy subject to the following provisions. A written cancellation notice, together with the specific reasons for cancellation, will be delivered to you, or mailed to you at your mailing address shown in the Declaration.

Proof of mailing will be sufficient proof of notice.

(1) When you have not paid the premium, we may cancel at any time by letting you know at least 10 days before the date cancellation takes effect.
(2) When this policy has been in effect for 90 days or less, we may cancel for any reason, except we may not cancel:
   (a) on the basis of property insurance claims that are the result of an act of God, unless we can demonstrate, by claims frequency or otherwise, that the insured has failed to take action reasonably necessary as requested by us to prevent recurrence of damage to the insured property; or
   (b) on the basis of filing claims for partial loss caused by sinkhole damage or clay shrinkage, regardless of whether this policy has been the subject of a sinkhole claim, or on the basis of the risk associated with the **occurrence** of such a claim. However, we may cancel this policy if;
      (i) the total of such property claim payments for this policy exceeds the current policy limits of coverage for **property damage**; or

(ii). you have failed to repair the structure in accordance with the engineering recommendations upon which any loss payment or policy proceeds were based.

Except as provided in Paragraph c. 2 above, we will let you know of our action at least 20 before the date cancellation takes effect.

(3) When this policy has been in effect for more than 90 days, we may cancel for:

(a) Material misstatement or material misrepresentation.

(b) Substantial change in risk since the policy was issued.

(c) Failure to comply with our underwriting requirements established by us within 90 days of the effective date of coverage.

(d) If the cancellation is for all **insured** under polices of this type for a given class of **insureds**.

(e) On the basis of property insurance claims that are a result of an act of God, if we can demonstrate, by claims frequency or otherwise, that the **insured** has failed to take action reasonably necessary as requested by us to prevent recurrence of damage to the insured property.

(f) On the basis of filing claims for partial loss caused by sinkhole damage or clay shrinkage, regardless of whether this policy has been the subject of a sinkhole claim, or on the basis of the risk associated with the **occurrence** of such a claim. However, we may cancel this policy if;

    (i) the total of such property claim payments for this policy exceeds the current policy limits of coverage for **property damage**; or

    (ii) you have failed to repair the structure in accordance with the engineering recommendations upon which

any loss payment or policy proceeds were based.

We will give you 90 days written notice of cancellation.

d. When this policy is canceled, the premium for the period from the date of cancellation to the expiration date will be refunded pro rata.

e. If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will refund it within a reasonable time after the date cancellation takes effect.

6. Non-Renewal is deleted and replaced with the following:

**6. Non-Renewal**

We may elect not to renew your policy. However, we will not nonrenew this policy:

a. On the basis of property claims that are a result of an act of God, unless we can demonstrate, by claims frequency or otherwise, that the **insured** has failed to take action reasonably necessary as requested by us to prevent recurrence of damage to the insured property.

b. on the basis of filing claims for partial loss caused by sinkhole damage or clay shrinkage, regardless of whether this policy has been the subject of a sinkhole claim, or on the basis of the risk associated with the **occurrence** of such a claim. However, we may non renew this policy if;

    (1) The total of such property claim payments for this policy exceeds the current policy limits of coverage for **property damage**; or

    (2) You have failed to repair the structure in accordance with the engineering recommendations upon which any loss payment or policy proceeds were based.

We may do so by delivering to you or mailing to you at your mailing address shown in the Declarations, written notice, together with the specific reasons for nonrenewal, at least 90 days prior to the expiration date of this policy. Proof of mailing will be sufficient proof of notice.

All other provisions of this policy apply

MUSA261198    0

# MANDATORY AND OPTIONAL HURRICANE DEDUCTIBLES

Your policy may have a Mandatory Hurricane Deductible. This deductible is taken on a wind loss during a hurricane. If your policy has this deductible, we have adjusted your premium to show this change.

If a mandatory deductible is not shown on your Declaration Page, you may choose one of the following:

1.  2% of Coverage A Hurricane Deductible (minimum of $500.00),
2.  5% of Coverage A Hurricane Deductible (minimum of $500.00),
3.  10% of Coverage A Hurricane Deductible (only if no lienholder exists).

If you select one of these deductibles, your premium will be less. The reason your premium will be less is because you are choosing a higher deductible for a wind loss during a hurricane. If you have a covered wind loss during a hurricane, you may pay more out-of-pocket to repair your property.

If you want to take advantage of the lower premium, please call your agent.

HURR (Ed. 11/00)

MUSA261198    0

## AGREEMENT

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

## DEFINITIONS

In this policy, "you" and "your" refer to the "named insured" shown in the Declarations and the spouse if a resident of the same household. "We," "us" and "our" refer to the Company providing this insurance. In addition, certain words and phrases are defined as follows:

1. **"bodily injury"** means bodily harm, sickness or disease, including required care, loss of services and death that results.

2. **"business"** includes trade, profession or occupation.

3. **"insured"** means you and residents of your household who are:

    a. your relatives; or

    b. other persons under the age of 21 and in the care of any person named above.

    Under Section II, **"insured"** also means:

    c. with respect to animals or watercraft to which this policy applies, any person or organization legally responsible for these animals or watercraft which are owned by you or any person included in 3a or 3b above. A person or organization using or having custody of these animals or watercraft in the course of any **business** or without consent of the owner is not an **insured;**

    d. with respect to any vehicle to which this policy applies:

    (1) persons while engaged in your employ or that of any person included in 3a or 3b above; or

    (2) other persons using the vehicle on an **insured location** with your consent.

4. **"insured location"** means:

    a. the **residence premises;**

    b. the part of other premises, other structures and grounds used by you as a residence and:

    (1) which is shown in the Declarations; or

    (2) which is acquired by you during the policy period for your use as a residence;

    c. any premises used by you in connection with a premises in 4a or 4b above;

    d. any part of a premises:

    (1) not owned by an **insured;** and

    (2) where an **insured** is temporarily residing;

    e. vacant land, other than farm land, owned by or rented to an **insured;**

    f. land owned by or rented to an **insured** on which a one or two family dwelling is being built as a residence for an **insured;**

    g. individual or family cemetery plots or burial vaults of an **insured;** or

    h. any part of a premises occasionally rented to an **insured** for other than **business** use.

5. **"occurrence"** means an accident, including exposure to conditions, which results, during the policy period, in:

    a. **bodily injury;** or

    b. **property damage.**

6. **"property damage"** means physical injury to, destruction of, or loss of use of tangible property.

7. **"residence employee"** means:

    a. an employee of an **insured** whose duties are related to the maintenance or use of the **residence premises,** including household or domestic services; or

    b. one who performs similar duties elsewhere not related to the **business** of an **insured.**

8. **"residence premises"** means:

   a. the one family dwelling, other structures, and grounds; or

   b. that part of any other building;

where you reside and which is shown as the **"residence premises"** in the Declarations.

**"Residence premises"** also means a two family dwelling where you reside in at least one of the family units and which is shown as the **"residence premises"** in the Declarations.

## SECTION I – PROPERTY COVERAGES

### COVERAGE A – Dwelling

We cover:

1. the dwelling on the **residence premises** shown in the Declarations, including structures attached to the dwelling; and

2. materials and supplies located on or next to the **residence premises** used to construct, alter or repair the dwelling or other structures on the **residence premises**.

This coverage does not apply to land, including land on which the dwelling is located.

### COVERAGE B – Other Structures

We cover other structures on the **residence premises** set apart from the dwelling by clear space. This includes structures connected to the dwelling by only a fence, utility line, or similar connection.

This coverage does not apply to land, including land on which the other structures are located.

We do not cover other structures:

1. used in whole or in part for **business;** or

2. rented or held for rental to any person not a tenant of the dwelling, unless used solely as a private garage.

The limit of liability for this coverage will not be more than 10% of the limit of liability that applies to Coverage A. Use of this coverage does not reduce the Coverage A limit of liability.

### COVERAGE C – Personal Property

We cover personal property owned or used by an **insured** while it is anywhere in the world. At your request, we will cover personal property owned by:

1. others while the property is on the part of the **residence premises** occupied by an **insured;**

2. a guest or a **residence employee**, while the property is in any residence occupied by an **insured.**

Our limit of liability for personal property usually located at an **insured's** residence, other than the **residence premises**, is 10% of the limit of liability for Coverage C, or $1000, whichever is greater. Personal property in a newly acquired principal residence is not subject to this limitation for the 30 days from the time you begin to move the property there.

**Special Limits of Liability.** These limits do not increase the Coverage C limit of liability. The special limit for each numbered category below is the total limit for each loss for all property in that category.

1. $200 on money, bank notes, bullion, gold other than goldware, silver other than silverware, platinum, coins and medals.

2. $1000 on securities, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, passports, tickets and stamps.

3. $1000 on watercraft, including their trailers, furnishings, equipment and outboard motors.

4. $1000 on trailers not used with watercraft.

5. $1000 on grave markers.

6. $1000 for loss by theft of jewelry, watches, furs, precious and semi-precious stones.

7. $2000 for loss by theft of firearms.

8. $2500 for loss by theft of silverware, silver-plated ware, goldware, gold-plated ware and pewterware. This includes flatware, holloware, tea sets, trays and trophies made of or including silver, gold or pewter.

9. $2500 on property, on the **residence premises,** used at any time or in any manner for any **business** purpose.

10. $250 on property, away from the **residence premises,** used at any time or in any manner for any **business** purpose.

Copyright, Insurance Services Office, Inc., 1984

HO-3 Ed. 4-84

**Property Not Covered.** We do not cover:

1. articles separately described and specifically insured in this or other insurance;

2. animals, birds or fish;

3. motor vehicles or all other motorized land conveyances. This includes:

   a. equipment and accessories; or

   b. any device or instrument for the transmitting, recording, receiving or reproduction of sound or pictures which is operated by power from the electrical system of motor vehicles or all other motorized land conveyances, including:

      (1) accessories or antennas; or

      (2) tapes, wires, records, discs or other media for use with any such device or instrument;

   while in or upon the vehicle or conveyance.

   We do cover vehicles or conveyances not subject to motor vehicle registration which are:

   a. used to service an **insured's** residence; or

   b. designed for assisting the handicapped;

4. aircraft and parts. Aircraft means any contrivance used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo;

5. property of roomers, boarders and other tenants, except property of roomers and boarders related to an **insured;**

6. property in an apartment regularly rented or held for rental to others by an **insured;**

7. property rented or held for rental to others off the **residence premises;**

8. a. books of account, drawings or other paper records; or

   b. electronic data processing tapes, wires, records, discs or other software media;

   containing **business** data. But, we do cover the cost of blank or unexposed records and media;

9. credit cards or fund transfer cards except as provided in Additional Coverages 6.

## COVERAGE D – Loss Of Use

The limit of liability for Coverage D is the total limit for all the coverages that follow.

1. If a loss covered under this Section makes that part of the **residence premises** where you reside not fit to live in, we cover, at your choice, either of the following. However, if the **residence premises** is not your principal place of residence, we will not provide the option under paragraph b. below.

   a. **Additional Living Expense,** meaning any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living; or

   b. **Fair Rental Value,** meaning the fair rental value of that part of the **residence premises** where you reside less any expenses that do not continue while the premises is not fit to live in.

   Payment under a. or b. will be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.

2. If a loss covered under this Section makes that part of the **residence premises** rented to others or held for rental by you not fit to live in, we cover the:

   **Fair Rental Value,** meaning the fair rental value of that part of the **residence premises** rented to others or held for rental by you less any expenses that do not continue while the premises is not fit to live in.

   Payment will be for the shortest time required to repair or replace that part of the premises rented or held for rental.

3. If a civil authority prohibits you from use of the **residence premises** as a result of direct damage to neighboring premises by a Peril Insured Against in this policy, we cover the Additional Living Expense or Fair Rental Value loss as provided under 1 and 2 above for no more than two weeks.

The periods of time under 1, 2 and 3 above are not limited by expiration of this policy.

We do not cover loss or expense due to cancellation of a lease or agreement.

## ADDITIONAL COVERAGES

1. **Debris Removal.** We will pay your reasonable expense for the removal of:

   a. debris of covered property if a Peril Insured Against causes the loss; or

   b. ash, dust or particles from a volcanic eruption that has caused direct loss to a building or property contained in a building.

   This expense is included in the limit of liability that applies to the damaged property. If the amount to be paid for the actual damage to the property plus the debris removal expense is more than the limit of liability for the damaged property, an additional 5% of that limit of liability is available for debris removal expense.

We will also pay your reasonable expense for the removal of fallen trees from the **residence premises** if:

a. coverage is not afforded under Additional Coverages 3. Trees, Shrubs and Other Plants for the peril causing the loss; or

b. the tree is not covered by this policy;

provided the tree damages covered property and a Peril Insured Against under Coverage C causes the tree to fall. Our limit of liability for this coverage will not be more than $500 in the aggregate for any one loss.

2. **Reasonable Repairs.** We will pay the reasonable cost incurred by you for necessary repairs made solely to protect covered property from further damage if a Peril Insured Against causes the loss. This coverage does not increase the limit of liability that applies to the property being repaired.

3. **Trees, Shrubs and Other Plants.** We cover trees, shrubs, plants or lawns, on the **residence premises,** for loss caused by the following Perils Insured Against: Fire or lightning, Explosion, Riot or civil commotion, Aircraft, Vehicles not owned or operated by a resident of the **residence premises,** Vandalism or malicious mischief or Theft.

The limit of liability for this coverage will not be more than 5% of the limit of liability that applies to the dwelling, or more than $500 for any one tree, shrub or plant. We do not cover property grown for **business** purposes.

This coverage is additional insurance.

4. **Fire Department Service Charge.** We will pay up to $500 for your liability assumed by contract or agreement for fire department charges incurred when the fire department is called to save or protect covered property from a Peril Insured Against. We do not cover fire department service charges if the property is located within the limits of the city, municipality or protection district furnishing the fire department response.

This coverage is additional insurance. No deductible applies to this coverage.

5. **Property Removed.** We insure covered property against direct loss from any cause while being removed from a premises endangered by a Peril Insured Against and for no more than 30 days while removed. This coverage does not change the limit of liability that applies to the property being removed.

6. **Credit Card, Fund Transfer Card, Forgery and Counterfeit Money.**

We will pay up to $500 for:

a. the legal obligation of an **insured** to pay because of the theft or unauthorized use of credit cards issued to or registered in an **insured's** name;

b. loss resulting from theft or unauthorized use of a fund transfer card used for deposit, withdrawal or transfer of funds, issued to or registered in an **insured's** name;

c. loss to an **insured** caused by forgery or alteration of any check or negotiable instrument; and

d. loss to an **insured** through acceptance in good faith of counterfeit United States or Canadian paper currency.

We do not cover use of a credit card or fund transfer card:

a. by a resident of your household;

b. by a person who has been entrusted with either type of card; or

c. if an **insured** has not complied with all terms and conditions under which the cards are issued.

All loss resulting from a series of acts committed by any one person or in which any one person is concerned or implicated is considered to be one loss.

We do not cover loss arising out of **business** use or dishonesty of an **insured.**

This coverage is additional insurance. No deductible applies to this coverage.

Defense:

a. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to defend a claim or suit ends when the amount we pay for the loss equals our limit of liability.

b. If a suit is brought against an **insured** for liability under the Credit Card or Fund Transfer Card coverage, we will provide a defense at our expense by counsel of our choice.

c. We have the option to defend at our expense an **insured** or an **insured's** bank against any suit for the enforcement of payment under the Forgery coverage.

7. **Loss Assessment.** We will pay up to $1000 for your share of any loss assessment charged during the policy period against you by a corporation or association of property owners. This only applies when the assessment is made as a result of each direct loss to the property, owned by all members collectively, caused by a Peril Insured Against under Coverage A – Dwelling, other than earthquake or land shock waves or tremors before, during or after a volcanic eruption.

This coverage applies only to loss assessments charged against you as owner or tenant of the **residence premises.**

We do not cover loss assessments charged against you or a corporation or association of property owners by any governmental body.

    Copyright, Insurance Services Office, Inc., 1984    HO-3 Ed. 4-84

**8. Collapse.** We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:

a. Perils Insured Against in Coverage C – Personal Property. These perils apply to covered building and personal property for loss insured by this additional coverage;

b. hidden decay;

c. hidden insect or vermin damage;

d. weight of contents, equipment, animals, or people;

e. weight of rain which collects on a roof; or

f. use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items b, c, d, e, and f unless the loss is a direct result of the collapse of a building.

Collapse does not include settling, cracking, shrinking, bulging or expansion.

This coverage does not increase the limit of liability applying to the damaged covered property.

## SECTION I – PERILS INSURED AGAINST

### COVERAGE A – DWELLING and
### COVERAGE B – OTHER STRUCTURES

We insure against risks of direct loss to property described in Coverages A and B only if that loss is a physical loss to property; however, we do not insure loss:

1. involving collapse, other than as provided in Additional Coverage 8;

2. caused by:

a. freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. This exclusion applies only while the dwelling is vacant, unoccupied or being constructed unless you have used reasonable care to:

(1) maintain heat in the building; or

(2) shut off the water supply and drain the system and appliances of water;

b. freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:

(1) fence, pavement, patio or swimming pool;

(2) foundation, retaining wall or bulkhead; or

(3) pier, wharf or dock;

c. theft in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied;

d. vandalism and malicious mischief or breakage of glass and safety glazing materials if the dwelling has been vacant for more than 30 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant;

e. constant or repeated seepage or leakage of water or steam over a period of weeks, months or years from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance;

f. (1) wear and tear, marring, deterioration;

(2) inherent vice, latent defect, mechanical breakdown;

(3) smog, rust, mold, wet or dry rot;

(4) smoke from agricultural smudging or industrial operations;

(5) release, discharge or dispersal of contaminants or pollutants;

(6) settling, cracking, shrinking, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings; or

(7) birds, vermin, rodents, insects or domestic animals.

If any of these cause water damage not otherwise excluded, from a plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance, we cover loss caused by the water including the cost of tearing out and replacing any part of a building necessary to repair the system or appliance. We do not cover loss to the system or appliance from which this water escaped.

3. excluded under Section I – Exclusions.

Under items 1 and 2, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

## COVERAGE C – PERSONAL PROPERTY

We insure for direct physical loss to the property described in Coverage C caused by a peril listed below unless the loss is excluded in Section I – Exclusions.

1. **Fire or lightning.**

2. **Windstorm or hail.**

   This peril does not include loss to the property contained in a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

   This peril includes loss to watercraft and their trailers, furnishings, equipment, and outboard motors, only while inside a fully enclosed building.

3. **Explosion.**

4. **Riot or civil commotion.**

5. **Aircraft,** including self-propelled missiles and spacecraft.

6. **Vehicles.**

7. **Smoke,** meaning sudden and accidental damage from smoke.

   This peril does not include loss caused by smoke from agricultural smudging or industrial operations.

8. **Vandalism or malicious mischief.**

9. **Theft,** including attempted theft and loss of property from a known place when it is likely that the property has been stolen.

   This peril does not include loss caused by theft:

   a. committed by an **insured;**

   b. in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied; or

   c. from that part of a **residence premises** rented by an **insured** to other than an **insured.**

   This peril does not include loss caused by theft that occurs off the **residence premises** of:

   a. property while at any other residence owned by, rented to, or occupied by an **insured,** except while an **insured** is temporarily living there. Property of a student who is an **insured** is covered while at a residence away from home if the student has been there at any time during the 45 days immediately before the loss;

   b. watercraft, and their furnishings, equipment and outboard motors; or

   c. trailers and campers.

10. **Falling objects.**

    This peril does not include loss to property contained in the building unless the roof or an outside wall of the building is first damaged by a falling object. Damage to the falling object itself is not included.

11. **Weight of ice, snow or sleet** which causes damage to a building or property contained in the building.

12. **Accidental discharge or overflow of water or steam** from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.

    This peril does not include loss:

    a. to the system or appliance from which the water or steam escaped;

    b. caused by or resulting from freezing except as provided in the peril of freezing below; or

    c. on the **residence premises** caused by accidental discharge or overflow which occurs off the **residence premises.**

13. **Sudden and accidental tearing apart, cracking, burning or bulging** of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

    We do not cover loss caused by or resulting from freezing under this peril.

14. **Freezing** of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance.

    This peril does not include loss on the **residence premises** while the dwelling is unoccupied, unless you have used reasonable care to:

    a. maintain heat in the building; or

    b. shut off the water supply and drain the system and appliances of water.

15. **Sudden and accidental damage from artificially generated electrical current.**

    This peril does not include loss to a tube, transistor or similar electronic component.

16. **Damage by glass or safety glazing material** which is part of a building, storm door or storm window.

    This peril does not include loss on the **residence premises** if the dwelling has been vacant for more than 30 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant.

17. **Volcanic Eruption** other than loss caused by earthquake, land shock waves or tremors.

## SECTION I – EXCLUSIONS

1. We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

   a. **Ordinance or Law,** meaning enforcement of any ordinance or law regulating the construction, repair, or demolition of a building or other structure, unless specifically provided under this policy.

   b. **Earth Movement,** meaning earthquake including land shock waves or tremors before, during or after a volcanic eruption; landslide; mudflow; earth sinking, rising or shifting; unless direct loss by:

      (1) fire;

      (2) explosion; or

      (3) breakage of glass or safety glazing material which is part of a building, storm door or storm window;

      ensues and then we will pay only for the ensuing loss.

      This exclusion does not apply to loss by theft.

   c. **Water Damage,** meaning:

      (1) flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

      (2) water which backs up through sewers or drains; or

      (3) water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

      Direct loss by fire, explosion or theft resulting from water damage is covered.

   d. **Power Failure,** meaning the failure of power or other utility service if the failure takes place off the **residence premises.** But, if a Peril Insured Against ensues on the **residence premises,** we will pay only for that ensuing loss.

   e. **Neglect,** meaning neglect of the **insured** to use all reasonable means to save and preserve property at and after the time of a loss.

   f. **War,** including undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these. Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

   g. **Nuclear Hazard,** to the extent set forth in the Nuclear Hazard Clause of Section I – Conditions.

   h. **Intentional Loss,** meaning any loss arising out of any act committed:

      (1) by or at the direction of an **insured;** and

      (2) with the intent to cause a loss.

2. We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

   a. **Weather conditions.** However, this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in paragraph 1. above to produce the loss;

   b. **Acts or decisions,** including the failure to act or decide, of any person, group, organization or governmental body;

   c. **Faulty, inadequate or defective:**

      (1) planning, zoning, development, surveying, siting;

      (2) design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

      (3) materials used in repair, construction, renovation or remodeling; or

      (4) maintenance;

      of part or all of any property whether on or off the **residence premises.**

## SECTION I – CONDITIONS

1. **Insurable Interest and Limit of Liability.** Even if more than one person has an insurable interest in the property covered, we will not be liable in any one loss:

   a. to the **insured** for more than the amount of the **insured's** interest at the time of loss; or

   b. for more than the applicable limit of liability.

2. **Your Duties After Loss.** In case of a loss to covered property, you must see that the following are done:

   a. give prompt notice to us or our agent;

   b. notify the police in case of loss by theft;

   c. notify the credit card or fund transfer card company in case of loss under Credit Card or Fund Transfer Card coverage;

   d. (1) protect the property from further damage;

   (2) make reasonable and necessary repairs to protect the property; and

   (3) keep an accurate record of repair expenses;

   e. prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory;

   f. as often as we reasonably require:

   (1) show the damaged property;

   (2) provide us with records and documents we request and permit us to make copies; and

   (3) submit to questions under oath and sign and swear to them;

   g. send to us, within 60 days after our request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

   (1) the time and cause of loss;

   (2) the interest of the **insured** and all others in the property involved and all liens on the property;

   (3) other insurance which may cover the loss;

   (4) changes in title or occupancy of the property during the term of the policy;

   (5) specifications of damaged buildings and detailed repair estimates;

   (6) the inventory of damaged personal property described in 2e above;

   (7) receipts for additional living expenses incurred and records that support the fair rental value loss; and

   (8) evidence or affidavit that supports a claim under the Credit Card, Fund Transfer Card, Forgery and Counterfeit Money coverage, stating the amount and cause of loss.

3. **Loss Settlement.** Covered property losses are settled as follows:

   a. (1) Personal property;

   (2) Awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings; and

   (3) Structures that are not buildings;

   at actual cash value at the time of loss but not more than the amount required to repair or replace.

   b. Buildings under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:

   (1) If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:

   (a) the limit of liability under this policy that applies to the building;

   (b) the replacement cost of that part of the building damaged for like construction and use on the same premises; or

   (c) the necessary amount actually spent to repair or replace the damaged building.

(2) If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the full replacement cost of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:

  (a) the actual cash value of that part of the building damaged; or

  (b) that proportion of the cost to repair or replace, after application of deductible and without deduction for depreciation, that part of the building damaged, which the total amount of insurance in this policy on the damaged building bears to 80% of the replacement cost of the building.

(3) To determine the amount of insurance required to equal 80% of the full replacement cost of the building immediately before the loss, do not include the value of:

  (a) excavations, foundations, piers or any supports which are below the undersurface of the lowest basement floor;

  (b) those supports in (a) above which are below the surface of the ground inside the foundation walls, if there is no basement; and

  (c) underground flues, pipes, wiring and drains.

(4) We will pay no more than the actual cash value of the damage unless:

  (a) actual repair or replacement is complete; or

  (b) the cost to repair or replace the damage is both:

    (i) less than 5% of the amount of insurance in this policy on the building; and

    (ii) less than $1000.

(5) You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis. You may then make claim within 180 days after loss for any additional liability on a replacement cost basis.

**4. Loss to a Pair or Set.** In case of loss to a pair or set we may elect to:

  a. repair or replace any part to restore the pair or set to its value before the loss; or

  b. pay the difference between actual cash value of the property before and after the loss.

**5. Glass Replacement.** Loss for damage to glass caused by a Peril Insured Against will be settled on the basis of replacement with safety glazing materials when required by ordinance or law.

**6. Appraisal.** If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the **residence premises** is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.

Each party will:

  a. pay its own appraiser; and

  b. bear the other expenses of the appraisal and umpire equally.

**7. Other Insurance.** If a loss covered by this policy is also covered by other insurance, we will pay only the proportion of the loss that the limit of liability that applies under this policy bears to the total amount of insurance covering the loss.

**8. Suit Against Us.** No action can be brought unless the policy provisions have been complied with and the action is started within one year after the date of loss.

**9. Our Option.** If we give you written notice within 30 days after we receive your signed, sworn proof of loss, we may repair or replace any part of the damaged property with like property.

**10. Loss Payment.** We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 60 days after we receive your proof of loss and:

  a. reach an agreement with you;

  b. there is an entry of a final judgment; or

  c. there is a filing of an appraisal award with us.

**11. Abandonment of Property.** We need not accept any property abandoned by an **insured**.

## 12. Mortgage Clause.

The word "mortgagee" includes trustee.

If a mortgagee is named in this policy, any loss payable under Coverage A or B will be paid to the mortgagee and you, as interests appear. If more than one mortgagee is named, the order of payment will be the same as the order of precedence of the mortgages.

If we deny your claim, that denial will not apply to a valid claim of the mortgagee, if the mortgagee:

a. notifies us of any change in ownership, occupancy or substantial change in risk of which the mortgagee is aware;

b. pays any premium due under this policy on demand if you have neglected to pay the premium; and

c. submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so. Policy conditions relating to Appraisal, Suit Against Us and Loss Payment apply to the mortgagee.

If the policy is cancelled or not renewed by us, the mortgagee will be notified at least 10 days before the date cancellation or nonrenewal takes effect.

If we pay the mortgagee for any loss and deny payment to you:

a. we are subrogated to all the rights of the mortgagee granted under the mortgage on the property; or

b. at our option, we may pay to the mortgagee the whole principal on the mortgage plus any accrued interest. In this event, we will receive a full assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt.

Subrogation will not impair the right of the mortgagee to recover the full amount of the mortgagee's claim.

## 13. No Benefit to Bailee.

We will not recognize any assignment or grant any coverage that benefits a person or organization holding, storing or moving property for a fee regardless of any other provision of this policy.

## 14. Nuclear Hazard Clause.

a. "Nuclear Hazard" means any nuclear reaction, radiation, or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these.

b. Loss caused by the nuclear hazard will not be considered loss caused by fire, explosion, or smoke, whether these perils are specifically named in or otherwise included within the Perils Insured Against in Section I.

c. This policy does not apply under Section I to loss caused directly or indirectly by nuclear hazard, except that direct loss by fire resulting from the nuclear hazard is covered.

## 15. Recovered Property.

If you or we recover any property for which we have made payment under this policy, you or we will notify the other of the recovery. At your option, the property will be returned to or retained by you or it will become our property. If the recovered property is returned to or retained by you, the loss payment will be adjusted based on the amount you received for the recovered property.

## 16. Volcanic Eruption Period.

One or more volcanic eruptions that occur within a 72-hour period will be considered as one volcanic eruption.

---

## SECTION II – LIABILITY COVERAGES

### COVERAGE E – Personal Liability

If a claim is made or a suit is brought against an **insured** for damages because of **bodily injury** or **property damage** caused by an **occurrence** to which this coverage applies, we will:

1. pay up to our limit of liability for the damages for which the **insured** is legally liable; and

2. provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay for damages resulting from the **occurrence** equals our limit of liability.

### COVERAGE F – Medical Payments To Others

We will pay the necessary medical expenses that are incurred or medically ascertained within three years from the date of an accident causing **bodily injury**. Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital, professional nursing, prosthetic devices and funeral services. This coverage does not apply to you or regular residents of your household except **residence employees**. As to others, this coverage applies only:

1. to a person on the **insured location** with the permission of an **insured**; or

Copyright, Insurance Services Office, Inc., 1984

2. to a person off the **insured location**, if the **bodily injury**:

   a. arises out of a condition on the **insured location** or the ways immediately adjoining;

   b. is caused by the activities of an **insured**;

c. is caused by a **residence employee** in the course of the **residence employee's** employment by an **insured**; or

d. is caused by an animal owned by or in the care of an **insured**.

## SECTION II – EXCLUSIONS

1. **Coverage E – Personal Liability and Coverage F – Medical Payments to Others** do not apply to **bodily injury** or **property damage**:

   a. which is expected or intended by the **insured**;

   b. arising out of **business** pursuits of an **insured** or the rental or holding for rental of any part of any premises by an **insured**.

      This exclusion does not apply to:

      (1) activities which are usual to non-**business** pursuits; or

      (2) the rental or holding for rental of an **insured location**:

         (a) on an occasional basis if used only as a residence;

         (b) in part for use only as a residence, unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or

         (c) in part, as an office, school, studio or private garage;

   c. arising out of the rendering of or failure to render professional services;

   d. arising out of a premises:

      (1) owned by an **insured**;

      (2) rented to an **insured**; or

      (3) rented to others by an **insured**;

      that is not an **insured location**;

   e. arising out of:

      (1) the ownership, maintenance, use, loading or unloading of motor vehicles or all other motorized land conveyances, including trailers, owned or operated by or rented or loaned to an **insured**;

      (2) the entrustment by an **insured** of a motor vehicle or any other motorized land conveyance to any person; or

   (3) statutorily imposed vicarious parental liability for the actions of a child or minor using a conveyance excluded in paragraph (1) or (2) above.

   This exclusion does not apply to:

   (1) a trailer not towed by or carried on a motorized land conveyance.

   (2) a motorized land conveyance designed for recreational use off public roads, not subject to motor vehicle registration and:

      (a) not owned by an **insured**; or

      (b) owned by an **insured** and on an **insured location**.

   (3) a motorized golf cart when used to play golf on a golf course.

   (4) a vehicle or conveyance not subject to motor vehicle registration which is:

      (a) used to service an **insured's** residence;

      (b) designed for assisting the handicapped; or

      (c) in dead storage on an **insured location**.

   f. arising out of:

      (1) the ownership, maintenance, use, loading or unloading of a watercraft described below;

      (2) the entrustment by an **insured** of a watercraft described below to any person; or

      (3) statutorily imposed vicarious parental liability for the actions of a child or minor using a watercraft described below.

      Watercraft:

      (1) with inboard or inboard-outdrive motor power owned by an **insured**;

      (2) with inboard or inboard-outdrive motor power of more than 50 horsepower rented to an **insured**;

(3) that is a sailing vessel, with or without auxiliary power, 26 feet or more in length owned by or rented to an **insured**; or

(4) powered by one or more outboard motors with more than 25 total horsepower if the outboard motor is owned by an **insured**. But, outboard motors of more than 25 total horsepower are covered for the policy period if:

    (a) you acquire them prior to the policy period and:

        (i) you declare them at policy inception; or

        (ii) your intention to insure is reported to us in writing within 45 days after you acquire the outboard motors.

    (b) you acquire them during the policy period.

This exclusion does not apply while the watercraft is stored.

g. arising out of:

(1) the ownership, maintenance, use, loading or unloading of an aircraft;

(2) the entrustment by an **insured** of an aircraft to any person; or

(3) statutorily imposed vicarious parental liability for the actions of a child or minor using an aircraft.

An aircraft means any contrivance used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo.

h. caused directly or indirectly by war, including undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these. Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

Exclusions d., e., f., and g. do not apply to **bodily injury** to a **residence employee** arising out of and in the course of the **residence employee's** employment by an **insured**.

2. **Coverage E – Personal Liability**, does not apply to:

a. liability:

(1) for your share of any loss assessment charged against all members of an association, corporation or community of property owners;

(2) under any contract or agreement. However, this exclusion does not apply to written contracts:

    (a) that directly relate to the ownership, maintenance or use of an **insured location**; or

    (b) where the liability of others is assumed by the **insured** prior to an **occurrence**;

    unless excluded in (1) above or elsewhere in this policy;

b. **property damage** to property owned by the **insured**;

c. **property damage** to property rented to, occupied or used by or in the care of the **insured**. This exclusion does not apply to **property damage** caused by fire, smoke or explosion;

d. **bodily injury** to any person eligible to receive any benefits:

(1) voluntarily provided; or

(2) required to be provided;

by the **insured** under any:

(1) workers' compensation law;

(2) non-occupational disability law; or

(3) occupational disease law;

e. **bodily injury** or **property damage** for which an **insured** under this policy:

(1) is also an insured under a nuclear energy liability policy; or

(2) would be an insured under that policy but for the exhaustion of its limit of liability.

A nuclear energy liability policy is one issued by:

(1) American Nuclear Insurers;

(2) Mutual Atomic Energy Liability Underwriters;

(3) Nuclear Insurance Association of Canada;

or any of their successors; or

f. **bodily injury** to you or an **insured** within the meaning of part a. or b. of **"insured"** as defined.

3. **Coverage F – Medical Payments to Others,** does not apply to bodily injury:

  a. to a **residence employee** if the **bodily injury:**

    (1) occurs off the **insured location;** and

    (2) does not arise out of or in the course of the **residence employee's** employment by an **insured;**

  b. to any person eligible to receive benefits:

    (1) voluntarily provided; or

    (2) required to be provided;

  under any:

    (1) workers' compensation law;

    (2) non-occupational disability law; or

    (3) occupational disease law;

  c. from any:

    (1) nuclear reaction;

    (2) nuclear radiation; or

    (3) radioactive contamination;

    all whether controlled or uncontrolled or however caused; or

    (4) any consequence of any of these.

  d. to any person, other than a **residence employee** of an **insured,** regularly residing on any part of the **insured location.**

## SECTION II – ADDITIONAL COVERAGES

We cover the following in addition to the limits of liability:

1. **Claim Expenses.** We pay:

  a. expenses we incur and costs taxed against an **insured** in any suit we defend;

  b. premiums on bonds required in a suit we defend, but not for bond amounts more than the limit of liability for Coverage E. We need not apply for or furnish any bond;

  c. reasonable expenses incurred by an **insured** at our request, including actual loss of earnings (but not loss of other income) up to $50 per day, for assisting us in the investigation or defense of a claim or suit;

  d. interest on the entire judgment which accrues after entry of the judgment and before we pay or tender, or deposit in court that part of the judgment which does not exceed the limit of liability that applies;

  e. prejudgment interest awarded against the **insured** on that part of the judgment we pay. If we make an offer to pay the applicable limit of liability, we will not pay any prejudgment interest based on that period of time after the offer.

2. **First Aid Expenses.** We will pay expenses for first aid to others incurred by an **insured** for **bodily injury** covered under this policy. We will not pay for first aid to you or any other **insured.**

3. **Damage to Property of Others.** We will pay, at replacement cost, up to $500 per **occurrence** for **property damage** to property of others caused by an **insured.**

We will not pay for **property damage:**

  a. to the extent of any amount recoverable under Section I of this policy;

  b. caused intentionally by an **insured** who is 13 years of age or older;

  c. to property owned by an **insured;**

  d. to property owned by or rented to a tenant of an **insured** or a resident in your household; or

  e. arising out of:

    (1) **business** pursuits;

    (2) any act or omission in connection with a premises owned, rented or controlled by an **insured,** other than the **insured location;** or

    (3) the ownership, maintenance, or use of aircraft, watercraft or motor vehicles or all other motorized land conveyances.

    This exclusion does not apply to a motorized land conveyance designed for recreational use off public roads, not subject to motor vehicle registration and not owned by an **insured.**

4. **Loss Assessment.** We will pay up to $1000 for your share of any loss assessment charged during the policy period against you by a corporation or association of property owners, when the assessment is made as a result of:

  a. each **occurrence** to which Section II of this policy would apply;

b. liability for each act of a director, officer or trustee in the capacity as a director, officer or trustee, provided:

(1) the director, officer or trustee is elected by the members of a corporation or association of property owners; and

(2) the director, officer or trustee serves without deriving any income from the exercise of duties which are solely on behalf of a corporation or association of property owners.

This coverage applies only to loss assessments charged against you as owner or tenant of the **residence premises.**

We do not cover loss assessments charged against you or a corporation or association of property owners by any governmental body.

Section II – Coverage E – Personal Liability Exclusion 2.a. (1) does not apply to this coverage.

## SECTION II – CONDITIONS

1. **Limit of Liability.** Our total liability under Coverage E for all damages resulting from any one **occurrence** will not be more than the limit of liability for Coverage E as shown in the Declarations. This limit is the same regardless of the number of **insureds,** claims made or persons injured.

   Our total liability under Coverage F for all medical expense payable for **bodily injury** to one person as the result of one accident will not be more than the limit of liability for Coverage F as shown in the Declarations.

2. **Severability of Insurance.** This insurance applies separately to each **insured.** This condition will not increase our limit of liability for any one **occurrence.**

3. **Duties After Loss.** In case of an accident or **occurrence,** the **insured** will perform the following duties that apply. You will help us by seeing that these duties are performed:

   a. give written notice to us or our agent as soon as is practical, which sets forth:

      (1) the identity of the policy and **insured;**

      (2) reasonably available information on the time, place and circumstances of the accident or **occurrence;** and

      (3) names and addresses of any claimants and witnesses;

   b. promptly forward to us every notice, demand, summons or other process relating to the accident or **occurrence;**

   c. at our request, help us:

      (1) to make settlement;

      (2) to enforce any right of contribution or indemnity against any person or organization who may be liable to an **insured;**

      (3) with the conduct of suits and attend hearings and trials;

      (4) to secure and give evidence and obtain the attendance of witnesses;

   d. under the coverage – Damage to Property of Others – submit to us within 60 days after the loss, a sworn statement of loss and show the damaged property, if in the **insured's** control;

   e. the **insured** will not, except at the **insured's** own cost, voluntarily make payment, assume obligation or incur expense other than for first aid to others at the time of the **bodily injury.**

4. **Duties of an Injured Person – Coverage F – Medical Payments to Others.**

   The injured person or someone acting for the injured person will:

   a. give us written proof of claim, under oath if required, as soon as is practical; and

   b. authorize us to obtain copies of medical reports and records.

   The injured person will submit to a physical exam by a doctor of our choice when and as often as we reasonably require.

5. **Payment of Claim – Coverage F – Medical Payments to Others.** Payment under this coverage is not an admission of liability by an **insured** or us.

6. **Suit Against Us.** No action can be brought against us unless there has been compliance with the policy provisions.

   No one will have the right to join us as a party to any action against an **insured.** Also, no action with respect to Coverage E can be brought against us until the obligation of the **insured** has been determined by final judgment or agreement signed by us.

7. **Bankruptcy of an Insured.** Bankruptcy or insolvency of an **insured** will not relieve us of our obligations under this policy.

8. **Other Insurance – Coverage E – Personal Liability.** This insurance is excess over other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

## SECTIONS I AND II – CONDITIONS

1. **Policy Period.** This policy applies only to loss in Section I or **bodily injury** or **property damage** in Section II, which occurs during the policy period.

2. **Concealment or Fraud.** We do not provide coverage for an **insured** who has:

   a. intentionally concealed or misrepresented any material fact or circumstance; or

   b. made false statements or engaged in fraudulent conduct;

   relating to this insurance.

3. **Liberalization Clause.** If we adopt a revision which would broaden the coverage under this policy without additional premium within 60 days prior to or during the policy period, the broadened coverage will immediately apply to this policy.

4. **Waiver or Change of Policy Provisions.**

   A waiver or change of a provision of this policy must be in writing by us to be valid. Our request for an appraisal or examination will not waive any of our rights.

5. **Cancellation.**

   a. You may cancel this policy at any time by returning it to us or by letting us know in writing of the date cancellation is to take effect.

   b. We may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect. This cancellation notice may be delivered to you, or mailed to you at your mailing address shown in the Declarations.

   Proof of mailing will be sufficient proof of notice.

   (1) When you have not paid the premium, we may cancel at any time by letting you know at least 10 days before the date cancellation takes effect.

   (2) When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason by letting you know at least 10 days before the date cancellation takes effect.

   (3) When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:

   (a) if there has been a material misrepresentation of fact which if known to us would have caused us not to issue the policy; or

   (b) if the risk has changed substantially since the policy was issued.

This can be done by letting you know at least 30 days before the date cancellation takes effect.

   (4) When this policy is written for a period of more than one year, we may cancel for any reason at anniversary by letting you know at least 30 days before the date cancellation takes effect.

   c. When this policy is cancelled, the premium for the period from the date of cancellation to the expiration date will be refunded pro rata.

   d. If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will refund it within a reasonable time after the date cancellation takes effect.

6. **Non-Renewal.** We may elect not to renew this policy. We may do so by delivering to you, or mailing to you at your mailing address shown in the Declarations, written notice at least 30 days before the expiration date of this policy. Proof of mailing will be sufficient proof of notice.

7. **Assignment.** Assignment of this policy will not be valid unless we give our written consent.

8. **Subrogation.** An **insured** may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

   If an assignment is sought, an **insured** must sign and deliver all related papers and cooperate with us.

   Subrogation does not apply under Section II to Medical Payments to Others or Damage to Property of Others.

9. **Death.** If any person named in the Declarations or the spouse, if a resident of the same household, dies:

   a. we insure the legal representative of the deceased but only with respect to the premises and property of the deceased covered under the policy at the time of death;

   b. **insured** includes:

   (1) any member of your household who is an **insured** at the time of your death, but only while a resident of the **residence premises**; and

   (2) with respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative.

MUSA261198      0

# LOSS TO A PAIR OR SET

The following is added to Paragraph 4 of Section I – Conditions:

We cannot guarantee the availability of parts for replacement.  We will not be obligated
to repair or replace the entire pair, set, or series of objects, piece or panel when a part is
lost or damaged.

Pair (Ed. 11/00)

MUSA261198    0    **LIBERTY AMERICAN INSURANCE GROUP, INC.**

Liberty American Insurance Company, Mobile USA Insurance Company, Philadelphia Indemnity Insurance Company, Mobile Homeowners Insurance Agency (MHIA)

### *Notice of Insurance Information Privacy Practices*

---

### We Are Concerned About Your Privacy

When you apply for insurance coverage through Liberty American Insurance Group, Inc., you disclose nonpublic personal information to us. The collection, use and disclosure of such information is regulated by law. Liberty American Insurance Group, Inc., its agents, and subsidiaries maintain physical, electronic, and procedural safeguards that comply with state and federal statutes and regulations to guard your personal information. We also restrict employee access to nonpublic personal information to those with a business reason for knowing such information. Liberty American Insurance Group, Inc., also instructs our employees so that they will understand the importance of the confidentiality of nonpublic personal information, and take appropriate measures to enforce employee privacy responsibilities.

---

### What Types Of Information Do We Collect About You And From Whom?

Liberty American Insurance Group, Inc. obtains most of our information directly from you. The application for insurance you complete, as well as any additional information you provide, generally gives us most of the information we need to know. Occasionally, we may contact you by telephone or mail to obtain additional information. We may use nonpublic personal information about you from your other transactions with us, our affiliates, or others.

Depending on the nature of your insurance transaction, we may require additional information about you or other individuals proposed for coverage. For property coverage, we may send someone to inspect your property to verify information about its value and condition. A photo of any property to be insured may be taken. We may also review insurance claims information and other loss information reports.

We may obtain the additional information we require from third parties, such as other insurance companies, government agencies, information clearinghouses, courts, and other public records. We may receive consumer credit information from a consumer reporting agency. A report from a consumer reporting agency may contain information as to the creditworthiness, credit standing, credit capacity, character, general reputation, hobbies, occupation, personal characteristics, or mode of living. The consumer reporting agency that prepares a consumer report for us may retain that report and disclose it to other persons as permitted by law.

---

### What Do We Do With The Information Collected About You?

Information that has been collected about you may be retained in both our records and in your agent's files. We review it in evaluating your request for insurance coverage, and in determining your rates. We will also refer to and use information in our policy records for purposes related to issuing and servicing insurance policies and settling claims. We may use information about you in our files for insurance marketing purposes or to help you with your overall insurance programs.

If coverage is declined, or the charge for coverage is increased because of information contained in a consumer report we obtained, we will tell you as required by state law and under the federal Fair Credit Reporting Act. We will also provide to you the name and address of the consumer reporting agency making the report.

We may retain information about our former customers and may disclose that information to affiliates and non-affiliates as described in this notice.

Privacy (06/02)

---

### To Whom Do We Disclose Information About You?

We usually do not disclose information about you to others unless the disclosure is necessary to conduct our business.

We do not disclose any nonpublic personal information about our customers or former customers, except as permitted by law. That may mean that we will make disclosures to the following types of third parties without your consent:

- Our affiliated companies;
- Your agent or broker;
- Parties who perform a business, professional, or insurance function for our company, including our reinsurance partners;
- Independent claims adjusters, appraisers, investigators, and attorneys who need information to investigate, defend, or settle a claim involving you;
- Businesses that assist us with data processing or marketing;
- Businesses that conduct scientific research, including actuarial or underwriting studies;
- Other insurance companies, agents, or consumer reporting agencies as reasonably necessary in connection with any application, policy, or claim involving you;
- Insurance support organizations which are established to collect information for the purpose of detecting and preventing insurance crimes of fraudulent claims;
- Insurance regulatory agencies in connection with the regulation of our business;
- Law enforcement or other governmental authorities to protect our legal interests, or in cases of suspected fraud or illegal activities;
- Authorized persons as ordered by subpoena, warrant, or other court order, or as required by law;
- Policyholders for the purpose of providing information regarding the status of an insurance transaction; or
- Lienholders, mortgagees, lessors, or other persons shown on our records as having a legal or beneficial interest in your policy.

## Joint Venture Provision

We may disclose all the information we collect, as described above, to companies that perform marketing services on our behalf, or to other financial institutions with whom we have joint marketing agreements.

## How Can You Find Out About Information We Have About You?

You have the right to know what kind of information we keep in our files about you, to have reasonable access to it and to receive a copy. Contact us at any of the ways provided at the end of this notice if you have questions about what information we may have on file. Tell us what information you would like to receive. Provide your complete name, address, date of birth, type of policy held or applied for and all policy numbers issues to you by us. Certain types of information generally collected when evaluating claims or possible lawsuits, need not be disclosed to you.

Within thirty business days of receipt of your request, we will inform you in writing of the nature and substance of locatable, retrievable, and available recorded personal information about you in our files. You may review this information in person or receive a copy at a reasonable charge. We will also identify the person or organizations to whom we have disclosed this information within the past two (2) years. In addition, you will be given the name and address of any consumer credit reporting agency that prepared a report about you so that you can contact them for a copy of the report if you wish.

After you have reviewed the personal information about you in our file, you may contact us if you believe it should be corrected, amended, or deleted. Tell us what you think is wrong and why. We will consider your request and within thirty business days either change our files, or tell you that we did not and the reason. If we do not make changes, you will have the right to insert in our file a concise statement containing what you believe to be the correct, relevant or fair information and explaining why you believe the information on file to be improper. We will notify persons designated by you to whom we have previously disclosed the information of the change or of your statement. Subsequent disclosures we make also will include your statement.

## How To Contact Us:

*Use any of the following methods:*

| | |
|---|---|
| Liberty American Insurance Group, Inc. | |
| P.O. Box 8080 | Telephone: (727) 546-8911 |
| Pinellas Park, Florida 33780 | Toll Free Number: (800) 299-8911 |
| | Facsimile: (727) 541-1608 |
| | E-mail: www.libertyamerican.com |

Privacy (06/02)

MUSA261198     0

# SPECIFIC ANIMAL LIABILITY EXCLUSION

### SECTION II – EXCLUSIONS

Under paragraph 2. Coverage E – Personal Liability, does not apply to, the following is added:

g.  Bodily injury or property damage caused by the following ineligible breeds or breed mixtures of dog, owned by or kept by you, whether or not the injury or damage occurs on your premises or any other location.

   (1)  Akita
   (2)  Chow (Chow Chow)
   (3)  Doberman Pinscher
   (4)  Great Dane
   (5)  German Shepherd
   (6)  Husky, (Siberian Husky, Husky Type)
   (7)  Keeshond
   (8)  Malamute (Alaskan Malamute)
   (9)  Pit Bull (American Pit Bull, American Pit Bull Terrier, Pit Bull Terrier, American Bulldog)
   (10) Rottweiler
   (11) Staffordshire Terrier (Staffordshire Bull Terrier, American Staffordshire Terrier)
   (12) Wolf or Wolf breed

h.  Bodily injury or property damage caused by livestock, saddle animals or exotic pets. For the purposes of this exclusion, livestock is defined as large farm animals usually kept on a farm; including, but not limited to, cows; pigs; horses; or ostriches. Saddle animals include horses; ponies; camels; llamas; or other animals that may be saddled and ridden. Exotic pets are defined as animals usually only found in the wild or in zoos such as monkeys; large or poisonous snakes or insects; large cats (tigers, lions, panthers, jaguars etc.); bears; alligators or other large reptiles; wolf or any dog including wolf mix.

MUSA ALE 03 03

MUSA261198      0

## PERSONAL PROPERTY REPLACEMENT COST

### SECTION I

For an additional premium, covered losses to the following property are settled at replacement cost at the time of loss:

    a. Coverage C-Personal Property;

    b. If covered in this policy, awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings.

Condition 3. Loss Settlement does not apply to property described in paragraphs a. and b. above.

Personal Property Replacement Cost coverage also applies to articles or classes of property separately described and specifically insured in this policy.

### 1. PROPERTY NOT ELIGIBLE

Property listed below is not eligible for replacement cost settlement. Any loss will be settled at actual cash value at the time of loss but not more than the amount required to repair or replace.

    a. antiques, fine arts, paintings and similar articles of rarity or antiquity which cannot be replaced.

    b. memorabilia, souvenirs, collectors items and similar articles whose age or history contribute to their value.

    c. articles not maintained in good or workable condition

    d. articles that are outdated or obsolete and are stored or not being used.

### 2. REPLACEMENT COST

    a. We will pay no more than the least of the following amounts:

        (1) replacement cost at the time of loss without deduction for depreciation;

        (2) the full cost of repair at the time of loss;

        (3) the limit of liability that applies to Coverage C; or

        (4) any special limits stated in this policy.

    b. When the replacement cost for the entire loss under this endorsement is more than $500, we will pay no more than the actual cash value for the loss or damage until the actual repair or replacement is complete.

    c. You may make a claim for loss on an actual cash value basis and then make claim within 180 days after the loss for any additional liability in accordance with this endorsement.

All other provisions of this policy apply.

MUSA261198    0

# HURRICANE PERCENTAGE DEDUCTIBLE

### A.   Loss by Windstorm During a Hurricane

As respects Paragraph **C. Hurricane Deductible** coverage for loss or damage caused by the peril of Hurricane, which occurs anywhere in the state of Florida, includes loss or damage to the inside of a building or the property contained in a building caused by rain, snow, sleet, hail, sand, or dust if the direct force of the windstorm damages the building, causing an opening in a roof or wall and the rain, snow, sleet, hail, sand or dust enters through this opening.

### B.   Hurricane Defined:

A **Hurricane**   is a storm that has been declared to be a hurricane by the National Hurricane Center of the National Weather Service.  The duration of a Hurricane will be determined by the following conditions for the State of Florida.

1.  Beginning when a hurricane watch or Hurricane warning is issued for any portion of Florida by the National Weather Service; and
2.  Remaining in effect for as long as hurricane conditions exists anywhere in the State of Florida: and
3.  Ending 72 hours after any hurricane watch or hurricane warning has been discontinued for all counties in the state of Florida by the National Hurricane Center of the National Weather Service.

### C.  Hurricane Deductible

1.  We will pay only that part of the total of all loss or damage payable under Section I – Property Coverages that exceeds the hurricane percentage deductible stated on the policy declarations page.

    In determining the amount, if any, that we will pay for loss or damage, we will deduct an amount equal to the percentage deductible, as shown on the declarations page, of the limit of liability that applies to Coverage A – Dwelling, in the policy to which this endorsement is attached at the time of loss or damage.   A minimum deductible of $500 applies.

2.  No other deductible in the policy applies to loss or damage caused by windstorm during a hurricane.  Refer to the policy declarations for the deductible that applies to windstorm loss or damage if the circumstances of the loss described above do not apply.

All other provisions of this policy apply.

FL22.97 (Ed. 11/00)

MUSA261198    0

# MOBILE HOMEOWNERS POLICY

## SPECIAL PERSONAL PROPERTY COVERAGE

### (Attaches to Form HO-3 Ed. 4/84 Only)

For an additional premium, the Perils Insured Against under Coverage C - Personal Property is deleted and the following substituted:

### SECTION I – PERILS INSURED AGAINST

## COVERAGE C – PERSONAL PROPERTY

We insure against risks of direct physical loss to the property described in Coverage C only if that loss is a physical loss to property.

We do not insure, however, for loss:

1.     Under coverage C:

    a.    excluded under SECTION I – EXCLUSIONS;

    b.    caused by freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. The exclusion applies only while the dwelling is vacant, unoccupied, or being constructed, unless you have used reasonable care to:

        (1)    maintain heat in the building; or

        (2)    shut off the water supply and drain the system and appliance of water;

    c.    caused by freezing, thawing, pressure, or weight of the water or ice, whether driven by wind or not, to a:

        (1)    fence, pavement, patio, or swimming pool;

        (2)    foundation, retaining wall, or bulkhead;

        (3)    pier, wharf, or dock;

    d.    caused by Theft in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is completed and occupied;

    e.    caused by

        (1)    wear and tear, marring, deterioration;

        (2)    inherent vice, latent defect, mechanical breakdown;

        (3)    Smog, rust, mold, wet or dry rot;

        (4)    smoke from agricultural smudging, or industrial operations;

        (5)    discharge, dispersal, seepage, migration, release or escape of pollutants. Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed;

        (6)    settling, cracking, shrinking, bulging, or expansion of pavements, patios, foundations, walls, floors, roofs, or ceilings; or

        (7)    birds, vermin, rodents, insects or domestic animals.

If any of these cause water damage not otherwise excluded, from a plumbing, heating, air conditioning, or automatic fire protective sprinkler system or

household appliance, we cover loss caused by the water including the cost of tearing out and replacing any part of a building necessary to repair the system or appliance. We do not cover loss to the system or appliance from which this water escaped.

f.   To property caused by constant or repeated seepage or leakage of water or steam over a period of weeks, months or years from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.

g.   Loss to personal property caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the exterior of a building causing an opening in a roof or wall and the rain, snow, sleet, sand, or dust enters through this opening.

Under Paragraphs b. through f., any ensuing loss to property described in Coverage C not excluded or excepted in this policy is covered.

2.   We do not insure for loss under Coverage C caused by:

a.   Breakage of:

(1)   eyeglasses, glassware, statuary, marble;

(2)   bric-a-brac, porcelains, and similar fragile articles other than jewelry, watches, bronzes, cameras, and photographic lenses.

There is coverage for breakage of the property by or resulting from:

(1)   fire, lightning, windstorm, hail;

(2)   smoke, other than smoke from agricultural smudging, or industrial operations;

(3)   explosion, riot, civil commotion;

(4)   aircraft, vehicles, vandalism and malicious mischief, earthquake;

(5)   collapse of a building or any part of a building;

(6)   water not otherwise included;

(7)   theft or attempted theft; or

(8)   sudden and accidental tearing apart, cracking, burning, or bulging of a:

(a)   steam or hot water heating system;

(b)   air conditioning or automatic fire protective sprinkler system; or

(c)   an appliance for heating water;

b.   Dampness of atmosphere or extremes of temperature unless the direct cause of loss is rain, snow, sleet, or hail;

c.   Refinishing, renovating, or repairing property other than watches, jewelry, and furs;

d.   Collision, other than collision with a land vehicle, sinking, swamping, or stranding of watercraft, including their trailers, furnishings, equipment, and outboard motors;

e.   Destruction, confiscation, or seizure by order of any government or public authority.

    f.    Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body. However, any ensuing loss to property described in Coverage C not excluded or excepted in this policy is covered.

## SECTION I – COVERAGE C – PERSONAL PROPERTY

The **Special Limits of Liability** items 6., 7., and 8., are deleted and the following substituted:

6.    $1000 for loss by theft, misplacing or losing of jewelry, watches, furs, precious and semi-precious stones.

7.    $2000 for loss by theft, misplacing, or losing of firearms.

8.    $2500 for loss by theft, misplacing or losing of silverware, silver-plated ware, goldware, gold-plated ware, and pewterware. This includes flatware, hollowware, tea sets, trays and trophies made of or including silver, gold or pewter.

## SECTION I – ADDITIONAL COVERAGES

8.    **Collapse**

Paragraph a. is deleted and replaced by the following:

a. Perils Insured Against in Coverages A and B.

The following paragraph is also added:

This additional coverage does not apply to Coverage C – Personal Property

## SECTION I – EXCLUSIONS

1.b.    **Earth Movement.** The following paragraph is added:

This exclusion applies only to property described in Coverages A and B.

1.c.    **Water Damage.** The following paragraph is added:

Water damage to property described in Coverage C away from a premises or location owned, rented, occupied, or controlled by an **insured** is covered.

All other provisions of this policy apply.

*First Amended Class Action Complaint and Demand for Trial By Jury*
CASE NO. 08-20385-CV-GRAHAM/TORRES

# Exhibit "B"

## Declarations Page

**Liberty American Insurance Group.**
Member Philadelphia Insurance Companies
For inquiries please call your agent or 800-299-8911

| | |
|---|---|
| Policy Number | MUSA261198 |
| Effective Dates | From: 01-15-04 to 01-15-05  Effective Date of Transaction: 01-15-2004 Original Inception: 01-15-04  At 12:01 AM Standard Time at the residence premises. |
| Transaction | NEW BUSINESS  Policy Type: Manufactured Home  Program Type: Imperial |
| Agent Name and Address  Agency Code:  Agent Phone # | INS BUREAU INC/PT CHARLOTTE  55500I  PO BOX 31087  TAMPA, FL 33631-3087  (800)891-4222 |
| Named Insured  Mailing Address | DOMENIC ALLOCCO  OR LESLIE ALLOCCO  1000 KINGS HWY UNIT 272  PORT CHARLOTTE, FL 33980-4217 | Insuring Company:  MOBILE USA INSURANCE CO  P. O. BOX 8080  PINELLAS PARK, FL 33780-8080 |
| Physical Location | 1000 KINGS HWY UNIT 272  PORT CHARLOTTE, FL 33980-4217 |
| Property Description | Year:1977  LxW:44 x 24  Make:DORA LEE  Serial:OL074707871FL |

Coverage at the residence premises is provided only where a limit of liability is shown or a premium is stated

| Coverage Section | Limits | Non-Hurricane Premium | Hurricane Premium | Total Premium |
|---|---|---|---|---|
| A.Dwelling | 40000 | 269.00 | 291.00 | 560.00 |
| B.Other Structures | | | | |
| C.Personal Property | 20000 | INCLUDED | INCLUDED | INCLUDED |
| D.Loss Of Use | 8000 | INCLUDED | INCLUDED | INCLUDED |
| E.Personal Liability | 100000 | 6.00 | INCLUDED | 6.00 |
| F.Medical Payments To Others | 1000 | 2.00 | INCLUDED | 2.00 |

| Additional Coverages | | |
|---|---|---|
| REPLACEMENT COST MOBILE HOME | | INCLUDED |
| REPLACEMENT PERSONAL EFFECTS | | INCLUDED |
| $500 NON HURR DEDUCTIBLE | | INCLUDED |
| HO3 ENDORSEMENT (PL 5.94 ATTACHED) | | 15.00 |

| Total Premium Adjustment | See Page 2 For Breakdown | 0.00 |
|---|---|---|
| Total Policy Prem | | Total 583.00 |

| Deductible | All Section I Perils: 500 | Hurricane Deductible: 1000 |
|---|---|---|

| Special Messages | THIS POLICY CONTAINS A SEPARATE DEDUCTIBLE FOR HURRICANE LOSSES, WHICH MAY RESULT IN HIGH OUT OF POCKET EXPENSES TO YOU. |
|---|---|

| Reason For Change | NEW BUSINESS |
|---|---|

Countersigned by Authorized Representative    Pinellas Park, Florida    Insured    Date: 01-12-2004

LAIG DEC Rev. 11/01

Page 2

| Named Insured | Policy Number |
|---|---|
| DOMENIC ALLOCCO | MUSA261198 |

**Pay Plan**

| Number of Payments: | Bill to: INSURED |
|---|---|

**Additional Insured**

| | Special Messages: |
|---|---|
| | NOTICE! THIS POLICY DOES NOT COVER FLOOD LOSS. |

**Mortgagee(s)**

Number 1                          Number 2

Loan #                            Loan #

**Rating Information**

| Construction | Year Constructed | # Families | Occupancy Type | County | BCEG |
|---|---|---|---|---|---|
| FRAME | 1977 | N/A 10 Mons or More | | CHARLOTTE | |

| Territory/Pr Grp | MH Park Name | Prot Class | Fire Department | Company Code |
|---|---|---|---|---|
| 2 | PORT CHARLOTTE VILLAGE | CHARLOTTE CO FD | | 000001 |

**Premium Adjustments Breakdown**

| | Non-Hurricane | Hurricane |
|---|---|---|
| OLDER THAN 20 YR SURCHARGE | 40.00 | |
| AGE 50 DISCOUNT | -13.00 | |
| AAA,AARP,FMHO MEMBER DISCOUNT | -13.00 | |
| FIRE/SMOKE ALARM/NOSMOKER DISC | -13.00 | |
| $1000 HURR DEDUCTIBLE | -13.00 | -15.00 |
| MGA FEE | 25.00 | |
| EMPATF SURCHARGE | 2.00 | |

**Forms And Endorsements**

```
MHOJ2 01 02
FL1A.96 05 03
HURR. 11/00
HO-3 4/84
PAIR 11/00
MUSA ALE 03 03
HO-290 1/87
FL22.97 11/00
FL5.94 01 03
```

## Declarations Page



**Liberty American Insurance Group.**
Member Philadelphia Insurance Companies
For inquiries please call your agent or 800-290-8911

| Policy Number | MUSA273207 |
|---|---|

**Effective Dates** From: 05-31-04 to 05-31-05  Effective Date of Transaction: 05-31-2004 Original Inception: 05-31-04
*At 12:01 AM Standard Time at the residence premises.*

**Transaction** NEW BUSINESS   Policy Type Manufactured Home   Program Type Imperial

**Agent Name and Address**
JOHNSON INSURANCE INC    00278J
401 JOHNSON LANE  SUITE 103
**Agency Code:** VENICE, FL 34292-
**Agent Phone #** (941)488-7495

**Named Insured** WILLIAM J APPEL    Insuring Company:
**Mailing Address** 1000 KINGS HWY #285    MOBILE USA INSURANCE CO
PORT CHARLOTTE, FL 33980    P. O. BOX 8080
PINELLAS PARK, FL 33780-8080

**Physical Location**
1000 KINGS HWY #285
PORT CHARLOTTE, FL 33980
**Property**

**Description** Year:1977  LxW:48 x 24  Make:FLEETWOOD  Serial:1272-1273-B
**Coverages and Premiums** *Coverage at the residence premises is provided only where a limit of liability is shown or a premium is stated*

| Coverage Section | Limits | Non-Hurricane Premium | Hurricane Premium | Total Premium |
|---|---|---|---|---|
| A.Dwelling | 45000 | 298.00 | 323.00 | 621.00 |
| B.Other Structures | | | | |
| C.Personal Property | 22500 | INCLUDED | INCLUDED | INCLUDED |
| D.Loss Of Use | 9000 | INCLUDED | INCLUDED | INCLUDED |
| E.Personal Liability | 100000 | 6.00 | INCLUDED | 6.00 |
| F.Medical Payments To Others | 1000 | 2.00 | INCLUDED | 2.00 |

**Additional Coverages**
REPLACEMENT COST MOBILE HOME    INCLUDED
REPLACEMENT PERSONAL EFFECTS    INCLUDED
$500 NON HURR DEDUCTIBLE    INCLUDED

**Total Premium**
**Adjustments** See Page 2 For Breakdown
-4.00

**Total Policy Prem** Total
625.00

**Deductible** All Section I Perils:    Hurricane Deductible:
500    1000

**Special Messages** THIS POLICY CONTAINS A SEPARATE DEDUCTIBLE FOR
HURRICANE LOSSES, WHICH MAY RESULT IN HIGH OUT OF
POCKET EXPENSES TO YOU.

**Reason For Change** NEW BUSINESS

Insured

Countersigned by Authorized Representative    Pinellas Park, Florida    Date: 04-07-2004

LAIG DEC Rev. 11/01

Page 2

**Named Insured**
WILLIAM J APPEL

**Policy Number**
MUSA273207

**Pay Plan**

**Number of Payments:**

**Bill to:**  INSURED

**Additional Insured**

**Special Messages:**
NOTICE! THIS POLICY
DOES NOT COVER FLOOD LOSS.

**Mortgagee(s)**

Number 1

Number 2

Loan #

Loan #

**Rating Information**

| Construction | Year Constructed | # Families | Occupancy Type | County | BCEG |
|---|---|---|---|---|---|
| FRAME-ALUMINUM | 1977 | N/A Not < 2 Months | | CHARLOTTE | |

| Territory/Pr Grp | MH Park Name | Prot Class | Fire Department | Company Code |
|---|---|---|---|---|
| 2 | PORT CHARLOTTE VILLAGE | | CHARLOTTE CO FD | 000001 |

**Premium Adjustments Breakdown**

|  | Non-Hurricane | Hurricane |
|---|---|---|
| OLDER THAN 20 YR SURCHARGE | 45.00 | |
| AGE 50 DISCOUNT | -15.00 | |
| AAA,AARP,FMHO MEMBER DISCOUNT | -15.00 | |
| FIRE/SMOKE ALARM/NOSMOKER DISC | -15.00 | |
| $1000 HURR DEDUCTIBLE | -15.00 | |
| MGA FEE | 25.00 | -16.00 |
| EMPATF SURCHARGE | 2.00 | |

**Forms And Endorsements**

MHOJ2 01 02
FL1A.96 05 03
HURR. 11/00
HO-3 4/84
PAIR 11/00
MUSA ALE 03 03
FL DOG 05 00
MH ANEXCL 02 04
LAIGTREX 12 03
HO-290 1/87
FL22.97 11/00

LAIG DEC Rev. 11/01

## Declarations Page

**Liberty American**
**Insurance Group.**
Member Philadelphia Insurance Companies
For inquiries please call your agent or 800-299-8911

| | |
|---|---|
| Policy Number | MUSA278505 |
| Effective Dates | From: 05-06-04 to 05-06-05  Effective Date of Transaction: 05-06-2004 Original Inception: 05-06-04  At 12:01 AM Standard Time at the residence premises. |

| Transaction | NEW BUSINESS | Policy Type Manufactured Home  Program Type  Imperial |
|---|---|---|

**Agent Name and Address**
SPINNAKER INSURANCE AGENCY                        01930S
531 TAMIAMI TRAIL SUITE 2
PORT CHARLOTTE, FL 33953-
(941)613-2210

**Agency Code:**

**Agent Phone #**

**Named Insured**
FLORENCE L KRUSE
**Mailing Address**
AND/OR LINDA DAWSON
1000 KINGS HWY UNIT 243
PORT CHARLOTTE, FL 33980-5206

**Insuring Company:**
MOBILE USA INSURANCE CO
P. O. BOX 8080
PINELLAS PARK, FL 33780-8080

**Physical Location**
1000 KINGS HWY UNIT 243
PORT CHARLOTTE, FL 33980-5206

**Property**

**Description**
Year:1977  LxW:44 x 24  Make:BAYWOOD  Serial:CELTFL71153U

**Coverages and Premiums**
Coverage at the residence premises is provided only where a limit of liability is shown or a premium is stated

| Coverage Section | Limits | Non-Hurricane Premium | Hurricane Premium | Total Premium |
|---|---|---|---|---|
| A. Dwelling | 50000 | 328.00 | 355.00 | 683.00 |
| B. Other Structures | | | | |
| C. Personal Property | 25000 | INCL | INCL | INCL |
| D. Loss Of Use | 10000 | INCL | INCL | INCL |
| E. Personal Liability | 300000 | 21.00 | INCL | 21.00 |
| F. Medical Payments To Others | 1000 | 2.00 | INCL | 2.00 |

**Additional Coverages**

| | |
|---|---|
| REPLACEMENT COST MOBILE HOME | INCL |
| REPLACEMENT PERSONAL EFFECTS | INCL |
| $500 NON HURR DEDUCTIBLE | INCL |

**Total Premium**  See Page 2 For Breakdown

**Adjustments**                                                                    -6.00

**Total Policy Prem**                                                    Total  : 700.00

**Deductible**

| All Section I Perils: | Hurricane Deductible: | |
|---|---|---|
| 500 | 1000 | |

**Special Messages**
THIS POLICY CONTAINS A SEPARATE DEDUCTIBLE FOR
HURRICANE LOSSES, WHICH MAY RESULT IN HIGH OUT OF
POCKET EXPENSES TO YOU.

**Reason For Change**
NEW BUSINESS

_[signature]_                              Insured

Countersigned by Authorized Representative    Pinellas Park, Florida    Date: 05-06-2004

LAIG DEC Rev. 11/01

Page 2

| | | |
|---|---|---|
| **Named Insured** FLORENCE L KRUSE | | **Policy Number** MUSA278505 |

**Pay Plan**

| **Number of Payments:** 4 Installments | **Bill to:** INSURED |
|---|---|

**Additional Insured**

**Special Messages:**
NOTICE! THIS POLICY
DOES NOT COVER FLOOD LOSS.

**Mortgagee(s)**

Number 1                                    Number 2

Loan #                                        Loan #

**Rating Information**

| Construction FRAME | Year Constructed 1977 | # Families N/A | Occupancy Type 10 Mons or More | County CHARLOTTE | BCEG |
|---|---|---|---|---|---|
| Territory/Pr Grp 2 | MH Park Name PORT CHARLOTTE VILLAGE | | Prot Class | Fire Department CHARLOTTE CO FD | Company Code 000001 |

**Premium Adjustments Breakdown**

| | Non-Hurricane | Hurricane |
|---|---|---|
| OLDER THAN 20 YR SURCHARGE | 49.00 | |
| AGE 50 DISCOUNT | -16.00 | |
| AAA,AARP,FMHO MEMBER DISCOUNT | -16.00 | |
| FIRE/SMOKE ALARM/NOSMOKER DISC | -16.00 | |
| $1000 HURR DEDUCTIBLE | -16.00 | -18.00 |
| MGA FEE | 25.00 | |
| EMPATF SURCHARGE | 2.00 | |

**Forms And Endorsements**

MHOJ2 01 02
FL1A.96 05 03
HURR. 11/00
HO-3 4/84
PAIR 11/00
MUSA ALE 03 03
FL DOG 05 00
MH ANEXCL 02 04
LAIGTREX 12 03
HO-290 1/87
FL22.97 11/00

LAIG DEC Rev. 11/01

## Declarations Page



**Liberty American**
**Insurance Group,**
Member Philadelphia Insurance Companies
For inquiries please call your agent or 800-299-8911

| | |
|---|---|
| **Policy Number** | MUSA278164 |
| **Effective Dates** | From: 06-22-04 to 06-22-05  Effective Date of Transaction: 06-22-2004  Original Inception: 06-22-04<br>At 12:01 AM Standard Time at the residence premises. |
| **Transaction** | NEW BUSINESS   Policy Type Manufactured Home  Program Type Imperial |
| **Agent Name and Address** | JOHNSON INSURANCE INC          00278J<br>401 JOHNSON LANE  SUITE 103<br>VENICE, FL 34292-<br>(941)488-7495 |
| **Agency Code:** | |
| **Agent Phone:** | |
| **Named Insured** | ROY WIIK              Insuring Company:<br>AND/OR ANNE WIIK           MOBILE USA INSURANCE CO<br>1000 KINGS HWY #284         P. O. BOX 8080<br>PORT CHARLOTTE, FL 33980     PINELLAS PARK, FL 33780-8080 |
| **Mailing Address** | |
| **Physical Location** | 1000 KINGS HWY #284<br>PORT CHARLOTTE, FL 33980 |
| **Property** | |
| **Description** | Year:1978  LxW:40 x 24  Make:SCHULTZ  Serial:S154912A/B |

**Coverages and Premiums**

Coverage at the residence premises is provided only where a limit of liability is shown or a premium is stated

| Coverage Section | Limits | Non-Hurricane Premium | Hurricane Premium | Total Premium |
|---|---|---|---|---|
| A.Dwelling | 40000 | 269.00 | 291.00 | 560.00 |
| B.Other Structures | | | | |
| C.Personal Property | 20000 | INCL | INCL | INCL |
| D.Loss Of Use | 8000 | INCL | INCL | INCL |
| E.Personal Liability | 100000 | 6.00 | INCL | 6.00 |
| F.Medical Payments<br>  To Others | 1000 | 2.00 | INCL | 2.00 |

**Additional Coverages**

| | |
|---|---|
| REPLACEMENT COST MOBILE HOME | INCL |
| REPLACEMENT PERSONAL EFFECTS | INCL |
| $500 NON HURR DEDUCTIBLE | INCL |

| | |
|---|---|
| **Total Premium** | See Page 2 For Breakdown |
| **Adjustments** | 0.00 |
| **Total Policy Prem** | Total  568.00 |
| **Deductible** | All Section I Perils: 500    Hurricane Deductible: 1000 |

**Special Messages**  THIS POLICY CONTAINS A SEPARATE DEDUCTIBLE FOR HURRICANE LOSSES, WHICH MAY RESULT IN HIGH OUT OF POCKET EXPENSES TO YOU.

**Reason For Change**  NEW BUSINESS

Countersigned by Authorized Representative   Insured  Pinellas Park, Florida   Date: 05-06-2004

LAIG DEC Rev. 11/01

Page 2

| | | |
|---|---|---|
| **Named Insured**<br>ROY WIIK | | **Policy Number**<br>MUSA278164 |

**Pay Plan**

| **Number of Payments:** | **Bill to:** INSURED |
|---|---|

**Additional Insured**

**Special Messages:**

NOTICE! THIS POLICY
DOES NOT COVER FLOOD LOSS.

**Mortgagee(s)**

Number 1                     Number 2

Loan #                       Loan #

**Rating Information**

| **Construction**<br>FRAME-ALUMINUM | **Year Constructed**<br>1978 | **# Families**<br>N/A Not | **Occupancy Type**<br>< 2 Months | **County**<br>CHARLOTTE | **BCEG** |
|---|---|---|---|---|---|

| **Territory/Pr Grp**<br>2 | **MH Park Name**<br>PORT CHARLOTTE VILLAGE | **Prot Class** | **Fire Department**<br>CHARLOTTE CO FD | **Company Code**<br>000001 |
|---|---|---|---|---|

**Premium Adjustments Breakdown**

| | Non-Hurricane | Hurricane |
|---|---|---|
| OLDER THAN 20 YR SURCHARGE | 40.00 | |
| AGE 50 DISCOUNT | -13.00 | |
| AAA,AARP,FMHO MEMBER DISCOUNT | -13.00 | |
| FIRE/SMOKE ALARM/NOSMOKER DISC | -13.00 | |
| $1000 HURR DEDUCTIBLE | -13.00 | -15.00 |
| MGA FEE | 25.00 | |
| EMPATF SURCHARGE | 2.00 | |

**Forms And Endorsements**

MHOJ2 01 02
FLIA.96 05 03
HURR. 11/00
HO-3 4/84
PAIR 11/00
MUSA ALE 03 03
FL DOG 05 00
MH ANEXCL 02 04
LAIGTREX 12 03
HO-290 1/87
FL22.97 11/00

LAIG DEC Rev. 11/01