UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 08-20385-CIV-GRAHAM/TORRES

WILLIAM APPEL, ROY WIIK,
ANNE WIIK, LESLIE ALLOCCO,
FLORENCE KRUSE, and LINDA DAWSON,

    Plaintiffs,

vs.

LIBERTY AMERICAN INSURANCE
COMPANY,

LIBERTY AMERICAN INSURANCE
GROUP, INC.,

MOBILE HOMEOWNERS' INSURANCE
AGENCIES, INC.,
(now known as LIBERTY AMERICAN
INSURANCE SERVICES, INC.),

MOBILE USA INSURANCE COMPANY,
(now known as LIBERTY AMERICAN
SELECT INSURANCE COMPANY), and

PHILADELPHIA CONSOLIDATED
HOLDING CORPORATION,

    Defendants.
_____/

### ORDER

**THIS CAUSE** comes before the Court upon Defendants' Motion to Dismiss for Lack of Standing [D.E. 102] and Defendants' Motion to Dismiss the First Amended Class Action Complaint [D.E. 103].

**THE COURT** has considered the Motions and the pertinent portions of the record, and is otherwise fully advised in the premises.

I.  BACKGROUND

Plaintiffs William Appel ("Appel"), Roy Wiik, Anne Wiik, Leslie Allocco ("Allocco"), Florence Kruse ("Kruse"), and Linda Dawson ("Dawson") filed their original Complaint against Liberty American Insurance Company ("LAIC"), Liberty American Insurance Group, Inc. ("LAIG"), Mobile USA Insurance Company (now known as Liberty American Select Insurance Company, hereinafter "LASIC"), and Philadelphia Consolidated Holding Corporation ("PCHC") for breach of contract, unjust enrichment, money had and received, injunctive relief, and declaratory relief [D.E. 1]. Plaintiffs are mobile homeowners in Florida who suffered windstorm damage to their homes from hurricanes. They claim that the Defendants failed to pay them the replacement cost of their mobile homes in violation of their insurance policies.

The Defendants filed motions to dismiss for various reasons, including lack of standing [D.E. 12 & 13]. With respect to standing, Defendants argued that Plaintiffs' policies are with LASIC only and, therefore, there is no standing to sue the other Defendants. Plaintiffs countered that they have standing to sue the other Defendants under agency theories. The court found that there was standing to sue LAIG under an apparent agency theory, but was unable to reach a conclusion with respect to the other Defendants due to the limited evidence in the record [D.E. 59]. Ultimately, the Court denied the motions to dismiss, but directed

the parties to engage in limited discovery to elucidate the relationship between PCHC, LAIG, LASIC and LAIC [D.E. 59]. In subsequent Orders, the Court set out a schedule for limited discovery, for Plaintiffs to amend the complaint, and for Defendants to renew their standing arguments via a motion to dismiss the amended complaint.

The limited discovery has concluded, and Plaintiffs have filed their First Amended Class Action Complaint and Demand for Jury Trial [D.E. 118]. The First Amended Complaint includes a new Defendant - Liberty American Insurance Services ("LAIS"). Before the Court are Defendants' Motion to Dismiss for Lack of Standing [D.E. 102] and Defendants' Motion to Dismiss the First Amended Class Action Complaint [D.E. 103].

## II. DISCUSSION

### A. Motion to Dismiss for Lack of Standing

#### 1. Standard of Review

To come within the subject matter jurisdiction of a federal court, a party must prove the elements of standing, Dimaio v. Democratic National Committee, 520 F.3d 1299 (11th Cir. 2008). There are three prerequisites for standing:

> First, the plaintiff must have suffered an injury in fact - an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of - the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third

3

party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Id. at 1302.

"[A] motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) can be based upon either a facial or factual challenge to the complaint." McElmurray v. The Consolidated Government of Augusta-Richmond County, 501 F.3d 1244, 1251 (11th Cir. 2007)(citing Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir. 1981). "A 'facial attack' on the complaint requires the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." McElmurray, 501 F.3d at 1251 (quoting Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990). "'Factual attacks,' on the other hand, 'challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered.'" McElmurray, 501 F.3d at 1251 (quoting Lawrence v. Dunbar, 919 F.22d 1525, 1529 (11th Cir. 1990).

"[W]hen the attack is factual, the trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56." Lawrence v. Dunbar, 919 F.3d 155, 1529 (11th Cir. 1990). "Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction - its very power to hear the case - there is substantial authority that

4

the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." Lawrence, 919 F.3d at 1529. As a result, "the district court has the power to dismiss for lack of subject matter jurisdiction on any of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." McElmurray, 501 F.3d at 1251 (quoting Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir. 1981).

In the instant case, it is clear that Defendants' Motion to Dismiss for Lack of Standing is based on a factual challenge to the Amended Complaint. Moreover, the Court provided the parties an opportunity to conduct limited discovery so that the facts relating to standing could be obtained and then presented to this Court. Because the attack on the First Amended Complaint is factual, the Court will consider matters outside the pleadings.

### 2. Standing to sue LAIC, LAIS and PCHC

It is undisputed that except for their independent insurance agents and their policies with LASIC, Plaintiffs had no contact with any of the Defendants at the time they purchased the policies. [D.E. 102-2, Allocco Dep. 8:4-14:3; D.E. 102-3, Appel Dep. 12:21-16:17; D.E. 102-3, D.E. 102-4, Dawson Dep. 8:21-13-22; D.E. 102-5, Anne Wiik Dep. 8:20-10:23; D.E. 102-6, Roy Wiik 8:25-9:23]. Without reference to any authority, Defendants argue that "the key

point in time for [the] 'causal connection' element of the standing inquiry is the point of purchase of the policies" and, therefore, Plaintiffs have standing to sue LASIC only [D.E. 102 at 8]. This unsupported argument ignores the allegations in the First Amendment Complaint. Specifically, Plaintiffs allege that:

> After Plaintiffs and Class Members made insurance claims due to hurricanes, Defendants took advantage of the ambiguity between Defendants' type written Declaration Page and the printed Loss Settlement provision... Instead of complying with the coverages provided on the Declarations Page and paying for replacement cost coverage, Defendants paid on a 'policy limits' basis resulting in the payment of Plaintiffs' and Class Members claims at only a fraction of what Plaintiffs and Class Members needed in order to repair or replace their significantly damaged homes. Defendants routinely caused Plaintiffs and Class Members monetary injury because of Defendants' failure to provide the replacement cost coverage purchased by the Plaintiffs and Class.

[D.E. 118, ¶ 5]. Further in the Amended Complaint, Plaintiffs allege:

> Defendants proximately caused damages to each Plaintiff and Class Member because he/she was not paid for his/her covered hurricane windstorm damage claims based upon a 'replacement cost' basis. Instead, his or her claim was paid based upon an insurance 'policy limits' or other non-replacement cost method.

[D.E. 118, at ¶ 80]. Based on the foregoing, the Court finds that the alleged economic injury is traceable to the failure to pay replacement cost coverage. Thus, Plaintiffs' failure to deal with Defendants at the time of purchase is not dispositive of their claims against the Non-LASIC Defendants.

### a. Actual Agency

"Generally, a contract does not bind one who is not a party to the contract, or who has not in some manner agreed to accept its terms." Whetstone Candy Co. v. Kraft Foods Inc., 351 F.3d 1067, 1073 (11th Cir. 2003). However, under Florida law, if an agency relationship exists between PCHC, LAIC, LAIS and LASIC, then LASIC could bind the other Defendants to the policy agreements. See Whetstone, 351 F.3d at 1074, n.8.

There are two theories of agency - actual authority and apparent authority. See Court Appointed Receiver of Lancer Offshore, Inc. v. The Citgo Group, 2008 U.S.Dist. LEXIS 25740, at * 78 (S.D.Fla. Mar. 31, 2008). "For actual authority to exist such that the principal is bound, there must be an agency relationship, which requires: (1) the principal to acknowledge that the agent will act for it; (2) the agent to manifest an acceptance of the undertaking; and (3) control by the principal over the actions of the agent." Whetstone, 351 F.3d at 1077. The amount of control must be significant for a subsidiary to be the agent of a parent corporation. Whetstone, 351 F.3d at 1077, n.14 (citing Meterlogic, Inc. v. Copier Solutions, Inc., 126 F.Supp.2d 1346, 1356 (S.D.Fla. 2000)). In other words, "there must be "so much control that the subsidiary has 'no separate interests of its own and functions solely to achieve the purposes of the dominant corporation.'" Id. at 1077. Furthermore, the parent company must control the day-to-day activities of the subsidiary. Meterlogic, 126 F.Supp.2d at

1356.

According to the organization chart, PCHC is the parent company. LAIG is a 100% owned subsidiary of PCHC, and LAIS, LASIC, and LAIC are owned 100% by LAIG. [D.E. 102-8, Meyer Dep. 21:6-22:4]. The CEO of the Liberty Defendants testified that LAIG is a holding company, LASIC and LAIC are insurance companies, and LAIS is a managing general agency [D.E. 105-2, Eldridge Dep. 43:21-44:2]. According to Craig Keller, the Executive VP, Treasurer, and Secretary of PCHC, PCHC is also a holding company [D.E. 102-7, Keller Dep. At 50].

In the instant case, Plaintiffs do not allege simply that the subsidiaries are agents of the parent corporations. Rather, Plaintiffs allege and argue that the Liberty Defendants and PCHC acted as agents for each other. For example, according to the First Amended Complaint, "[i]n soliciting policies and adjusting claims for Plaintiffs and Class Members, the Liberty American Defendants and PCHC, individually or in concert, have routinely acted as an agent or agents for each other in marketing, providing insurance coverage, and settling insurance claims ..." [D.E. 118 at ¶ 47].

### LAIS

The Complaint alleges that "LAIS has been authorized and has had the apparent authority to market and provide and did provide mobile home insurance coverage and claims administration as a

managing general agent for Defendants in the State of Florida on behalf of PCHC and all Defendants" [D.e. 118 at ¶ 47]. It is undisputed that LAIS has been the managing general agent for LASIC and LAIC since October 2003 [D.E. 102-8, Meyer Dep. 16:17-25; D.E. 107-7; D.E. 107-8]. Pursuant to the Managing General Agency Agreement with LASIC, LAIS has the authority to perform various functions including supervising and conducting the writing of the Personal Lines Insurance business, soliciting, evaluating and binding applications for insurance, collecting, refunding and remitting premiums, and handling all claims arising out of the Personal Lines Insurance Business. [D.E. 107-7, Section II]. The foregoing is sufficient evidence of LASIC's acknowledgment of LAIS's authority to act on its behalf and LAIS's acceptance of the undertaking.

The evidence also demonstrates that LASIC controlled the actions of LAIS. Paul Leftwich, the former VP of Claims for LAIS, agreed that the Florida Liberty American companies acted as a single, common enterprise when he worked there. When asked to expand, Mr. Leftwich stated: "[w]e didn't meet as individual companies. We met and we conducted business as really one entity. And by business, I don't mean the financial end of it because I have very little knowledge of the financial end of it. I'm just talking about the day-to-day, mundane business operations" [D.E. 105-3; Leftwich Dep. 44]. Mr. Leftwich also testified that the

Liberty American Defendants used the same personnel and managers, and operated out of the same office in Florida" [D.E. 105-3, Leftwich Dep. 46].

The Liberty Defendants' CEO, Bruce Meyer, testified that LAIS is an MGA that "markets, underwrites, collects premium[s], issues policies, and adjusts claims for the insurance carriers that it represents as a managing general agency." [D.E. 102-8, Meyer Dep. 16:19-25]. He also testified that the Liberty American Defendants shared the same office space during the class period, and the same officers and directors, many of whom were also employees of LAIS [Meyer Dep. 27:3-32:16].

The former CEO of the Liberty Defendants, Dan Eldridge, testified that during his tenure (from 1999 to 2005), LAIS was a managing general agency that "produces, services the business for companies." [D.E. 105-2, Eldridge Dep. 23:23-24:2]. Furthermore, when asked if LAIS is a company in the insurance industry, Mr. Eldridge replied that "[i]t's an agency" [D.E. 105-2, Eldridge Dep. 24:6-27:2]. He also testified that all of the Liberty American Defendants did business out of the same office between 1999 and 2005. Id.

Finally, with respect to the Plaintiffs in this case, it appears that the premiums were paid to LAIS [D.E. 107-11, 107-12]. Furthermore, in one of the responses to Plaintiffs' interrogatories, Defendants answered that they "were not involved

in the processing, evaluation, adjusting, settlement or payment of claims under the LASIC Manufactured Homeowners Insurance Policies. Claims adjustment functions were performed by LAIS, on behalf of LASIC" [D.E. 107-3, at 9]. These interrogatories were answered in October 2008, prior to the amendment of the Complaint which added LAIS as a Defendant. The aforementioned factors, in addition to the MGA agreement, lead this Court to conclude that LAIS functioned solely to achieve the purposes of LASIC, and that LASIC exerted control over the day-to-day operations of LAIS. At the very least, with respect to the claims of Plaintiffs in this case, the evidence demonstrates that LAIS was acting solely on behalf of LASIC. Based on the foregoing, this Court finds that LAIS is the agent of LASIC.

### LAIC

With respect to LAIC, the Amended Complaint alleges that LAIC "has been authorized and has had the apparent authority to market and provide and did provide mobile home insurance coverage in the state of Florida on behalf of PCHC and all Defendants" [D.E. 118 at ¶ 51].

Significantly, the evidence shows that LAIC's Claims Department was involved in processing Plaintiffs' claims. Plaintiffs have included a letter dated May 4, 2005 detailing the amount Mr. Appel would receive for his claim [D.E. 107-13]. The letter states that the payment would exhaust the policy limits for loss of use. [D.E. 107-13]. The letter is on LAIG letterhead, but

11

it is signed by an employee of the LAIC Claims Department. In addition, LAIC, LASIC and LAIS appear in the footer. Furthermore, the letter references the insurance policy that Mr. Appel has with LASIC [D.E. 107-13]. This evidence demonstrates acknowledgment by LASIC of LAIC's authority to act on its behalf, with respect to the processing of Plaintiffs' claims, and LAIC's acceptance of this undertaking.

The evidence also shows that LASIC controlled the actions of LAIC, at least with respect to Plaintiffs' insurance claims. Between October 1999 and September 2004, LASIC and LAIC (along with other related entities) were parties to a reinsurance and pooling agreement "whereby the entire net insurance business ... would be treated as a unit and distributed between them on a pro rata basis, in order to obtain the mutual advantages to the Companies and their policyholders or more economical operations and more uniform underwriting results" [D.E. 107-9, at 3]. Furthermore, in September 2004, LAIC and LASIC entered into a Reinsurance and Pooling Agreement among themselves only, and the pooling agreement dated October 1999 was terminated [D.E. 107-10]. Like the first pooling agreement, the second also states that the insurance business of LAIC and LASIC "would be treated as a unit ... for more economical operations and more uniform underwriting results" [D.E. 107-10].

The foregoing, in addition to the testimony of Mr. Leftwich

(that the Liberty Defendants met and conducted day-to-day mundane business as one entity, used the same personnel and managers, and operated out of the same office), Mr. Meyer (that the Liberty Defendants shared the same office space and the same officers and directors), and Mr. Eldridge (that the Liberty Defendants did business out of the same office between 1999 and 2005), leads this Court to conclude that, with respect to the processing of Plaintiffs' claims, LAIC functioned solely to achieve the purposes of LASIC, and LASIC exerted control over the day-to-day operations of LAIC. [D.E. 105-3, Leftwich Dep. 44 & 46; D.E. 102-8, Meyer Dep. 27:3-32:16; D.E. 105-2, Eldridge Dep. 24:6-27:2]. Based on the foregoing, this Court finds that LAIC was the agent of LASIC.

### PCHC

According to PCHC's SEC filings, PCHC's business segments are organized around three underwriting groups. The Personal Lines Underwriting Group is located in Pinellas Park, Florida [D.E. 20-10, at 6]. According to the 2004 and 2005 10K Reports, PCHC:

> maintains a local presence to more effectively serve its producer and customer base, operating through 12 regional offices and 24 field offices throughout the country, which report to the regional offices. These offices are staffed with field underwriters, marketers, accounts receivable and, in some cases, claim personnel, who interact closely with home office management in making key decisions. This approach allows the company to adapt its underwriting and marketing strategies to local conditions and build value-added relationships with its customers and producers...

[D.E. 20-9, at 3; 20-10, at 3]. The same filing goes on to state

that PCHC's operations are classified into three reportable business segments, one of which is the Personal Lines Underwriting Group. Id. Finally, the report states that PCHC "entered the personal lines property and casualty business through the acquisition of Liberty American Insurance Group, Inc." and that the personal lines platform "produces and underwrites specialized manufactured housing and homeowners' property and casualty business principally in Florida ..." [D.E. 20-9, at 4; 20-10 at 4]. Furthermore, a snapshot taken from PCHC's website in January 2008 shows that one of its Regional Offices is located in Pinellas Park, Florida [D.E. 20-15]. Finally, in the 2006 Annual Report, "PHLY" is identified as the Nasdaq symbol for PCHC [D.E. 20-16]. The Report goes on to say that PHLY is six different entities, including LASIC, LAIC and LAIS [D.E. 20-16]. The Court finds that the foregoing evidence sufficiently demonstrates acknowledgment by PCHC of LASIC's authority to act on its behalf, and LASIC's acceptance of this undertaking.

Turning to the question of control, Defendants argue that the evidence merely demonstrates common ownership and control between PCHC and LASIC, which is insufficient to demonstrate the requisite degree of control.

For LASIC to be the actual agent of PCHC, there must be so much control that LASIC "has no separate interests of its own" and "functions solely to achieve the purposes of" PCHC. See Whetstone,

14

351 F.3d at 1077, n.14 (citing Meterlogic, 126 F.Supp.2d at 1356). Furthermore, PCHC must control the day to day activities of LASIC. See Whetstone, 351 F.3d at 1077, n.14 (citing Meterlogic, 126 F.Supp.2d at 1356).

As evidence of substantial control, Plaintiffs point to PCHC's involvement in the business activities of LASIC, such as PCHC's approval, through its CEO, of the decision to stop writing insurance in Florida after Hurricane Charley and to sell insurance to mobile home customers [D.E. 102-8, Meyer Dep. 153-156], the use of PCHC claims personnel to process claims after the hurricanes, due to a shortage in Liberty American personnel [D.E. 105-3, Leftwich Dep. 38:16-39:7], the involvement of PCHC in the decision to use the Liberty Bell logo [D.E. 105-2; Eldridge Dep. at 74-75], the requirement that the Liberty American Defendants follow PCHC's code of conduct [D.E. 107-20, at 8], PCHC's control of the computer server that contained the Liberty American Defendants' emails [McVeigh Dep. at 48, 60-61], PCHC's maintenance of detailed systems, records and databases that enable it to respond swiftly to developments and trends, including hurricanes in Florida [D.E. 102-7, at 113], PCHC's participation in the decision to execute a reinsurance and pooling agreement [D.E. 105-2, Eldridge Dep. At 64:7-12], and the reporting of the Liberty Defendants' managers to PCHC's officers and managers. Plaintiffs also argue that PCHC's officers and managers were also officers, managers and board

members of the Liberty American Defendants.

With respect to reporting, Mr. Leftwich, the former VP of Claims for LAIS, testified that he reported to Dan Eldridge, President of LAIG, LAIS, LASIC and LAIC, and peripherally to Mr. Benake, the VP of Claims for PCHC [D.E. 105-3, Leftwich Dep. at 22-23]. Mr. Leftwich also sought Mr. Benake's approval for the standard operating procedures he created, and, in general, for large loss claims. Id. at 24-27. Furthermore, Mr. Leftwich testified that PCHC managers attended the Liberty Defendants' monthly meetings on occasion. [Leftwich Dep. at 28:19-29:14; 33:12-34:1]. Dan Eldridge, the former President of the Liberty Defendants, testified that he reported to Jamie Maguire, the President and CEO of PCHC, three to four times a month on average by telephone, and once or twice a week on average by email [D.E. 105-2, Eldridge Dep. 33:18-35:5]. He also testified that, after the hurricanes hit in 2003 and 2004, he spoke to Jamie Maguire two to three times a week regarding the Liberty American Defendants' resources to handle the claims. Id. at 36-37. Mr. Eldridge also stated that he provided quarterly operations and financial reports to Jamie Maguire. These reports included updates on the business plan and claims activity. Id. at 46-48. Finally, Bruce Meyer, the current CEO and President of the Liberty Defendants, testified that he reported to Chris Maguire on average eight to ten times per month regarding the ongoing business activity of LASIC, LAIC and

LAIS [D.E. 102-8, Meyer Dep. at 90-92]. At the time, Chris Maguire was the Chief Underwriting Officer at PCHC. Id.

After reviewing the evidence, the Court finds that it sufficiently demonstrates that PCHC controlled the day-to-day activities of LASIC, and that LASIC functioned solely to achieve the business purposes of PCHC. Thus, the Court finds that LASIC is the agent of PCHC.

### B. Motion to Dismiss the First Amended Complaint

Defendants argue that the First Amended Complaint should be dismissed because: (1) Plaintiffs' claims conflict with the plain and unambiguous provisions of their policies; (2) Plaintiffs' claims are subject to appraisal; and (3) Plaintiffs fail to allege actual repair and replacement [D.E. 103]. After reviewing this Motion, the Court finds that all of the arguments were previously raised in the Motion to Dismiss the original complaint. The changes that appear in the First Amended Complaint have no effect on this Court's prior resolution of these arguments [See Order at D.E. 59].

With respect to the new case cited by Defendants in support of their argument that Plaintiffs' claims are subject to appraisal, Goff v. State Farm Florida Ins. Co., 2008 WL 5191521 (Fla. 2d DCA Dec. 12, 2008) the Court finds that it is also distinguishable from the facts in this case. Although Goff involves an insurance contract with similar replacement cost and appraisal provisions,

the amount of loss was clearly in dispute. Based on its review of the First Amended Complaint in this case, the Court finds that there is no allegation of a dispute over the amount of loss. This case continues to present a question of coverage under the policy, specifically, whether Defendants must pay the total replacement cost under the policy.

## III. CONCLUSION

Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss for Lack of Standing [D.E. 102] is **DENIED**. It is further

**ORDERED AND ADJUDGED** that Defendant's Motion to Dismiss the First Amended Complaint [D.E. 103] is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 1st day of July, 2009.

DONALD L. GRAHAM
UNITED STATES DISTRICT JUDGE

cc: U.S. Magistrate Judge Edwin G. Torres
All Counsel of Record