**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 08-20385-CV-GRAHAM/TORRES**

WILLIAM APPEL, ROY WIIK, ANNE WIIK,
LESLIE ALLOCCO, FLORENCE KRUSE, and
LINDA DAWSON,

     Plaintiffs,

v.

LIBERTY AMERICAN INSURANCE COMPANY,
LIBERTY AMERICAN INSURANCE GROUP, INC.,
MOBILE HOMEOWNERS' INSURANCE
AGENCIES, INC., a Florida corporation,
*now known as* LIBERTY AMERICAN
INSURANCE SERVICES, INC.,
MOBILE USA INSURANCE COMPANY, *now known
as* LIBERTY AMERICAN SELECT INSURANCE
COMPANY, and, PHILADELPHIA
CONSOLIDATED HOLDING CORPORATION,

     Defendants.

_____/

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ...................................................................................... 5

      A.    Who Is Liberty American?............................................................... 5

      B.    How Does Mobile Home Insurance Work?...................................... 6

      C.    How Did Florida Insureds Purchase Their Liberty American Policies?................ 8

      D.    Regulatory Interpretation and Publications about "Replacement Cost".............. 10

      E.    Claims Handling by Liberty American During the 2004-2005 Hurricanes......... 13

      F.    Analysis of the Named Plaintiffs' Claims ........................................... 15

      G.    Sample Survey of Putative Class Members' Claims ............................ 17

ARGUMENT ....................................................................................................... 18

I.     THERE ARE NO COMMON QUESTIONS OF LAW OR FACT, AND CERTAINLY NONE THAT PREDOMINATE OVER INDIVIDUAL ISSUES ......... 19

      A.    Plaintiffs Have Not Satisfied Their Burden of Proving on a Classwide Basis That the Policy Limits Paid to Class Members Necessarily Were Less Than "Replacement Cost." ......................................... 20

            1.    Plaintiffs' Mere Assertion that Payment of Policy Limits Necessarily Undercompensated Class Members Is Unsupported by Any Evidence .............................................. 21

            2.    The Issue Whether the Replacement Cost Exceeds the Policy Limit Payment Policy Will Depend on Individualized Proofs ......................... 23

      B.    LASIC Has a Contractual Right to Appraisal of the "Amount of Loss" for Each Putative Class Member ................................................ 28

      C.    Plaintiffs' "Policy Interpretation" Question Also Implicates Individualized Issues................................................................ 29

II.    A CLASS ACTION IS NOT THE SUPERIOR METHOD FOR THE FAIR AND EFFICIENT ADJUDICATION OF THIS CONTROVERSY ....................... 31

III.   PLAINTIFFS HAVE NOT ESTABLISHED ADEQUACY OR TYPICALITY........... 33

IV.   CERTIFICATION OF A CLASS WOULD VIOLATE DEFENDANTS' CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A JURY TRIAL ............... 34

CONCLUSION...................................................................................................... 35

## **TABLE OF AUTHORITIES**

**CASES**

*Adams v. Monumental Gen. Cas. Co.*,
 4:05-CV-132 (CDL), 2009 WL 383625 (M.D. Ga. Feb. 12, 2009) ........................................ 29

*Allapattah Services, Inc. v. Exxon Corp.*,
 333 F.3d 1248 (11th Cir. 2003) ......................................................................................... 27

*Auto Ventures, Inc. v. Moran*,
 92-426-CIV-KEHOE, 1997 WL 306895 (S.D. Fla. Apr. 3, 1997).......................................... 21

*Buell v. Direct Gen. Ins. Agency, Inc.*,
 8:06-cv-1791-T-26MSS, 2007 WL 1296347  (M.D. Fla. May 1, 2007),
 *amended on denial of reh'g*, 488 F. Supp. 2d 1215 (M.D. Fla. 2007),
 *aff'd*, 267 F. App'x. 907 (11th Cir. 2008).......................................................................... 31

*Buford v. H & R Block, Inc.*,
 168 F.R.D. 340 (S.D. Ga. 1996), *aff'd sub nom. Jones v. H & R Block Tax Servs.*,
 117 F.3d 1433 (11th Cir. 1997) ........................................................................................ 29

*Burstein v. First Penn-Pac. Life Ins. Co.*,
 209 F.R.D. 674 (S.D. Fla. 2002)........................................................................................ 23

*Cannon v. GunnAllen Fin., Inc.*,
 No. 3:06-0804, 2008 WL 4279858 (M.D. Tenn. Sept. 15, 2008) ........................................ 34

*Cardiovascular Care of Sarasota, P.A. v. Cardinal Health, Inc.*,
 No. 8:08–cv–1931–T30TBM, 2009 WL 928321 (M.D. Fla. Apr. 3, 2009)............................ 20

*CH2M Hills Se., Inc. v. Pinellas County*,
 598 So. 2d 85 (Fla. Dist. Ct. App. 1992) ........................................................................... 33

*City of St. Petersburg v. Total Containment, Inc.*,
 265 F.R.D. 630 (S.D. Fla. 2010)................................................................................... 32, 34

*Davis v. Allstate Ins. Co.*,
 781 So. 2d 1143 (Fla. Dist. Ct. App. 2001) ........................................................................ 24

*Eisen v. Carlyle & Jacquelin*,
 417 U.S. 156 (1974).......................................................................................................... 19

*Essex Ins. Co. v. Zota*,
 466 F.3d 981 (11th Cir. 2006), 985 So. 2d 1036 (Fla. 2008) ............................................. 30

*Estevez v. N. Assur. Co. of Am.*,
 10-14647, 2011 WL 2206707 (11th Cir. June 7, 2011)....................................................... 30

*Folkman v. Quamme*,
 665 N.W.2d 857 (Wis. 2003)............................................................................................. 30

*Gen. Tel. Co. v. Falcon*,
 457 U.S. 147 (1982).......................................................................................................... 18

*Gibbs Properties Corp. v. CIGNA Corp.*,
   196 F.R.D. 430 (M.D. Fla. 2000) ............................................................ 34

*Green v. FedEx Nat'l, LTL, Inc.*,
   272 F.R.D. 611 (M.D. Fla. 2011) ............................................................ 29

*Griffin v. Dugger*,
   823 F.2d 1476 (11th Cir. 1987) ............................................................ 33

*Guardian Angel Credit Union v. MetaBank*,
   No. 08-cv-261-PB, 2009 WL 2489325 (D.N.H. Aug. 12, 2009) ........................... 34

*Jim Moore Ins. Agency, Inc. v. State Farm Mut. Auto. Ins. Co., Inc.*,
   02-80381-Civ, 2003 WL 21146714 (S.D. Fla. May 6, 2003), *report and recommendation
   adopted*, 02-80381-Civ, 2003 WL 22097937 (S.D. Fla. Sept. 2, 2003) ................... 29

*Jones v. Jeld-Wen, Inc.*,
   250 F.R.D. 685 (S.D. Fla. 2008) ............................................................ 33

*Kelly v. Palmer, Reifler, & Assocs., P.A.*,
   681 F. Supp. 2d 1356 (S.D. Fla. 2010) ..................................................... 20

*Kerr v. W. Palm Beach*,
   875 F.2d 1546 (11th Cir. 1989) ............................................................ 19

*King v. CVS/Caremark Corp.*,
   No. 07-21824-CIV, 2008 WL 5973490 (S.D. Fla. Sept. 11, 2008) ........................ 32

*Klay v. Humana Inc.*,
   382 F.3d 1241 (11th Cir. 2004) ................................................. 20, 27, 32

*Lindsey v. Normet*,
   405 U.S. 56 (1972) ....................................................................... 35

*Mills v. Foremost Ins. Co.*,
   269 F.R.D. 663 (M.D. Fla. 2010) ........................................... 18, 26, 29, 32

*Monticello Ins. Co. v. City of Miami Beach*,
   No. 06-20459-CIV, 2009 WL 667454 (S.D. Fla. Mar. 11, 2009) ......................... 30

*Moore v. Travelers Cos.*,
   321 Fed. App'x 911 (11th Cir. 2009) ....................................................... 28

*Nguyen v. St. Paul Travelers Ins. Co.*,
   CIV.A. 06-4130, 2008 WL 4691685 (E.D. La. Oct. 22, 2008) ............................ 27

*Phillip Morris USA v. Scott*,
   131 S. Ct. 1 (2010) ...................................................................... 35

*Pop's Pancakes, Inc. v. NuCO2, Inc.*,
   251 F.R.D. 677 (S.D. Fla. 2008) ............................................................ 21

*Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*,
   601 F.3d 1159 (11th Cir. 2010) ............................................... 20, 27, 29, 32

*Schafer v. State Farm Fire & Cas. Co.*,
   74 Fed. R. Serv. 3d 150 (E.D. La. 2009) ................................................... 27

*Sher v. Raytheon*,
  No. 09-15798, 2011 WL 814379 (11th Cir. Mar. 9, 2011) ..................................................... 19

*State Farm Fire & Cas. Co. v. Metro. Dade Cnty.*,
  639 So. 2d 63 (Fla. Dist. Ct. App. 1994) ...................................................................................... 26

*State Farm Fire & Cas. Co. v. Patrick*,
  647 So. 2d 983 (Fla. Dist. Ct. App. 1994) .................................................................................... 25

*State of Ala. v. Blue Bird Body Co.*,
  573 F.2d 309 (5th Cir. 1978) ........................................................................................................ 35

*Valley Drug Co. v. Geneva Pharms., Inc.*,
  350 F.3d 1181 (11th Cir. 2003) ............................................................................................. 18, 19

*Vega v. T-Mobile USA, Inc.*,
  564 F.3d 1256 (11th Cir. 2009) ........................................................................... 18, 19, 20, 30, 31

*Wal-Mart Stores, Inc. v. Dukes*,
  ___ U.S. ___, 2011 WL 2437013 (June 20, 2011) ................................................ 18, 19, 22, 35

*Williams v. Essex Ins. Co.*,
  712 So. 2d 1232 (Fla. Dist. Ct. App. 1998) .................................................................................. 30

## STATUTES

Fla. Stat. § 627.411(1)(b) ....................................................................................................................... 7

Fla. Stat. § 627.4143(3) ......................................................................................................................... 11

Fla. Stat. § 627.702 ................................................................................................................................ 15

## RULES

Fed. R. Civ. P. 23 advisory committee's note to 2003 amendments ........................................... 31

Fed. R. Civ. P. 23(a)(3) ......................................................................................................................... 33

Fed. R. Civ. P. 23(a)(4) ......................................................................................................................... 33

Fed. R. Civ. P. 23(b)(3)(D) ................................................................................................................... 31

## OTHER AUTHORITIES

12 Lee R. Russ, *Couch on Insurance* § 176.66 (3d ed. 2011) ...................................................... 26

## INTRODUCTION

After the devastating 2004-2005 Florida hurricanes, Liberty American[1] acted quickly to bring relief to its policyholders whose mobile homes had been damaged by those storms. Liberty American fulfilled its obligations under its insurance policies in exemplary fashion (as the Florida insurance regulators recognized), fully and promptly indemnifying tens of thousands of Florida insureds. Now, years later, four LASIC policyholders bring this action, arguing that they — and more than 7,300 other insureds who were paid their full policy limits — should have received more. They allege that the policy limits stated on their Declarations Pages must be disregarded, and that they are entitled to "unlimited" coverage, because the words "REPLACEMENT COST MOBILE HOME . . . INCL[UDED]" also appear on the Dec Pages. Plaintiffs contend that, for *each and every one* of the more than 7,300 putative class members, " 'policy limits' coverage . . . does not provide you with enough money to replace your home with a new one of like kind and quality." (Pl.s' Br. at 5.)

Plaintiffs do not deny that the amount needed "to provide you with enough money to replace your home with a new one of like kind and quality" is an inherently individualized liability issue, unfit for class certification. Instead, they attempt to characterize their class certification motion as resting on straightforward issues of contract interpretation. They claim that certification is appropriate because this Court can "easily" rule on the issue of policy interpretation, and if this issue is resolved in their favor, liability for breach of contract and unjust enrichment necessarily and automatically follows. They assert that "*by definition*" the payment of policy limits was "tantamount to an underpayment to *all* Class Members" and that, if

---

[1] Only two Defendants issued policies to putative class members: Liberty American Select Insurance Company ("LASIC") and Liberty American Insurance Company ("LAIC"). All four Named Plaintiffs' policies were issued by LASIC. For ease of reference only, LASIC and LAIC are referred to in this Brief as "Liberty American."

this Court rules in their favor on contract interpretation, "a breach or unjust enrichment would be shown, and *each* Class Member would be equally entitled to relief." (Pl.s' Br. at 6, 13 (emphasis added).) Thus, Plaintiffs' entire class certification motion hinges on their *assumption* that the payment of policy limits *necessarily* undercompensated putative class members for their mobile homes, and *necessarily* resulted in a classwide breach of contract.

Plaintiffs' bid for class certification unravels under the very standard they themselves have articulated. Plaintiffs have presented no evidence to support their conclusory assertion that the payment of policy limits was *always* insufficient to pay the "full replacement cost" of the homes of *all* putative class members — no testimony, no experts:  nothing. This is a critical question not only of damages, but also of *liability*:  unless an insured proves that he or she was actually paid less than what the contract required, there is no breach and therefore no liability. Nor have Plaintiffs proposed a trial plan or other method for the Court to make this determination classwide. As the proponents of certification, Plaintiffs have the burden of proffering a valid means of trying these claims — fairly and consistent with due process — on a classwide basis. Plaintiffs' failure to do so alone requires denial of their Motion.

Moreover, the record evidence submitted by Defendants directly contradicts Plaintiffs' assumption, and demonstrates that it has no basis in fact or law. First, the record demonstrates that policy-limits payments to many policyholders — including Named Plaintiffs — *exceeded* the estimated replacement costs of their homes. For example, pursuant to Florida's Valued Policy Law, Liberty American paid policy limits whenever an insured's mobile home was deemed a "total loss" — that is, when the estimated replacement cost exceeded 80% of the policy limits. Thus, if the estimated replacement cost of a home was $40,000, and the insured had a $50,000 policy limit, the insured would receive the entire $50,000 limit, even though that amount *exceeded* the replacement cost of the home. That, in fact, is precisely what happened in

this case:  the Appels received their full policy limits of $45,000, even though the estimated replacement cost of their home was $40,884; Ms. Allocco received her full policy limits of $40,000, even though the estimated replacement cost was $37,392; and the Wiiks received their full policy limits of $40,000, even though the estimated replacement cost was $37,241.  (The Dawson/Kruse home was a "blowdown," and thus no replacement-cost estimate was done.) Liberty American, in short, erred on the side of *overcompensating* its policyholders.  And to the extent Plaintiffs dispute Liberty American's estimates, that, too, presents individualized issues not susceptible to classwide resolution.

Second, the record evidence makes clear that determining whether the payment of policy limits is adequate to pay for a replacement home of "like kind and quality" (the undisputed contractual standard) is a highly individualized, fact-intensive inquiry that necessarily predominates over any purported "common" issues.  Indeed, contrary to the "picture" Plaintiffs paint here — of elderly retirees cheated out of money sufficient to replace their homes — the evidence demonstrates that several of the Named Plaintiffs took the opportunity after the hurricanes to *significantly upgrade and upsize* their homes.  Moreover, careful and individualized reviews of claim files conducted by independent claims adjusting experts also show that at least three of the four Named Plaintiffs were not underpaid at all, and that many other putative class members could have repaired or replaced their damaged mobile homes for the amount of money actually paid them by Liberty American.

Thus, Plaintiffs' "policy interpretation" argument is a red herring.  Even if Plaintiffs are correct in their interpretation of the Policy as providing for "unlimited" replacement cost coverage, class certification would still be improper, because there is no classwide method of proving that all class members were *in fact* undercompensated for their mobile homes by the payment of policy limits.  But even Plaintiffs' policy interpretation issue cannot be decided on a

classwide basis.  Plaintiffs' assertion about how "easily" this Court can decide this issue misconceives both the facts and the law on ambiguity.  Plaintiffs cannot prevail on their contract claim unless their interpretation of the policy is a "reasonable" one.  As the record evidence demonstrates, however, no one interpreted the policies as providing for "unlimited" coverage — not insurers, not insurance regulators, not even insureds themselves.  Insureds were routinely told by their agents at the time of purchase that replacement cost is capped by policy limits, and the Florida insurance regulator likewise has taken that position, and so informed the public at every opportunity.  Indeed, the Named Plaintiffs' decisions to pay premiums based on coverage limits of anywhere from $40,000 to $50,000 is flatly inconsistent with the liability theory their attorneys now assert:  if Plaintiffs *actually believed* that their policies provided for "unlimited" replacement cost, why did they not simply purchase the minimum amount of coverage (say, $10,000), pay a lower premium, and then seek payment from Liberty American for tens of thousands of dollars in excess of that coverage limit?

Regardless, Plaintiffs' contract interpretation issue is simply not a common question. As Plaintiffs themselves previously admitted (DE 22 at 32), the interpretation of an allegedly "ambiguous" policy requires an examination of extrinsic evidence — including what each insured was told and what each insured reasonably understood with regard to the coverage provided.  This examination is necessarily individualized and cannot be determined classwide.

The balance of this Brief sets out additional reasons demonstrating why Plaintiffs have failed to carry their burden of establishing that common questions predominate, that a class action is the superior method for the fair and efficient adjudication of this controversy, that Plaintiffs' claims are typical of those of the putative class, and that they are adequate representatives of the putative class.  Defendants respectfully request that the Court deny Plaintiffs' Motion for Class Certification.

## STATEMENT OF FACTS[2]

### A.      Who Is Liberty American?

The predecessor to the Liberty American companies was founded in 1946 by Richard M. Jerger and eventually became the largest independent mobile home insurance agent in the State of Florida, under the name Mobile Homeowners Insurance Agencies, Inc. ("MHIA").  (Meyer Aff. (Ex. D) ¶ 3.)   In 1989, the Jerger family established Mobile USA Insurance Company ("MUSA") and several years later Mobile United Property and Casualty Insurance Company ("MUPCIC"), both of which specialized in writing mobile homeowners insurance.  The Jerger family sold these three companies to Philadelphia Consolidated Holding Corporation ("PCHC") in 1999.  MHIA's name was changed to Liberty American Insurance Services ("LAIS"), and MUPCIC's name was changed to Liberty American Insurance Company ("LAIC").  Mobile USA Insurance Company continued to operate under that name until 2005, when it became Liberty American Select Insurance Company ("LASIC").

Like all insurance companies in Florida, Liberty American is closely scrutinized and regulated in all aspects of its business.  The policy forms and underwriting practices that it employed in the 2003-2006 period were audited and examined by the Florida insurance regulators.  (Roddenberry Aff. (Ex. G) ¶ 9; Meyer Aff. ¶ 11.)  The Florida Office of Insurance Regulation ("OIR"), for example, audited numerous Liberty American mobile home policies and their corresponding Declarations Pages.  It never found any fault with the language that is in dispute here.  (Roddenberry Aff. ¶¶ 15-16; Meyer Aff. ¶¶ 19-20.)

---

[2] In support of this Brief, Defendants submit the affidavits or declarations of the following: William Berglund (Ex. A), George Carey (Ex. B), Darren Impson (Ex. C), T. Bruce Meyer (Ex. D), Lisa Miller (Ex. E), Craig Norton (Ex. F), Jonathan Lee Roddenberry (Ex. G), and Terry Sincich (Ex. H), and various independent insurance agents (Ex. I).  Additional exhibits, including deposition transcripts, spreadsheets, and discovery responses, are also submitted in support of this Brief.

Liberty American has always conducted its business with integrity and fairness. Contrary to the scurrilous picture painted by Plaintiffs, Liberty American was recognized by Florida regulators for its exemplary performance during the hurricanes of 2004-2005 and its generous and caring approach to handling the tens of thousands of claims from its insureds. (Miller Aff. (Ex. E) ¶¶ 12-15; Meyer Aff. ¶ 31.) One thing is certain: Liberty American did not take advantage of "unsuspecting" senior citizens or "target" elderly mobile homeowners (or anyone else, for that matter). (Meyer Aff. ¶ 18.)

**B.     How Does Mobile Home Insurance Work?**

There are two common methods of loss adjustment used for property insurance: "actual cash value" basis (ACV) and "replacement cost" basis (RCV), the principal difference being that ACV is calculated including depreciation while (RCV) is calculated without depreciation. (Roddenberry Aff. (Ex. G) ¶ 10.) Coverage provided under either of these methods is capped by the amount of insurance (i.e., policy limits) selected by the insured, unless "extended" or "guaranteed" additional coverage is expressly provided by special endorsement (allowing a specific increase to the policy limits under certain limited circumstances). (*Id.*) Such extended or guaranteed endorsements have rarely been offered for mobile homes in Florida, and mobile home insurance policies offered on an unlimited or uncapped basis are never seen in Florida. (*Id.*)

Declarations Pages containing the identical disputed wording as those issued to the Named Plaintiffs (Exhibit B to the First Amended Complaint ("Cmplt.")) were in use by the Jerger companies for at least a decade before the acquisition of Liberty American by PCHC in 1999. (Meyer Aff. (Ex. D) ¶ 6 & Exs. A & B thereto.) The disputed wording was also used by other mobile home insurers unrelated to Defendants, including Republic Western Insurance Company, the prior carrier for two of the Named Plaintiffs. (*Id.* ¶ 7 & Exs. C & D thereto.)

-6-

The Liberty American Policy at issue here was filed with, reviewed, and approved by the Florida Department of Insurance (now known as the OIR).  (Roddenberry Aff. ¶ 9.)  The basic policy form within the Liberty American Policy (HO-3 Ed. 4-84) sets out, unless altered by endorsement, the insurance agreement between the parties.   It contains in pertinent part the following Loss Settlement provision:

> 3.  Loss Settlement.  Covered property losses are settled as follows:
> * * *
> b. Buildings under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:
>
> > **(1) [W]e will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:**
> >
> > **(a) the limit of liability under this policy that applies to the building;**
> >
> > (b) the replacement cost of that part of the building damaged for like construction and use on the same premises; or
> >
> > (c) the necessary amount actually spent to repair or replace the damaged building.

(Cmplt., Ex. A, Form HO-3 Ed. 4-84 at 8 of 15 (emphasis added).)

Implicit in the regulators' approvals of the Liberty American form was the conclusion that the Loss Settlement provision of that Policy was entirely consistent with Florida insurance requirements, including that it not contain "any inconsistent, ambiguous, or misleading clauses, or exceptions and conditions which deceptively affect the risk purported to be assumed in the general coverage of the contract."  (Roddenberry Aff. ¶ 22 (quoting Fla. Stat. § 627.411(1)(b)).)  The Loss Settlement provision of the Policy was therefore determined not to be ambiguous; nor was it "buried" in any sense.  (*Id.*)

The Policy also contains an appraisal provision for determining the amount of loss in the event of a dispute between the parties:  "Mediation or Appraisal.  If you and we fail to agree on the amount of loss, either may:  * * *  b.  Demand an appraisal of the loss." (Cmplt., Ex. A

-7-

(Florida Mobile Homeowners Endorsement,  FL 1A.96 (Ed. 05/03) at 2-3 of 5).)  It is undisputed that Plaintiffs never sought appraisal of their losses.

The Declarations Pages issued to the Named Plaintiffs list coverages selected by each insured.  For each of these coverages, there are corresponding "Limits" selected by each insured.  Those limits cap the amount of coverage that the insurer must pay the insured in the event of a loss.  (Roddenberry Aff. ¶ 11; Miller Aff. (Ex. E) ¶¶ 17-18.)

The words "REPLACEMENT COST MOBILE HOME" on the Declarations Page are like an entry in a table of contents; they simply alert the policyholder to the basis of loss adjustment provided by the Policy and signal that the premium charge for this methodology is already included in the base premium under the program selected by the insured.  (Miller Aff. ¶ 19; Roddenberry Aff. ¶ 26.)  The words "REPLACEMENT COST MOBILE HOME . . . INCL[UDED]" would not have been interpreted by a Florida regulator as providing coverage greater than or different from that provided under the Loss Settlement provision of the state-approved Liberty American Policy.  (Roddenberry Aff. ¶ 26.)  The Declarations Page cannot be read in isolation from the Policy itself (*id.* ¶ 18); nor can it "trump" the Policy (Miller Aff. ¶ 19).

### C.  How Did Florida Insureds Purchase Their Liberty American Policies?

In consultation with their agent, each applicant chooses the amount of insurance (i.e., the policy limits) that he or she wishes to purchase. Agents typically recommended to their customers that they purchase enough insurance to be able to replace their home with one of like make, model, year, and condition.  If they recently acquired a mobile home, the applicants typically used the price that they had paid for it as the amount of insurance to buy.  (Ex. I(1) ¶¶ 5-6; I(2) ¶¶ 5-6; I(3) ¶¶ 7-8; I(4) ¶¶ 6-7; I(5) ¶¶ 6-7; I(6) ¶¶ 6-7; I(7) ¶¶ 5-6; I(8) ¶6.)

The policy limits was one of the principal determinants of the premium, and the total policy premium increased as the amount of insurance provided on the policy increased.  (Meyer

Aff. (Ex. D) ¶ 14.)  Without specific policy limits, appropriately pricing an insurance policy would not be possible.  (Roddenberry Aff. (Ex. G) ¶ 12.)  Liberty American Insurance Services, Inc., the managing general agent for LASIC, calculated the premium on Liberty American mobile home policies using rates that were filed with and approved by the Florida OIR and based on the amount of insurance selected by the applicant.  (Meyer Aff. ¶ 14.)  Here, for example, Mr. and Mrs. Appel selected limits of $45,000 (twice what they had paid for their 1977 mobile home in 1996) because they "thought that's what the house would be worth."  (C. Appel Dep. (Ex. L) at 9-10.)  Plaintiff Allocco selected $40,000 in coverage on her dwelling; Ms. Kruse/Dawson selected $50,000; and the Wiiks selected $40,000.  All paid a higher premium for the policy limits they chose than would have been charged had they selected a lower limit.  (Cmplt., Ex. B.)  All purchased many multiples of the $10,000 minimum limits that were available.  As the state regulators recognize, these policy limits cap the coverage provided on a "replacement cost" coverage basis under the Policy, and the disputed wording on the Declarations Pages does not imply unlimited coverage. (Miller Aff. (Ex. E) ¶¶ 3.c, 18; Roddenberry Aff. ¶ 23.)

As shown by the declarations from independent insurance agents in Florida, one of the topics typically covered by agents with applicants for mobile home insurance, including Liberty American policies, is how claims are adjusted on a replacement cost basis under those policies. If applicants considered or were offered policies that provide for claims to be adjusted on a "replacement cost basis," they were routinely told that Liberty American would pay for losses only up to the policy limits and that coverage on the mobile home is capped by the limits of the policy purchased.  (Ex. I(1) ¶ 8; I(2) ¶ 4; I(3) ¶ 6; I(4) ¶ 5; I(5) ¶ 5; I(6) ¶ 5; I(7) ¶ 8; I(8) ¶ 5.)[3]

---

[3]  At no time did these agents employ a script or other uniform narrative for the sale of insurance.  (Ex. I(1) ¶ 3; I(2) ¶ 11; I(3) ¶ 18; I(4) ¶ 12; I(6) ¶ 12; I(7) ¶ 15.)  Indeed, the communications that occur by and between agents and customers vary in each and every separate insurance communication or transaction.  (*See id.*)

The Named Plaintiffs' testimony about their insurance purchases does not contradict this clear evidentiary record.  (Allocco Dep. (Ex. K) at 32-34; C. Appel Dep. (Ex. L) at 15, 20-21; W. Appel Dep. (Ex. M) at 17, 51-52; Dawson Dep. (Ex. N) at 35-37; R. Wiik Dep. (Ex. O) at 34-40; A. Wiik Dep. (Ex. P) at 24-25, 37, 42-43, 79, 91-92.)   Plaintiffs testified about what they "understood" the policy to mean, but stated no basis for their belief.  None testified that they had asked their agents what replacement cost meant, and none testified that *anyone* ever told them that their replacement cost policy was "guaranteed" or "uncapped" or "unlimited" or that it was not "up to the policy limits."  Plaintiffs never had any communication with LASIC before buying their policies.  Indeed, some did not even read their policy.  (Ex. O at 16, 37; Ex. K at 34.)

Class Counsel's contention that Liberty American policyholders were not provided a purported "required statutory notice" that they "would be co-insurers" of their homes (Pl.s' Br. at 5, 9-10) has no basis in fact or relevance to this case.  Coinsurance penalties may be imposed by insurers to reduce monetary payments for claims that are partial losses.  (Roddenberry (Ex. G) ¶ 31.)  But Liberty American *never applied* coinsurance penalties in the adjustment of putative class members' claims, and a policy that, like Liberty American's, provides for replacement cost coverage up to policy limits simply does not create a circumstance under which a policyholder would be a "co-insurer."  (Roddenberry (Ex. G) ¶ 31; Meyer Aff. (Ex. D) ¶ 30.)

### D.      Regulatory Interpretation and Publications about "Replacement Cost"

Lisa Miller and Lee Roddenberry were senior officials of the OIR and the Department of Financial Services ("DFS") during 2003-2006 directly responsible for regulation of insurance policy forms, rates, and consumer services.  (Miller Aff. (Ex. E) ¶¶ 3.a, 10-11; Roddenberry Aff.

(Ex. G) ¶ 2.)[4]   Their Affidavits describe Florida's insurance regulatory environment and the history of regulatory interpretation and publications about "replacement cost" in those years.

The OIR and the Florida Legislature expect insureds to read their entire insurance policy carefully.  (Roddenberry Aff. ¶¶ 19-20; Miller Aff. ¶¶ 20, 31.)   The Florida legislature has consistently passed laws affirming the importance of reading and understanding the entirety of one's insurance policy.  For example, by statute, Florida requires insurance companies to provide to their policyholders a copy of a state-approved Outline of Coverage form. *See* Fla. Stat. § 627.4143(3).  The Liberty American Policy contains such a form, which expressly states (in bold and uppercase letters) "**READ YOUR MOBILE HOMEOWNERS INSURANCE POLICY CAREFULLY**" in the first paragraph of the outline and then states (again in bold and uppercase letters) "**READ YOUR POLICY CAREFULLY**" in the last paragraph. (Roddenberry Aff. ¶¶ 19-20; Cmplt., Ex. A, at 1-2 of 2.)   Some Named Plaintiffs admit that they did not read their policies. (R. Wiik Dep. (Ex. O) at 16, 37; L. Allocco Dep. (Ex. K) at 34.)   It would be inconsistent with the guidance given by the Florida regulators for any policyholder to simply look at the Declarations Pages and to assume that this gave them a comprehensive understanding of their coverages.  (Miller Aff. ¶ 20.)

During the 2003-2006 time period, it was generally understood within the Florida OIR and the DFS that a typical "replacement cost" policy pays only up to policy limits.  The regulators would not have accepted an argument that the typed "Additional Coverages" section of the Declarations Page referring to "replacement cost mobile home" supersedes or was inconsistent with the loss settlement provisions and policy limits of the Liberty American

---

[4] Jonathan Lee Roddenberry was OIR's Director of Property & Casualty Financial Oversight from 2001-2005 and its Director of Property & Casualty Product Review from 2005-2006.  Lisa Miller was the Deputy Insurance Commissioner of OIR from 2003-2005 and thereafter served as Deputy Chief Financial Officer of DFS through 2006.

-11-

policies at issue in this case.   (Roddenberry Aff. ¶¶ 5, 24.)   The absence of words like "unlimited," "guaranteed," "uncapped," or "extended" expanding replacement cost coverage beyond policy limits on the Liberty American Policy or on the Declarations Pages issued to Plaintiffs is important and further serves to indicate that interpreting the words on the Declarations Page in the manner asserted by the Plaintiffs is not reasonable.  (*Id.*)

In fact, during this time period, the DFS Division of Consumer Services published and distributed consumer guides about homeowners insurance both in a paper booklet form and also over the Internet.  (Miller Aff. ¶ 31.)  All of the versions of the guides that were available from 2003 to 2005 clearly explained to new and existing policyholders that replacement costs are capped by policy limits.  (*Id.*)  The 2004 Guide expressly states that "Standard replacement cost depends upon the dwelling limit stated on your policy."  (*Id.* ¶ 31 & Ex. B thereto.)  To this day, the definition is displayed on the DFS website under the caption "Residential Coverage Type - Replacement Cost" and states: " 'Replacement Cost' coverage means the policy will pay *up to the limits* for the replacement of a damaged or destroyed home, or personal property, without deducting for depreciation."  (*Id.* ¶ 32 & Ex. F thereto (emphasis added).)

It would be a matter of serious regulatory concern if the policy form used in the Liberty American Policy were interpreted to provide "unlimited" replacement cost coverage to Florida insureds. (Roddenberry Aff. ¶ 14; Miller Aff. ¶ 23.)  Such an interpretation would improperly incentivize persons to purchase a policy with the least amount of coverage to obtain the lowest possible premium, knowing that the stated policy limit would be meaningless at the time of claim.  (*Id.*)  This would distort the rating basis for insurance policies and create an unacceptable moral hazard that the OIR would not permit.  (*Id.*)  It would also threaten insolvency for any insurer that falls victim to such a policy interpretation.  (Roddenberry Aff. ¶ 14.)

If any of the Named Plaintiffs had contacted the Florida insurance regulators before or after purchasing their policy, they would have been told that replacement cost is capped by policy limits.  For example, a couple insured by LASIC ("Mr. & Mrs. A") wrote to DFS in December 2004 complaining that LASIC had paid policy limits on their Hurricane Charley loss and then cancelled their policy.  After investigating, including a review of the Dec Pages with the wording Plaintiffs challenge, DFS advised them that LASIC had acted properly:

> In regards to the replacement cost on the policy, when a policy states it covers "Replacement Cost" for the structure, this means the insurer will pay for damage to the property by a covered peril *up to the limits of policy*. Replacement Cost is the actual cost to replace, or repair the insured property, *up to the policy limits*, without any reduction for depreciation.

(Miller Aff. ¶ 27 & Ex. D thereto (emphasis added).)

Moreover, when one insured ("Mr. W") contacted DFS about the very issue asserted by Plaintiffs in their Complaint, DFS investigated the matter and closed the inquiry after ascertaining that the insured had been paid policy limits.  (Miller Aff. ¶¶ 28-29 & Ex. E thereto.) None of the Named Plaintiffs, however, raised any question with anyone when they purchased their policies. Nor did they ever lodge a complaint with the OIR or DFS, their agents, or LASIC regarding what they now claim as dissatisfaction with their policy limits loss settlement until years later, when they filed this lawsuit — despite having been sent a letter enclosing their policy-limits payment (signed by the then-Vice President of Claims, Paul Leftwich) and inviting them to call the company (toll free) if they had questions about their payment. (Meyer Aff. ¶ 27 & Ex. F thereto.)  None of the Named Plaintiffs called with any questions, and certainly never complained, about the company's paying policy limits.  (*Id.* ¶¶ 27-28.)

### E.    Claims Handling by Liberty American During the 2004-2005 Hurricanes

The hurricane seasons of 2004 and 2005 brought unprecedented activity, with four major storms making landfall in Florida in 2004 and another major storm, Hurricane Wilma, making

landfall in 2005.  These storms wreaked havoc on Florida homeowners in general and mobile homeowners in particular.  (Meyer Aff. (Ex. D) ¶ 21.)  Three of the 2004 storms struck areas of the State with heavy concentrations of mobile homes, with two storms (Frances and Jeanne) following very similar tracks that had been taken by Hurricane Charley a few weeks earlier.  As a result, some mobile homes were struck more than once.  (*Id.*)

As one of the leading producers of mobile home insurance in the State, LAIS, the managing general agent responsible for handling all Liberty American claims, was inundated with claims, including 60,000 in one six-week period.  In order to deal with the volume of claims, the company ceased all operations other than claims handling for an extended period of time and involved every employee in the claims handling process.  Additionally, a number of temporary workers were utilized, thereby doubling the number of people at the company working to meet the need; daily work hours were extended, with many employees working substantial overtime and reporting for work seven days a week.  (Meyer Aff. ¶ 22.)

During the 2004-2005 hurricane seasons, LAIS utilized scores of independent adjusters to make on-site visits to each of the tens of thousands of damaged mobile homes throughout the State to assess the loss that each policyholder had suffered.  (Meyer Aff. ¶ 25.)  These adjusters received instructions to calculate the dollar amount of the damage in accordance with the Loss Settlement provision of the applicable policy.  (*Id.*)  For policies like the Named Plaintiffs', which provided for loss settlement on a replacement cost basis, each claim was to be adjusted on that basis.  (*Id.*)  Adjustors inspected the damaged property and, after taking into account numerous factors relevant to the adjustment of each individual property loss, made a replacement cost value estimate of the damage, based on the cost to repair or replace the damaged property with property of like kind and quality and without deduction for depreciation, unless the property

-14-

was a "blowdown" or otherwise obviously damaged beyond repair, in which case no repair estimate was made.  (*Id.* ¶ 25; Norton Decl. (Ex. F) ¶¶ 4-7.)

For example, Craig Norton, an experienced independent adjustor who adjusted three of the four Named Plaintiffs' losses, would list every single piece of the mobile home that would need to be repaired or replaced, the number of such items (e.g., the number of damaged roof pans, ceiling tiles, wall panels, etc.), their dimensions, and the unit cost for each item.  (Norton Decl. ¶ 10.)  During the 2004-2005 hurricane seasons, the estimates were based upon then-current costs and were generally sufficient for mobile home repairmen (such as Darren Impson) to accomplish the specified repair or replacement.  (*Id.* ¶¶ 12-13; Impson Decl. (Ex. C) ¶ 5.)

The Loss Settlement provision of Plaintiffs' policies fully and clearly explains the manner in which claims will be settled on a replacement cost basis up to and including policy limits.  Liberty American's loss settlement procedure, as required by the Florida Valued Policy Law, Fla. Stat. § 627.702, was to pay policy limits for any "total loss." (Meyer Aff. (Ex. D) ¶ 26.)  Liberty American constructively deemed a loss to a mobile home to be a "total loss" whenever the estimated damage exceeded 80% of the amount of insurance (i.e., policy limits) purchased by the insured.  (*Id.*)  Thus, if an adjustor estimated the cost to repair or replace the damaged property to be $40,000 and the insured had a $50,000 policy limit, the insured received the full $50,000 limit.  (*Id.*)  This occurred frequently, as shown below.

## F.    Analysis of the Named Plaintiffs' Claims

A study of the claims files of three of the four Named Plaintiffs shows that the estimated replacement cost value ("RCV") (i.e., the cost to repair or replace the damage to the residence with property of like kind and quality and without depreciation) was calculated by the adjustor who inspected their damaged homes to be *less* than their policy limits.  All three were nonetheless paid their policy limits:

- The Appels' RCV was calculated at $40,884; they were paid their policy limits of $45,000.

- Ms. Allocco's RCV was calculated at $37,392; she was paid her policy limits of $40,000.

- The Wiiks' RCV was $37,241; they were paid their policy limits of $40,000.

(Norton Decl. (Ex. F) ¶¶ 14-15; Carey Aff. (Ex. B) ¶¶ 37, 40, 45; Berglund Aff. (Ex. A) ¶ 22.)

In the case of Ms Linda Dawson (and her mother, Florence Kruse), because their mobile home

was a "blowdown" and unrepairable, no RCV estimate was performed. (Norton Decl. ¶ 15.)

Further, a careful comparison of their replacement mobile homes with their older, damaged units — a study performed by mobile home expert George Carey[5] — makes clear that all three of the Plaintiffs who replaced their older homes did so with larger, upgraded units and attachments that were *not* of "like kind and quality," and constituted a significant betterment:

- Ms. Dawson purchased a unit 25% larger than her insured unit, and with significant additional enhancements and upgrades;

- Ms. Allocco purchased a unit 25% larger than her insured unit, also with significant upgrades; and

- The Appels purchased a home almost 50% larger than their insured unit.

(Carey Aff. ¶¶ 32, 37, 47.) Most significantly, the study shows that three of the Named Plaintiffs (Dawson, Allocco, and Wiik) could have replaced their damaged property with new units of "like kind and quality" — not upsized and upgraded — *within* the policy limits payment they received. (*Id.* ¶¶ 31, 36, 41.)

None of the Named Plaintiffs expressed any dissatisfaction with their claims settlement until years after the fact. The claims files of the Named Plaintiffs reveals that each of them communicated with LASIC several times during the course of the settlement process for their claims in 2004-2005, and, while they were quick to question or follow up on relatively minor

---

[5] Mr. Carey is a former Claims Manager at Foremost Insurance Co. (which specializes in mobile home insurance on a nationwide basis) and was responsible for procurement of replacement mobile homes for insureds. He was also a Board member of the Manufactured Housing Institute, HUD Advisory Board. (Carey Aff. ¶¶ 5-10.)

-16-

items involving reimbursement for additional living expenses or debris removal, *not one* of them complained about receiving a policy limits settlement or asserted that they were entitled to "unlimited" replacement cost regardless of the policy limits.  (Meyer Aff. ¶ 28.)  In fact, all of them expressed gratitude for Liberty American's handling of their claims. (*Id.* & Exs. G-J thereto.)  As noted above, it is undisputed that none of the Named Plaintiffs sought an appraisal of the loss, despite the availability of this remedy under their policies.

### G.      Sample Survey of Putative Class Members' Claims

Determining the cost to replace any particular damaged mobile home with a new one of "like kind and quality" requires an individualized consideration of size, make, model, features, and amenities of the mobile home and of any attachments, in addition to a detailed review of claims files, adjuster reports and itemized estimates, photos, and deposition testimony or interviews of insureds to ascertain the nature of damage to the mobile home.  (Carey Aff. (Ex. B) ¶¶ 20-24.)  The potential variables are infinite, and no two claims are the same.

The complexity of determining the "replacement cost" of any particular insured's damaged mobile home (and its relationship to the individual's policy-limits payment) is highlighted by an in-depth survey conducted by nationally known claims consultant William Berglund[6] on a sample of 148 claims files drawn from the universe of the 7,375 putative class members who were paid policy limits.  (Berglund Aff. (Ex. A) ¶¶ 26-30.)[7]  The survey found, among other things:

---

[6] William Berglund is a former Partner at Ernst & Young, where he led its national Claims Consulting practice, and was previously a Senior Vice President of Claims and Operations for a large national claims administrator.  (Berglund Aff. ¶¶ 4-13.)

[7] Mr. Berglund reviewed, recorded, and summarized data from a random sample of claim files selected by Professor Terry Sincich of the University of South Florida - Tampa from the putative class.  (Sincich Decl. (Ex. H) ¶ 3.)

- In at least 17 claims (11%), the insured was paid policy limits even though the appraised replacement cost value was *less* than policy limits. Many received thousands of dollars more than their estimated RCV damages. (*Id.* ¶ 31.)

- At least 30 claimants (20%) were paid policy limits without an itemized estimate ever being performed, so the replacement cost of their homes is uncertain. (*Id.* ¶ 32.)

The survey also found that, in many claims, the mobile homes were not damaged beyond repair, and complete "replacement" was not warranted:

- At least 20 claims (14%) appear to involve limited damages. (*Id.* ¶¶ 33-35.)

- At least 30 claims (20%) appear to involve repairs that could be made within policy limits. (*Id.* ¶¶ 37-40.)[8]

In order to ascertain who — and how many — of the 7,375 putative class members fall under any of the above categories would require the same exhaustive, individualized analysis of each of those 7,375 claim files.

## **ARGUMENT**

As the proponents of class certification, Plaintiffs bear "[t]he burden of proof to establish the propriety of class certification." *Valley Drug Co. v. Geneva Pharms., Inc.,* 350 F.3d 1181, 1187 (11th Cir. 2003). In considering whether Plaintiffs have met that burden, the Court must conduct a "rigorous analysis" of the Rule 23 requirements. *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161 (1982). This analysis "does not permit courts to be 'generous or forgiving' of failures of proof or to engage in speculation as to Rule 23's requirements." *Mills v. Foremost Ins. Co.*, 269 F.R.D. 663, 669 (M.D. Fla. 2010) (quoting *Vega v. T-Mobile USA, Inc.,* 564 F.3d 1256, 1269 (11th Cir. 2009)). As the Supreme Court recently explained, "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, ___ U.S. ___, 2011 WL 2437013, at *7 (June 20, 2011). Rather, "[a] party seeking class certification must affirmatively demonstrate

---

[8] In addition, the survey showed that over 60 claims (40%) involved no or minimal payment for Coverage C, which provides indemnification for damage to "contents" of the mobile home. The fact that there was no or minimal contents damage suggests that overall damage was not severe or that the damage was limited to parts of the mobile home with few contents (like a porch or carport). (Berglund Aff. (Ex. A) ¶¶ 41-42.)

his compliance with the Rule — that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* (emphasis in original). Moreover, in deciding whether to certify a class, a court must "make the necessary factual and legal inquiries and *decide all relevant contested issues prior to certification*," even if those issues implicate the merits of the claims. *Sher v. Raytheon*, No. 09-15798, 2011 WL 814379, at *3 (11th Cir. Mar. 9, 2011) (emphasis added; citing cases); *e.g.*, *Valley Drug Co.*, 350 F.3d at 1188 n.15. Plaintiffs' attempt to argue for a less rigorous standard ignores not only the Supreme Court's recent *Dukes* decision, but the last decade and more of class action jurisprudence.[9]

Here, a rigorous analysis of Plaintiffs' claims and arguments demonstrates that Plaintiffs have not satisfied their burden of proving each element of Rule 23.

## I. THERE ARE NO COMMON QUESTIONS OF LAW OR FACT, AND CERTAINLY NONE THAT PREDOMINATE OVER INDIVIDUAL ISSUES.

Plaintiffs ignore what the Eleventh Circuit repeatedly has said concerning Rule 23(b)(3)'s predominance requirement, arguing instead for a predominance standard that little differs from the Rule 23(a) commonality requirement. (Pl.s' Br. at 16-17.) The predominance inquiry, however, is "far more demanding" than the commonality requirement. *Vega*, 564 F.3d at 1270. To satisfy Rule 23(b)(3), "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." *Kerr v. W. Palm Beach*, 875 F.2d 1546, 1558 (11th Cir. 1989). The Eleventh Circuit has held that where, "after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3)." *Klay v. Humana Inc.*, 382 F.3d 1241, 1255

---

[9] *Dukes* makes clear that the use to which Plaintiffs put *Eisen v. Carlyle & Jacquelin*, 417 U.S. 156 (1974), *see* Pl.s' Br. at 10 n.41, is "mistaken" and "contradicted" by Supreme Court authority.

(11th Cir. 2004); *see also Vega*, 564 F.3d at 1270; *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1170 (11th Cir. 2010).

Here, because each putative class member would need to introduce individualized proof to establish a claim for breach of contract, certification of such claims is not appropriate.  *See Vega*, 564 F.3d at 1274 (reversing class certification because of "significant individualized issues with respect to breach"); *Cardiovascular Care of Sarasota, P.A. v. Cardinal Health, Inc.,* No. 8:08–cv–1931–T30TBM, 2009 WL 928321, at *6 (M.D. Fla. Apr. 3, 2009) ("Courts have repeatedly held that breach of contract claims are inappropriate for class certification where, as here, they involve individualized inquiries to determine liability and damages.").

Certification of Plaintiffs' claims for unjust enrichment and "money had and received" is similarly inappropriate because such claims require an assessment of the "individualized equities" pertaining to each class member; "common questions will rarely, if ever, predominate an unjust enrichment claim, the resolution of which turns on individualized facts."  *Vega*, 564 F.3d at 1274;[10] *see also Klay*, 382 F.3d at 1267 ("These [unjust enrichment] claims require the same extensive determinations of individualized fact as the breach of contract claims discussed above because the facts necessary to support the two types of claims are almost identical.").

A.     **Plaintiffs Have Not Satisfied Their Burden of Proving on a Classwide Basis That the Policy Limits Paid to Class Members *Necessarily* Were Less Than "Replacement Cost."**

Even if one accepts *arguendo* Plaintiffs' strained "contract interpretation" argument that their policy limits should be ignored, Plaintiffs' claims would still not be amenable to class certification.  Plaintiffs would still have to establish that the insurance contract of each and every one of the class members was breached and that Defendants were unjustly enriched in each

---

[10] Plaintiffs' claim in Count III for "money had and received" is subject to the same analysis as Plaintiffs' unjust enrichment claim (Count II) because "[i]n Florida, the elements of both causes of action are the same."  *Kelly v. Palmer, Reifler, & Assocs., P.A.*, 681 F. Supp. 2d 1356, 1384 (S.D. Fla. 2010).

-20-

instance.  As this Court has recognized:  "Where, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3)."  *Pop's Pancakes, Inc. v. NuCO2, Inc.*, 251 F.R.D. 677, 684 (S.D. Fla. 2008) (Graham, J.).

      1.    **Plaintiffs' Mere Assertion that Payment of Policy Limits Necessarily Undercompensated Class Members Is Unsupported by Any Evidence.**

Plaintiffs' claims all rest on the same theory:  that they were entitled to payment based on their "full replacement cost," but instead received "only" policy limits.  (Cmplt. ¶ 5.)  An obvious corollary to Plaintiffs' theory is that there could *not* have been a breach of the policy or any unjust enrichment for a particular class member if, in fact, the policy limits payment he or she received was *greater than or equal to* the replacement cost.

Plaintiffs' Brief studiously avoids this point.  Instead, Plaintiffs merely *assert* that "being paid 'policy limits' by Defendants was tantamount to an underpayment to all Class Members" and that the policy limits payment "was routinely less than it would cost to replace the insured's mobile home."  (Pl.s' Br. at 10, 13; *see also id.* at 18).  And despite having been afforded the opportunity to obtain class certification discovery, Plaintiffs provide no evidentiary support whatever (expert or otherwise) for their position; instead, they ask the Court to simply *assume* that, for *each and every putative class member*, the replacement cost of the mobile home was greater than the policy limits payment they received.[11]

---

[11] The only evidence cited by Plaintiffs in relation to this issue is one sentence in the deposition testimony of a former employee of LAIS, Paul Leftwich.  At no point, however, did Mr. Leftwich testify to having analyzed the claims of the putative class members to assess whether there was an underpayment in any case, much less in each case.  Nor does his testimony provide any basis for concluding that this is an issue that can be decided without an individualized, file-by-file review.  *See Auto Ventures, Inc. v. Moran*, 92-426-CIV-KEHOE, 1997 WL 306895 (S.D. Fla. Apr. 3, 1997) ("Plaintiffs do not refer to a single case in which a court has relied on former employee testimony as a vehicle for classwide proof, and this Court is aware of none.").

Plaintiffs' failure to provide any evidentiary support for this critical assertion (their entire Motion depends on it), or to propose any viable method for proving that assertion on a classwide basis, alone requires denial of their Motion.   Plaintiffs cannot simply assert that this is a "common" question, and assure the Court that they will be able to prove it, classwide, at trial. Nor can they claim that the proposition is a "merits" issue whose accuracy must be assumed for purposes of their Motion.  Plaintiffs are required to present evidence and a viable trial plan — *now* — so that the Court can rigorously analyze whether the issue may properly be tried on a classwide basis, and to make all factual and legal determinations necessary to that analysis.  In short, Plaintiffs have not made any effort to meet their burden to "affirmatively demonstrate" that "*in fact*" the predominance requirement is satisfied.  *Dukes*, 2011 WL 2437013, at *7.

By contrast, although Defendants were under no obligation to do so, they have presented detailed evidence from expert Berglund demonstrating that policy-limit payments were often greater than the mobile home's replacement cost value estimate.   Indeed, after conducting a detailed review of the Named Plaintiffs' claims, Defendants' expert Carey concluded that, for at least three of them, the proper "replacement cost" value of their mobile home was *less* than the policy limits payment they received.  *See supra* p.16.

There are good reasons why the full replacement cost of  a mobile home would be less than policy limits.  For example, in accordance with Florida's Valued Policy Law, Liberty American utilized a "constructive loss" approach to claims handling, whereby a damaged mobile home was deemed a total loss (and policy limits paid) if the estimated replacement cost was equal to or exceeded 80% of the policy limits.  *See supra* p.15.   Thus, in many instances, a policy-limits payment would have been made even though Liberty American's own assessment of the replacement cost was *below* that amount.  *See supra* p.17.

Thus, the record clearly refutes Plaintiffs' assumption that the policy-limits payments were always less than the replacement cost value for each class member's mobile home. Accordingly, in order to establish liability, each and every class member would need to demonstrate that the amount he or she received was an underpayment under Plaintiffs' "coverage" theory. Plaintiffs do not dispute that this determination requires an examination of a individualized issues and, therefore, cannot be determined classwide. As demonstrated in more detail below, the need for such proof presents "a host of individualized issues for virtually every class member," rendering class certification inappropriate. *Burstein v. First Penn-Pac. Life Ins. Co.*, 209 F.R.D. 674, 677 (S.D. Fla. 2002) (Graham, J.).

### 2. The Issue Whether the Replacement Cost Exceeds the Policy Limit Payment Policy Will Depend on Individualized Proofs.

First, a key component in the determination whether a policy-limits payment was sufficient to pay for "full replacement cost" is the policy limit itself. But there is no "standard" level of coverage. (Berglund Aff. ¶¶ 43-44.) Rather, the setting of policy limits was an individualized determination made by each insured, who chose the amount of coverage and paid premiums based on that coverage. *See supra* pp. 8-9. Many insureds opted for the minimum coverage amount of $10,000, which carried lower premium payments; but thousands of others opted for coverage amounts ranging from $20,000 to $100,000, at higher premium amounts. (Ex. J (spreadsheet listing all putative class members and produced to Plaintiffs as LAIS0000479).) Those who suffered either actual or constructive total losses received from Liberty American the policy limits amount they had selected and paid a premium for.

With respect to the other key component that Plaintiffs must prove (the amount of the "replacement cost" for each damaged mobile home), Plaintiffs' Complaint acknowledges that "[t]he ordinary meaning of 'replacement cost' coverage is the amount needed to replace or repair damaged property *with materials of similar kind and quality*, without deducting for

depreciation." (Cmplt. ¶ 4 (emphasis added).) But whether "materials [are] of similar kind and quality" indisputably requires an individualized determination, depending on the insured's particular mobile home and attachments. Thus, as Plaintiffs expressly recognize, replacement cost is not some standard amount. Rather, it depends on the particular characteristics of the property that was damaged, and the extent of the loss sustained.

The evidence Defendants present demonstrates that the calculation of replacement cost varies significantly from one claim to the next. That determination requires "individualized analysis of innumerable factors," including the size, features, floor-plan, attachments, upgrades and amenities of the insured unit, as well as a detailed assessment of the extent of the loss. (Berglund Aff. ¶ 20; Carey Aff. ¶ 21.) Determination of these highly individualized issues "is absolutely critical to establishing replacement cost and to determining whether payment of each individual insured's policy limits was sufficient to compensate each individual plaintiff for the repair or replacement of the actual damages each sustained." (Berglund Aff. ¶ 21.)

Because, as Plaintiffs acknowledge, replacement cost means the cost to repair or replace with materials of like kind and quality (Cmplt. ¶ 4),[12] the replacement cost valuation cannot be determined simply by looking at the cost of the replacement home the insured ultimately chose to purchase. Rather, the repair or replacement must be of "like kind and quality" to the original. (Miller Aff. ¶ 17; Berglund Aff. ¶ 17; Carey Aff. ¶¶ 14-15.) This point is illustrated in the analysis by George Carey of the new homes purchased by the Named Plaintiffs. Carey compared the damaged homes with their new ones and concluded that the replacement mobile

---

[12] That a replacement cost valuation is subject to the "like kind and quality" limitation is consistent with Florida law. *See, e.g., Davis v. Allstate Ins. Co.*, 781 So. 2d 1143, 1144-45 (Fla. Dist. Ct. App. 2001) (rejecting argument that insured was entitled to replacement cost based on purchase of bigger home: "[W]hen the insured desires to rebuild either a different structure or on different premises . . . the company's liability is not to exceed what it would have cost to replace *an identical structure* to the one lost on the same premises.") (emphasis added).

homes for Plaintiffs Dawson, Allocco, and Appel were larger than the damaged homes, and included significant upgrades, and were therefore not "like kind and quality."  (*Id.* ¶¶ 29-43.)

The replacement cost valuation may also require individualized evidence of the insured's actual repair costs.  Courts have recognized the importance of looking to actual repair costs, rather than only estimates, in order to determine whether there has been an underpayment.  *See, e.g., State Farm Fire & Cas. Co. v. Patrick*, 647 So. 2d 983, 984 (Fla. Dist. Ct. App. 1994) (rejecting argument that insurer "should pay the total amount the insurance company estimated it would cost to repair or replace his property, despite the completion of the work for a lesser amount").  Here, the claim of Named Plaintiffs Roy and Anne Wiik illustrates the importance of such evidence: the Wiiks provided receipts and deposition testimony indicating that the amount they spent to repair their home was considerably *less than* the replacement cost estimate (and their policy-limits payment).  (Carey Aff. ¶ 42.)  This type of evidence, as well as evidence regarding the actual cost of any replacement mobile home purchased by the insured, constitutes yet another individualized issue that must be considered.

Another claim-by-claim consideration will be the extent to which the replacement or repair costs were increased as a result of construction and building code requirements that were enacted in the period — often many years — since the damaged mobile home was originally built.  This mandate flows from the "Ordinance or Law" exclusion in the policy.  (Cmplt. Ex. A at 7 (Section I.1.a – Exclusions).)[13]  Since the late 1970s, government requirements for the construction, installation, and securing of mobile homes in Florida have become dramatically more stringent.  Here, for example, the Named Plaintiffs' mobile homes were built in 1977 or 1978, and after that date, numerous federal requirements were imposed on mobile home

---

[13] This provision excludes losses attributable to the enforcement of "any ordinance or law regulating the construction, repair, or demolition of a building or other structure."  (Cmplt., Ex. A, Form HO-3 Ed. 4-84 at 7 of 15.)

manufacturers relating to the construction of new mobile homes that did not previously exist. (Roddenberry Aff. (Ex. G) ¶ 33; Carey Aff. (Ex. B) ¶¶ 10, 16-17; Berglund Aff. (Ex. A) ¶¶ 18-19.)  Thus, a new mobile home purchased in the 2004-2005 period would have been subject to vastly more stringent standards.  The Ordinance or Law exclusion operates to exclude that portion of the cost from the replacement cost calculation for putative class members, and the amount of any such exclusion would be a highly individualized issue.  In Florida, as in other states, such exclusions are rigorously enforced.  *E.g., State Farm Fire & Cas. Co. v. Metro. Dade Cnty.*, 639 So. 2d 63, 65 (Fla. Dist. Ct. App. 1994) ("The language in the 'Ordinance or Law' exclusion is susceptible of only one interpretation: no coverage is provided for losses associated with construction regulation enforcement."); 12 Lee R. Russ, *Couch on Insurance* § 176.66 (3d ed. 2011).

Another important individualized factor is the *reason* a policy-limits payment was made. Plaintiffs claim that the payment they received for damages to their *mobile homes* should not have been subject to policy limits.  (Pl.s' Br. at 7.)  Plaintiffs' assumption that a limits payment means that a home was "destroyed," or even *damaged*, overlooks the fact that a limits payment could have been made for damage to structures *other* than the mobile home.  Because Coverage A includes not only the "dwelling" itself, but also "structures attached to the dwelling" (Cmplt., Ex. A at 2), Liberty American's payments frequently included substantial sums for damages to structures other than the mobile home.  Such attachments, including carports, lanais, screen-rooms and porches, "are frequently damaged in hurricanes and can account for large portions of any replacement cost analysis."  (Berglund Aff. ¶ 47.)  Thus, in many instances, a policy-limits payment would have been made even though the "mobile home" sustained little or no damage.

Given the inherently individualized nature of the "underpayment" issue, it should come as no surprise that courts routinely reject class treatment of these types of claims.  In *Mills v.*

*Foremost Insurance Co.*, 269 F.R.D. 663 (M.D. Fla. 2010), for example, the court recently rejected a similar effort to obtain class certification against a mobile home insurer based on the assertion that the insurer had systematically underpaid property damage claims.   The court recognized that individualized issues regarding the proper amount owed to repair or replace each mobile home precluded a finding of predominance.  *Id.* at 676-77;[14] *see Klay*, 382 F.3d at 1264 (rejecting certification of breach of contract claim because alleged underpayment to doctors was individualized issue).  As in those cases, the individualized nature of the determination whether there was an underpayment to each putative class member bars certification.

Plaintiffs cite *Allapattah Services, Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003), for the proposition that the presence of individualized damages issues may not necessarily defeat predominance.  (Pl.s' Br. at 18.)  But the question whether there was an underpayment is an issue of *liability*, not merely damages.   In any event, the Eleventh Circuit more recently rejected any "rigid distinction between liability and damages."  *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1178 (11th Cir. 2010).  Reversing the district court's class certification order, the Court held that it was not a case "where damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods."  *Id.* at 1179.  According to the Court, it was "a clear error of judgment to brush [these issues] aside as mere 'damages' issues."  *Id.*

---

[14] Other courts have held that claims alleging some systematic underpayment of property damage claims by an insurer are not amenable to class certification.  *See Schafer v. State Farm Fire & Cas. Co.*, 74 Fed. R. Serv. 3d 150 (E.D. La. 2009) ("In assessing the bevy of previous insurance-based class actions that have been denied due to lack of predominance, it appears unlikely that any insurance adjustment-based claim could survive current Fifth Circuit class action law."); *Nguyen v. St. Paul Travelers Ins. Co.*, CIV.A. 06-4130, 2008 WL 4691685 (E.D. La. Oct. 22, 2008) (citing numerous cases holding that "post-hurricane adjustment claims are not appropriate for class treatment because of the highly individualized facts of each claim").

The same would be true here.   Plaintiffs have not suggested any formula or other mechanical method for computing the individual amount of damage  — because there is none.

**B.    LASIC Has a Contractual Right to Appraisal of the "Amount of Loss" for Each Putative Class Member.**

The individualized nature of the liability issue determination is further highlighted by LASIC's[15] contractual right to appraisal of the "amount of loss" actually suffered by each claimant.   The result of such appraisal is an essential component in determining whether any putative class member received a payment sufficient to pay for his or her "full replacement cost." Before liability can be imposed for breach of the insurance contract, there would first have to be a determination — via the appraisal mechanism — of the amount of loss (*if any*) each class member suffered as a result of  a hurricane.   Then there would need to be an analysis of whether that amount of loss exceeded applicable policy limits.

LASIC's Policy provides for individual appraisal:  "If you [insured] and we [LASIC] fail to agree on the amount of the loss, either may: . . . [d]emand an appraisal of the loss.  (Cmplt. Ex. A, Policy Endorsement, Section I – Conditions (DE 118 at 53).)  Appraisal is essential to that liability determination, because even if Plaintiffs are correct in their interpretation of the Policy as providing "unlimited" replacement cost, no class member can have a claim if he or she already received the amount needed to repair or replace the home.   If an appraisal were to conclude that this amount was *less* than the amount the insured has already received, there would be no liability for the insurer, regardless of the policy interpretation issue.

Determining any insured's amount of loss is exactly the purpose and function of the appraisal provision.  *See Moore v. Travelers Cos.*, 321 Fed. App'x 911 (11th Cir. 2009) (in

---

[15] Defendants continue to maintain that Plaintiffs' only potential claims are against the entity that issued their policies, LASIC, which would have the right to assert the contractual appraisal provision.   But because Plaintiffs are seeking to hold all Defendants liable on the insurance contract, all Defendants join in this appraisal argument.

hurricane class action, appraisal required to determine amount of loss).  LASIC's contractual

right to have that issue resolved in appraisal on an individual basis, insured-by-insured,

necessarily presents predominating individual issues that defeat class certification.  *See, e.g.*,

*Mills*, 269 F.R.D. at 676 (individualized defenses such as appraisal preclude class certification).

### C.   Plaintiffs' "Policy Interpretation" Question Also Implicates Individualized Issues.

Plaintiffs take the position that this case is just a "coverage dispute" involving a "form"

contract, and that interpreting the Policy is a "common" question that predominates over any

individualized issues.  (Pl.s' Br. at 6, 17.)  In *Mills* and the other property damage cases cited

above, however, courts denied certification despite the existence of uniform insurance policy

language.[16]  *See supra* pp. 26-27.  Moreover, the presence of a purported form contract does not

establish predominance.  Here, Plaintiffs' assertion that the policy is "ambiguous" necessarily

opens the door to extrinsic evidence as to whether Plaintiffs' proposed interpretation of their

policy and Dec Page is a reasonable one and what each class member understood about the

coverage.  *See, e.g.*, *Sacred Heart,* 601 F.3d at 1176-77 (certification inappropriate in contract

interpretation case when extrinsic evidence must be examined); *Green v. FedEx Nat'l, LTL, Inc.*,

272 F.R.D. 611, 616 (M.D. Fla. 2011) (same).  Indeed, Plaintiffs themselves have recognized the

relevance of extrinsic evidence; in their objection to the Court's addressing Defendants' Motion

to Dismiss, they argued that the issues raised in their Complaint required "discovery into the

facts surrounding the formation and sale of the insurance policies at issue to thousands of

---

[16]  Indeed, it is not at all uncommon for certification to be denied in cases involving form contracts.  *See, e.g., Green v. FedEx Nat., LTL, Inc.*, 272 F.R.D. 611 (M.D. Fla. 2011); *Adams v. Monumental Gen. Cas. Co.*, 4:05-CV-132 (CDL), 2009 WL 383625 (M.D. Ga. Feb. 12, 2009); *Jim Moore Ins. Agency, Inc. v. State Farm Mut. Auto. Ins. Co., Inc.*, 02-80381-Civ, 2003 WL 21146714 (S.D. Fla. May 6, 2003), *report and recommendation adopted*, 02-80381-Civ, 2003 WL 22097937 (S.D. Fla. Sept. 2, 2003); *Buford v. H & R Block, Inc.*, 168 F.R.D. 340 (S.D. Ga. 1996), *aff'd sub nom. Jones v. H & R Block Tax Servs.*, 117 F.3d 1433 (11th Cir. 1997).

Floridians." (DE 22 at 32.) Thus, there are individualized fact inquiries even with respect to the purported "common" question of contract interpretation.

Under Florida law, when an insurance policy is alleged to be ambiguous, "[t]he court may look to parol evidence in interpreting [the] insurance contract." *Essex Ins. Co. v. Zota*, 466 F.3d 981, 987 (11th Cir. 2006), *certified question answered*, 985 So. 2d 1036 (Fla. 2008).[17] Consideration of extrinsic evidence is particularly appropriate for issues regarding policy limits because "the extent of the insurer's coverage is one of the few terms of the policy that requires discussion between the parties." *Folkman v. Quamme*, 665 N.W.2d 857, 872 (Wis. 2003). Moreover, because Plaintiffs also seek recovery under a theory of unjust enrichment, such evidence would also be admissible on the issue of whether "without a remedy, inequity would result or persist." *Vega*, 564 F.3d at 1274.

Undoubtedly, there will be significant variations in the proofs with respect to each insured's understanding of the coverage provided by the policy. The fact that many putative class members purchased more than the minimum required coverage ($10,000) strongly suggests that they understood that the policy limits placed a cap on the potential replacement cost recovery. Plaintiffs nowhere explain why policyholders (like themselves) purchased more than the bare minimum amount of coverage, and paid a higher premium, if they truly believed that they would be entitled to "unlimited" coverage regardless of the policy limits. Moreover, each insured's understanding of the coverage provided would necessarily be affected by

---

[17] *See also Estevez v. N. Assur. Co. of Am.*, 10-14647, 2011 WL 2206707 (11th Cir. June 7, 2011) ("[plaintiff's] argument that extrinsic evidence is not admissible to resolve ambiguities in an insurance contract is without merit"); *Monticello Ins. Co. v. City of Miami Beach*, No. 06-20459-CIV, 2009 WL 667454, *9-10 (S.D. Fla. Mar. 11, 2009) (parol evidence admissible to interpret ambiguous insurance policy provision; insured's intent may override "construction-against-the-draftsman" rule); *Williams v. Essex Ins. Co.*, 712 So. 2d 1232, 1232 (Fla. Dist. Ct. App. 1998) (because insurance policy was ambiguous, "the parties are entitled to offer extrinsic evidence as to the intent of the insurer and the insured at the time the policy was purchased").

individualized factors such as the discussions with the insurance agent; whether the insured read the Declarations Page and/or the policy; and the insured's prior experiences with Liberty American or other insurers. The presence of this individualized evidence relating to the policy interpretation issue further supports the conclusion that predominance is lacking.[18]

## II.    A CLASS ACTION IS NOT THE SUPERIOR METHOD FOR THE FAIR AND EFFICIENT ADJUDICATION OF THIS CONTROVERSY.

Plaintiffs likewise have failed to demonstrate that a class action is the "superior" method for the fair and efficient adjudication of this controversy. Among the factors a court must consider in making this finding are "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D). Indeed, a "critical" factor that must be addressed before certifying a class "is to determine how the case will be tried." Fed. R. Civ. P. 23 advisory committee's note to 2003 amendments. Here, Plaintiffs have provided the Court with no trial plan, no proposed jury instructions, no blueprint of any kind showing how they plan to go about proving the claims of thousands of persons on a classwide basis. *See Vega*, 564 F.3d at 1279 n.20 ("the proposal of a workable trial plan will often go a long way toward demonstrating that manageability concerns do not excessively undermine the superiority of the class action vehicle"). That failure is not surprising, because attempting to try these highly individualized claims on a classwide basis would present insuperable obstacles to manageability.

---

[18] Moreover, although the Complaint does not explicitly include a claim for relief based on fraud, it raises numerous individualized issues relating to "deception, misrepresentation, and exploitation by Defendants . . . that victimized thousands of Florida's most vulnerable, elderly, and most cherished citizens, its elderly." (Cmplt. ¶ 1.) Such assertions provide additional grounds for denial of Plaintiffs' Motion. *Buell v. Direct Gen. Ins. Agency, Inc.*, 8:06-cv-1791-T-26MSS, 2007 WL 1296347, *2 (M.D. Fla. May 1, 2007) (given "the unsuitability of class actions in fraud-based claims brought under Florida law," certification should be denied where alleged fraudulent or deceptive conduct is the "legal underpinning" of plaintiffs' claims, even if not explicitly pleaded as fraud), *amended on denial of reh'g*, 488 F. Supp. 2d 1215 (M.D. Fla. 2007), *aff'd*, 267 F. App'x. 907 (11th Cir. 2008).

As the Eleventh Circuit has held, "[t]he focus of this [predominance] analysis is on 'the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs.' " *Sacred Heart*, 601 F.3d at 1183-84 (quoting *Klay,* 382 F.3d at 1269).  Accordingly, "the predominance analysis has a 'tremendous impact on the superiority analysis.' "  *Id.* at 1184 (quoting *Klay,* 382 F.3d at 1269).  However, "a finding of superiority will not compensate for a lack of predominance, and the existence of problems with regard to manageability can only scuttle an otherwise proper motion for certification."  *Mills*, 269 F.R.D. at 678.

Given the predominance of individualized issues outlined above, Plaintiffs' proposed class would necessarily involve thousands of individual cases, offering none of the efficiencies class actions are intended to provide.  *See Sacred Heart*, 601 F.3d at 1184; *King v. CVS/Caremark Corp.*, No. 07-21824-CIV, 2008 WL 5973490, *5 (S.D. Fla. Sept. 11, 2008) (Graham, J.) (decertifying class where "the collective action would evolve into mini-trials concerning the claims of each Plaintiff — contrary to fairness and case manageability").  Each class member's case would require distinct discovery and individualized proofs concerning the facts that bear upon the proper replacement cost valuation, as well as the other individualized issues noted above.  *See Mills*, 269 F.R.D. at 678 ("This Court has grave concerns regarding the manageability of this suit as a class action, specifically the claim by claim review that will undoubtedly be needed.").

Just as they ignore the problems raised by their proposed class, so too do Plaintiffs ignore the feasible alternatives to the unwieldy class they propose.  This is not a case where the claimed damages of each class member are *de minimis*, such that they would have little or no economic incentive to pursue their claims individually.  *City of St. Petersburg v. Total Containment, Inc.*, 265 F.R.D. 630, 644 (S.D. Fla. 2010) ("Where the claims at issue do not involve *de minimis*

sums, individuals are more likely to have an interest in filing suit."); *Jones v. Jeld-Wen, Inc.*, 250 F.R.D. 685, 696 (S.D. Fla. 2008) ("the claims at issue here do not involve a *de minimis* sum so that an individual plaintiff would be discouraged from filing his own suit").  Rather, as illustrated by the fact that the Named Plaintiffs claim underpayments ranging from $30,816 to $68,972 (Exs. Q at 8, R at 9-10, S at 8, T at 6), the amounts at issue here are considerable.

## III.   PLAINTIFFS HAVE NOT ESTABLISHED ADEQUACY OR TYPICALITY.

Rule 23(a) provides that a class may be certified only if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). That Rule further requires a finding that the Named plaintiffs "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).

The Named Plaintiffs have not come forward with evidence establishing that they are typical of the class they seek to represent.  Their affidavits merely assert, in conclusory fashion, that they were not paid replacement costs.  (Pl.s' Br., Ex. G ¶ 5.)  In contrast, Defendants' expert performed a detailed assessment of the claims of each of the Named Plaintiffs and concluded that for at least three of them, the replacement cost of their mobile home was *less* than the payment already received.  (Carey Aff. ¶¶ 31, 36, 41.)

Furthermore, class certification is also improper as to Defendants LAIC, LAIG, LAIS, and PCHC for the additional reason that the Named Plaintiffs lack constitutional standing to assert claims against those Defendants, either on behalf of themselves or the putative class.  It is undisputed that the Named Plaintiffs bought insurance only from LASIC, not from any of the other four Defendants.  (Cmplt., Ex. B.)  Because the Named Plaintiffs lack standing to sue non-LASIC Defendants, *e.g.*, *CH2M Hills Se., Inc. v. Pinellas County*, 598 So. 2d 85, 89 (Fla. Dist. Ct. App. 1992), they cannot bring those claims on behalf of a putative class.  *See, e.g.*, *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987) ("[A] claim cannot be asserted on behalf of a

class unless at least one named plaintiff has suffered the injury that gives rise to the claim."). Defendants recognize that the Court previously addressed the merits of the standing issue with respect to the claims of the Named Plaintiffs and, therefore, will not repeat those arguments here. Instead, Defendants incorporate by reference and adopt their prior filings.  (DE 102, 103, 111, 112.)

Moreover, to show standing based on the "agency" theories the Court previously accepted as to the Named Plaintiffs, Plaintiffs must prove a number of individualized issues that predominate over purportedly common issues of "agency," requiring individualized discovery as to each class member.  For example, this Court held that LAIG could be held in the case based on an "apparent authority" theory, which requires, among other things, "reliance" on a "representation" by the purported principal.  (DE 59, 11/25/08 Order at 6-9.)  But it is well established that proof of "reliance" (like other issues such as misrepresentation) is an individual question that predominates over allegedly common issues.[19]  Accordingly, certification of a class against the non-LASIC Defendants under the "agency" theory would be inappropriate.

## IV.  CERTIFICATION OF A CLASS WOULD VIOLATE DEFENDANTS' CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A JURY TRIAL.

Finally, certification of a class would violate Defendants' constitutional rights to due process and a jury trial.  Given the numerous individualized inquiries required to adjudicate the class claims, any attempt to try these claims on a classwide basis would deprive Defendants of their due process right to a fair trial, including the right to present "every available defense" to

---

[19] *City of St. Petersburg v. Total Containment, Inc.*, 265 F.R.D. 630, 637 (S.D. Fla. 2010) (denying class certification; reliance was individual issue); *Guardian Angel Credit Union v. MetaBank*, No. 08-cv-261-PB, 2009 WL 2489325, at *5 (D.N.H. Aug. 12, 2009) (denying class certification; "apparent authority is an individualized, fact specific question"); *Cannon v. GunnAllen Fin., Inc.*, No. 3:06-0804, 2008 WL 4279858, at *7 (M.D. Tenn. Sept. 15, 2008) (denying class certification; individualized issues predominated with respect to apparent authority); *Gibbs Properties Corp. v. CIGNA Corp.*, 196 F.R.D. 430, 440 (M.D. Fla. 2000) ("40,000 separate inquiries into reliance makes this case unmanageable as a class action").

those claims.  *Lindsey v. Normet*, 405 U.S. 56, 66 (1972); *Phillip Morris USA v. Scott*, 131 S. Ct. 1, 3-4 (2010).  Moreover, attempting to try any supposed "common issues" in one trial, leaving for another day the resolution of individualized issues of liability and damages, would also violate the Seventh Amendment's guarantee of a jury trial.  *See, e.g.*, *State of Ala. v. Blue Bird Body Co.*, 573 F.2d 309, 318 (5th Cir. 1978).

Plaintiffs may not ignore these highly individualized issues in urging the adjudication of thousands of claims *en masse*.  The fact that this is a class action does not alter the elements of Plaintiffs' claims, and cannot "abridge, enlarge, or modify any substantive right."  *See, e.g., Dukes*, 2011 WL 2437013, at *15.  The only way to try all of Plaintiffs' claims in one common trial would be to cut corners — to change the substantive law, and the procedural rules, in an attempt to make a hopelessly unwieldy case manageable.  Defendants' fundamental constitutional rights may not be circumscribed or abridged simply because it would otherwise be impossible to conduct a manageable class trial.

## CONCLUSION

Defendants respectfully request that Plaintiffs' Motion for Class Certification be denied.

Respectfully submitted,

Date: July 14, 2011

**AKERMAN SENTERFITT**
One S.E. Third Avenue — 25th Floor
Miami, FL 33131-1714
Tel. 305-374-5600
Fax 305-374-5095

By: s/Christopher S. Carver
    Marcy Aldrich, Esq.
    Florida Bar No. 968447
    marcy.aldrich@akerman.com
    Christopher Carver, Esq.
    Florida Bar No. 993580
    christopher.carver@akerman.com
    Gideon Reitblat, Esq.
    Florida Bar No. 36388
    gideon.reitblat@akerman.com

and

William Hannay, Esq. (*Admitted pro hac vice*)
Marci Eisenstein, Esq. (*Admitted pro hac vice*)
Aphrodite Kokolis, Esq. (*Admitted pro hac vice*)
**SCHIFF HARDIN**
233 South Wacker Drive – Suite 6600
Chicago, IL 60606
Tel. 312-258-5500
Fax 312-258-5600
E-mail: whannay@schiffhardin.com
E-mail: meisentstein@schiffharding.com
E-mail: dkokolis@schiffhardin.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 14, 2011, I electronically filed *Defendants' Memorandum in Opposition to Plaintiffs' Motion for Class Certification* with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.


 s/Christopher S. Carver_____
Attorney

## SERVICE LIST

*Appel  v. Liberty Am. Ins.*, Case No. 08-20385-CV-GRAHAM
U.S. District Court, Southern District of Florida

**Counsel for Plaintiffs William Appel, Roy
Wiik, Anne Wiik, Leslie Allocco,
Florence Kruse, Linda Dawson,
and Donald Rachiele**
(service by CM/ECF)

Tod Aronovitz
Barbara Perez
Andrew Zelmanowitz
**ARONOVITZ LAW**
777 Brickell Avenue, Suite 850
Miami, Florida 33131
Telephone: (305) 372-2772
Facsimile: (305) 397-1886
Email: ta@aronovitzlaw.com
Email: bp@aronovitzlaw.com
Email: az@aronovitzlaw.com

Steven Jaffe
Mark S. Fistos
**FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.**
425 N. Andrew Avenue, Suite 2
Fort Lauderdale, FL 33301
Email: steve@pathtojustice.com
Email: mark@pathtojustice.com

Michael H. Lax
**MICHAEL H. LAX, P.A.**
18001 Old Cutler Road
Suite 409 – Palmetto Bay Village Center
Miami, Florida 33157
Telephone:  (305) 256-5529
Facsimile: (305) 256-5597
E-mail: mhlax@laxpa.com

**Counsel for Defendants Liberty American
Insurance Co., Liberty American Insurance
Group, Inc., Mobile USA Insurance Co. n/k/a
Liberty American Select Insurance Co., and
Philadelphia Consolidated Holding Corp.**
(service by CM/ECF)

William Hannay
Marci Eisenstein
Aphrodite Kokolis
**SCHIFF HARDIN**
233 South Wacker Drive, Suite 6600
Chicago, IL 60606
Telephone:  (312) 258-5500
Facsimile:  (312) 258-5600
E-mail: whannay@schiffhardin.com
E-mail:  meisentstein@schiffharding.com
E-mail:  dkokolis@schiffhardin.com

Marcy Aldrich
Christopher S. Carver
**AKERMAN SENTERFITT**
One S.E. Third Avenue— 25th Floor
Miami, Florida 33131
Telephone: (305) 374-5600
Facsimile: (305) 374-5095
E-mail: marcy.aldrich@akerman.com
E-mail: christopher.carver@akerman.com